Metrolando Warren V 08775
CSP-Corcoran P.O. Box 3461
Corcoran   CA. 93212

In propria persona

RECEIVED

AUG 2 2 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

FILED

AUG 2 2 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

United States District Court

Northern District of California

Metrolando Warren,
            Petitioner,

vs.

Tony Hedgpeth,
            Respondent,

Case no. C-08-0754-PJH (PR)

First Amended petition
To Federal writ of
Habeas Corpus per
28 USC 2254 and
2254(d)(1) pursuant
to Fed. R. Civ. P 15

28 USC 2254 Federal writ of Habeas Corpus

Table of Contents

1  28 USC 2254 Federal writ of
2  Habeas Corpus . . . . . . . . . . 2.

3
4  Table of Contents . . . . . . . . 2-4

5  Table of Authorities . . . . . . . 5-10
6

7  Procedural History . . . . . . . . 11

8  Statement of the Case . . . . . . 12-14
9  Statement of facts . . . . . . . . 15-33
10

11  Memorandum of Point and
12  Authorities . . . . . . . . . . . 34

13  Argument
14
15  I  This Court should grant petitioner
16     Warren's motion to stay
17     in abeyance to resolve the
18     mixed petition before this
19     Court on the issues of (1.)
20     Ineffective Assistance of
21     Trial Counsel, (2.) new evidence
22     of medical records the jury
23     did not review that Show petitioner
24     was not the perpetrator (3.) The
25     Trial Court Erred when it denied
26     petitioner Warren's Wheeler
27     Batson motion . . . . . . 2-6

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34769

*Table of Contents Cont.*
*page*

II.  petitioner warren, will show
Cause why the issue of
Uneffective Assistance of Trial
Counsel on Richard Doue was
not exhausted on Direct Appeal
before filing the federal petition
and why this issue is meritorious
For this court to grant Stay
of Abeyance to exhaust this
issue before the California
Supreme Court . . . . . . 7-33

III.  petitioner warren, will view Amend claim
3 with clarification, that this claim
of new Evidence Substantiates merit
that had the medical records been
Sent prior to trial by Highland
Hospital when Subpoenaed by defense
Counsel Richard Doue, the jury
could have heard factual evidence
that three physician's placed a
full leg cast on petitioner's warren's
leg in efforts to consider a defense
theory of misidentification by
Reina webb . . . . . . . -34-41

3.

Table of Contents Cont. page

IV. Petitioner Warren will sha(...) through claim 2
with clarification of the Batson
Error, providing factual support
that as a matter of law two of
the dismissed African American
women, and their relatives
involved in the criminal justice
System, were not crimes
of violence. And the record
confirms that. As according
to Batson v. Kentucky (1986)
476 US 79, 106 Sct 1712, 90 Led 2d
69; Reversal is required ...42-93

Conclusion .......... 94-96

Exhibit (A) Affidavit of Orcella A Warren
(B) Notary public of Felicia E Taylor
(C) declaration of Melrolando N Warren
(D) medical Report of 8/15/96
(E) medical Report of 9/17/96
(F) RT 930-931 of crim case no. H31401
(G) RT 303-315 of Wheeler/Batson motion
(H) court of Appeal 5th App Dist opinion
(I) California Supreme court opinion
(J) Highland General Hospital medical Report 7/30/96
(K) Highland Hospital medical Report physicians
(L) medical Report of Dr. Virgil Williams
(M) US Dist court northern Dist court order 7/24/08

Proof of Service ........... 97

Table of Authorities

1  Refer to memorandum of points
2  and authorities attachment
3
4
5  Alcala v. Woodford (9th cir 2004) 371 . . . 1,2
6  Anthony Cambra (9th cir 2000) 236 . . . 3,6
7  Calderon v District Court Thomas
8  (9th cir 1998 " . . . . " " " " . 3,
9  Summons v Blodgett (9th cir 1997)
10  110 F.3d 3, 9 . . . . . . . . . . . . . . . . . 3
11  Stewart v Martinez-Villareal
12  (1998) 523 US 637, 118 S.ct. 1618 . . . . . . . 3
13  Blair v California (9th cir 1965)
14  340 F.2d 741, 745 . . . . . . . . . . . 3,
15  Thomas v. Teets (9th cir 1953)
16  205 F.2d 236, 240 . . . . . . . . . . 3,
17  Duffy v Wells (9th cir 1953)
18  206 F.2d 503 . . . . . . . . . . . . . 3,
19  Laulson v Dixon (4th cir 1993)
20  3 F.3d 743, 748 . . . . . . . . . . . 3
21  Stano v Singletary (11th cir 1992)
22  952 F.2d 1273 . . . . . . . . . . . 3
23  Andreins v Deland (10th cir 1991)
24  943 F.2d 1162-1168 . . . . . . . . . . 3
25  Nichols v Pearce (6th cir 1981)
26  818 F.2d 554-556 . . . . . . . . . . . 3,
27  Burris v Farley (7th cir 995)
28  51 F.3d 655,659 . . . . . . . . . . . 3

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34769

Lambrix v Singletary 72 F3d 1500 . . . . 3,

Espinosa v Florida (1992) 505 US 1079, . . . 3,

Haleh v Oklahoma (10th Cir 1995)
58 F3d 1447 - 1452 . . . . . . . . . . . . . . 3,

Bush v Singletary (11th Cir 1993)
988 F.2d 1082 . . . . . . . . . . . . . . . .

Palmeon v Drammas (8th Cir 1988)
863 F.2d 588 . . . . . . . . . . . . . . . . 3,

Moore v Kemp (11th Cir) 809 F2d 702 . . 3, 4,

Shumeer v Faldeven, 977 F.Supp 987 . . . 4,

Mayle v Felix (2005) US, 162 L.Ed.2d
582, 125 S.Ct 256 . . . . . . . . . . . . . . 4,

Jefferson v Budge (9th Cir 2005)
419 F.3d 1013 . . . . . . . . . . . . . . . . . 4, 5, 6,

Rhines v Weber (2005)
544 US 269, 161 L.Ed 2d 440, 125 S.Ct 1528 . . . . 5,

Jackson v Roe (9th Cir 2005)
425 F.3d 654 . . . . . . . . . . . . . . . . 5

Murray v Carrier (1986) 477 US 478,
106 S.Ct 2639, 91 L.Ed 2d 597 . . . . . . . . 7, 8, 9,

Reed v Ross 448 US at 16, 104 S.Ct 2901 . . . 8

Brown v Allen (1953) 344 US 443, 486 . . . . . 8

Coleman v Thompson (1991) 501 US 722
111 S.Ct 2546, 115 L.Ed 2d 640 . . . . . . . 11, 12,

Herrera v Collins (1993) 506 US 390 . . . . 11,

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34769

Table of Authorities Con't page

1
2   Davis v Reed (1989) 489 US 255
3   262, 269, 1088, 103 Led 2d 308 . . . . . . . 12
4   Engle v Isaac (1982) 456 US 107, . . . 12, 13,
5   United States v Cronic (1984) 466 US 648, . . 13
6
7   Strickland v Washington (1984) 466 US 693 . . 13, 14, 24, 24
8   Dorsey v Ayers (2006) 458 F3d 892 . . . . . . 15, 25,
9
10  Dugas v Coplan (2005) 428 F3d 317 . . . . . . 15, 23, 24, 29,
11  Wake v Cameron (1966) 364 F.2d 657
12  124 U.O. 963, 15 Led 2d 100 . . . . . . . . . 17,
13  Johnson v Avery (1979) 393 US 483 . . . . 17
14  Ake v Oklahoma (1985) 470 US 68.
15  84 Led 2d 53, 105 Sct 1087 . . . . . . . . . 19
16  Wiggins v Smith, (2003) 539 US 510,
17  123 Sct. 2527, 156 Led 2d 471 . . . . . . . . 29, 33
18  Miller v Anderson (7th Cir 2001)
19  268 F.3d 485 . . . . . . . . . . . . . . 31
20  Karis v Calderon (9th Cir 2002)
21  283 F.3d 1117, 1133 . . . . . . . . . . . . 32, 33,
22  Alcala v Woodford (9th Cir 2003) . . . . . 33
23  334 F.3d 862.
24  Swan v Peterson (9th Cir 1993) . . . . 33
25  6 F.3d 1373, 1379 . . . . . . . . . .
26  In re Winship (1970) 397 US 358
27  90 Sct 1068, 25 Led 2d 368 . . . . . . . 34
28

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34769

Table of Authorities Cont page

1
2 Townsend v Sain (1963) 372 US 293
3 83 Sct 745, 9 Led 2d 770 . . . . . . . . . . 35,
4 Batson v Kentucky (1986) 476 US
5 79, 106 Sct 1712, 90 Led 2d 69 . . . . . . 42, 53, 68,
6
7 United States v Belk (2d Cir 1989)
8 881 F.2d 1155, 1161 . . . . . . . . . . . 52
9 United States v Childs (9th Cir 1993)
10 5 F.3d 1328, 1337 . . . . . . . . . . . . 52
11 Sanders v Ohio (1991) 499 US 400,
12 402 111 Sct 1364, 113 Led 2d 411 . . . . . . 53
13 McClain v Prunty (9th Cir 2000)
14 217 F.3d 1209 . . . . . . . . . . . . . 55
15 Turner v Marshall (9th Cir 1997) . . 56, 89
16 121 F.3d 1234,
17 Palanga v Keane (2d Cir 2001)
18 252 F.3d 630 . . . . . . . . . . . 58
19 Coulter v Gilmore (7th Cir 1998
20 155 F.3d 912 . . . . . . . . . . . 59
21 Devose v Norris (8th Cir 1995) . . . 59, 89
22 F.3d 201.
23 Davidson v Harris (8th Cir 1994) . . 59
24 30 F.3d 963 . . . . . . . . . . . .
25 Jones v Ryan (3d Cir 1993) 987 F.2d
26 973 . . . . . . . . . . . . . . . 60
27 Johnson v Vasquez (9th Cir 1993)
3 F.3d 1327 . . . . . . . . . . . . 60
28

Table of Authorities Cont. page

Ford v Garcia (8th Cir 1995)
67 F.3d 162, 169 " " . . . . . . . . . . . 60, 167

United States v McFerron
(6th Cir 1998) 163 F2d 952 . . . . . . . . . . 64

Tankleff v Senkowski (2nd Cir 1998)
135 F.3d 235, 248 . . . . . . . . . . . . . 66

Burkett v Cleno (1995) 514 US 765,
115 Sct 1769, 131 L ed 2d 854 . . . . . . . . . 79

Miller-El v Dretke (2005) 545 US 231
125 Sct 2317, 2325, 162 L ed 2d 196 . . . . . . 79, 89

United States v Bishop (9th Cir 1992)
959 F.2d 820, 821 . . . . . . . . . . . . . 87

United States v Battle (8th Cir 1987)
836 F.2d 1084, 1086 . . . . . . . . . . . . . 87

United States v Jackson (11th Cir 1987)
817 F.2d 1538, 541 . . . . . . . . . . . . . 88


United States Constitution

Fifth Amendment . . . . . . . . . . . 37,
Sixth Amendment . . . . . . . . . . . 37
Eighth Amendment . . . . . . . . . . 37
Fourteenth Amendment . . . . . . .

Table of Authorities Cont' Page

California Constitution

Article I §15 . . . . . . . . . . . . . 21
Article I §16 . . . . . . . . . . . . . 52


Federal Statutes

28 USC 2254 . . . . . . . . . . . . . 11,33
28 USC 2254(d)(1) . . . . . . . . . . . . . 24,
28 USC 1257 . . . . . . . . . . . . . 11
28 USC 2241 . . . . . . . . . . . . . 17
28 USC 2255 . . . . . . . . . . . . . 17
28 USC 2254(d)(2) . . . . . . . . . . . . . 24

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34769

Procedural History

petitioner warren's Direct Appeal was
Completed on October 25, 2004, (See Exhibit
I) the only federal constitutional Claim
exhausted before the California Supreme
Court was the Batson / Kentucky issue
(See Exhibit I) on September, of 2007
petitioner warren exhausted two
additional issues (1.) new evidence of
medical Records that condemn doctors
placed 6 Cast on petitioner warren's
leg from 8/30/96 to 9/17/96; (2) ineffective
Assistance of Counsel ( against Trial
defense Counsel Richard Hove.) before
the Superior Court of California

The petition was denied September
14, 2007 on these issues. (See Exhibit I)
petitioner thereby, filed an application
before this court of _____
_____ petitioner now
Amends per this Court's last order
of 7/24/08. (see Exhibit M)

## STATEMENT OF THE CASE

On March 13, 2003, the District Attorney of Alameda County filed a second amended information charging appellant with six counts of sexual penetration with a foreign object, in violation of Penal Code §289, subdivision (a)(1) (counts 1-2 and 4-7) and one count of rape, in violation of Penal Code §261, subdivision (a)(2) (count 3). The information also alleged that with respect to each count appellant kidnapped the victim, within the meaning of Penal Code §667.61, subdivision (d)(2), and used a firearm, within the meaning of Penal Code §12022.3, subdivision (a). In addition, the information alleged that appellant had a prior conviction for rape which was a serious felony within the meaning of Penal Code §667, subdivision (a)(1) and a strike

within the meaning of Penal Code §1170.12, subdivision (c)(1) and Penal Code §667, subdivision (e)(1). (CT 94-103.) On March 18, 2003, appellant pleaded not guilty to the charges and denied the additional allegations. (CT 107.)[1]

Trial was by jury and began on March 20, 2003. (CT 112.) The next day, the court bifurcated the trial of the allegations related to the prior conviction. (CT 135; RT 47.)

On April 18, 2003, the jury found appellant guilty on all counts and found the kidnapping and firearm-use allegations to be true. (CT 175-181.)

On April 21, 2003, a jury trial of the allegations related to the prior conviction took place. (CT 172.) The jury found that appellant suffered a prior conviction for rape. (CT 182.)

On September 2, 2003, the court sentenced appellant to state prison for 65 years to life. The sentence consists of a term of 25 years to life for rape, which was doubled to 50 years to life because of the prior strike, plus an upper term of 10 years for use of a firearm, plus five years for the prior conviction for the serious felony. The court imposed concurrent terms on the remaining counts. (CT 198-199, 201-204; see RT 935-937.)

---

[1]The original information, filed February 15, 2002, charged appellant with three counts of sexual penetration with a foreign object and one count of rape. (CT 57-63.) On February 27, 2002, appellant pleaded not guilty to the charges and denied the additional allegations. (CT 66.)

On the same day he was sentenced, appellant filed a timely notice of

appeal from the judgment.  (CT 200.)

*14.*

## STATEMENT OF FACTS

### A. Overview

This case stems from the sexual assault of Renia Webb that took place early on the morning of September 11, 1996. It began with an encounter with a man at a bus stop in San Leandro. The man showed Webb a gun in his waistband and had her accompany him to a more isolated place about 200 yards away. There, the man raped Webb, penetrated her vagina with his finger five times and penetrated her anus with his finger once.

The issue at trial was the identity of the person who sexually assaulted Webb. The People's case was based on the testimony of Webb identifying appellant as the perpetrator, on evidence showing that appellant's DNA matched DNA found on semen on Webb's clothing and on evidence showing that about five years before the incident involving Webb appellant sexually assaulted another woman.

The defense's case was based on evidence showing that shortly before the incident, appellant had been shot in the knee and had his leg placed in a full-leg cast. Defense witnesses testified that appellant was in the cast for several months, which would include the day of the incident. Webb did not testify that her assailant wore a cast.

The jury found appellant guilty of rape and six counts of sexual penetration with an object. The jury also found that appellant used a firearm

THE DISTRICT ATTORNEY, FOR ALAMEDA
COUNTY, CHARGED PETITIONER WARREN, WITH
6 COUNTS, OF CRIMINAL ACTS. ALL OF WHICH
STEM FROM (2) COUNT OF KIDNAPP, PENAL
CODE SECTION 667.61 (A)(d)(2), WITH USE OF A
DEADLY WEAPON, USED PENAL CODE SECTION
12022.3(A) (2) COUNT OF RAPE PER PENAL
CODE 261(A)(2) AND (2) COUNT OF SEXUAL.
PENETRATION BY FOREIGN OBJECT. SECTION
289(A)(1) THE REST OF THE COUNTS WERE
ACCRUED, TO ENHANCE THE MENS RE OF
THE PROSECUTION'S CASE. (SEE CT 57-63 ALSO CT-94-97
PROSECUTION'S PLEADINGS.) THE PROSECUTION'S
STAR WITNESS, REINA WEBB,
                           TESTIFIED, THAT ON
SEPTEMBER 11, 1996, SHE WAS RAPED AT GUN
POINT BY PETITIONER WARREN. (SEE
RT, 184 - 224,)          -     HER STATEMENTS
WERE INCONSISTANT (SEE RT 841 - 844 ALSO RT
176 - 291, HER IDENTIFICATION OF PETITIONER
WARREN, WAS NOT ACCURATE (RT 831-833
176 - 291.)     -     THE DEFENSES THEORY
PRESENTED TO THE JURY, WAS THAT REINA
WEBB, MISTAKENBLY, MISIDENTIFIED
PETITIONER, WARREN (SEE RT 831-833 ALSO RT 176-291, FOR
SHE GAVE A DIFFERENT STATEMENT TO

1  POLICE, IN THE POLICE REPORT. (RT 831-
2  832  -   ). IN HER STATEMENT
3  TO POLICE, HER DESCRIPTION OF PETITIONER
4  WARREN, WAS UNCHARACTERISTIC, OF WHERE
5  HIS DEPICTION IS TODAY. IN HER INITIAL
6  DESCRIPTION SHE NEVER USED THE WORD
7  "AFRICAN AMERICAN" OR BLACK. IN THE
8  INITIAL REPORT FILED BY, LAW ENFORCEMENT
9  (SEE RT 832-833). SHE COULD NOT
10  IDENTIFY PETITIONER'S ETHENTICITY, NOR SCARS
11  ON ANY OTHER DESCRIPTION OF PETITIONER, WARREN, IN
12  THE POLICE REPORT AND ON THE TAPE. (SEE
13  RT 831 - 832) SHE THOUGHT, THE PERPATRATOR
14  WAS MID EASTERN, WITH A SLIGHT ACCENT
15  (SEE RT 831 - 832). REINA WEBB
16  ALLEGED THAT SHE HAD BEEN RAPED,
17  HOWEVER, WHEN MR WOLDERWFATEL, DID
18  THE SEX KIT ON HER.
19  AND FOUND THAT HER BLOOD
   PRESSURE WAS NORMAL. AND LOOKED AT
20  HER ENTIRE BODY FOR TENDERNESS,
21  SWELLINGS AND BITE MARKS, THAT WERE NOT FOUND
22  AS SHE SAID, WAS ON THE BACK OF HER NECK. OUR
23  NO MARKS WERE EVEN FOUND BY HIM
24  (SEE RT 835-836). Mr. WOLDERW
25  EVEN, TESTIFIED, THAT THERE WERE NO
26  PHYSICAL FINDINGS OF RAPE, NO TENDERNESS
27  NO RIPPING, NO TEARING. NO BLOOD
28

NOTHING THAT PHYSICALLY, SUBStanTiated
A SEXUAL ASSAULT. IN the Woldenberg's
EXAMINATION OF REINA WEBB, USING
HIS TOOLS, He looKed For SigNS of blood,
Bleeding. NOT JUST EXTERNALLY, BUT
INTERNALLY. USING A COlPOSCOpe, THAT
TOOK photographs, IT WAS A MAGNIFYING
TOOl, THAT HAD A CAMERA ON IT. IN USING
THAT Tool, He FOUND NO TRACES, OF blood
NO TEARS, NO TRAUMA TO THE INSIDE of
HER. He Also TOOK VAGINAL SliCES, And
EXAMINED THEM MICROSCOPICAlLY, And
FOUND NO SPERMATOZOA, NON : MOTILE
OR NON-MOTILE. He FOUNd NOTHING ON
THOSE SliDES. NO SPERM Cells, EVEN
APPEARED; (See RT 837-838 )
MORE IMPORTANTLY, THE
                photographic LINE UP, THAT REINA
WEBB, WAS ADVISED TO RECAll, WAS DISCARDED
By THE WITNESS L.T. KEVIN HUNT (See RT 838-
839 ALSO RT 403-454 THE KINST SET Of pHOTO-
GRAPHS, FOR OCTOBER Of 96, NONE Of THEM
MATCH THE DESCRIpTION, SHE SAYS, Of THE
PERSON, SHE GAVE THE Officer. (See RT
838-839-    ) SIX YEARS, LATER, REINA WEBB
picks OUT A photograph, IDENTIFYING
pETitioner - WARRAN. REINA WEBB, FURTHER
LIED UNDER OATH, WITH REGARD, TO THE

18.

1  question, of Her recollection, of
2  where Brookfield village was. She
3  Aledged, to Have previously, met
4  Petitioner Warren. She was caught
5  in a Lie. where the question; posed
6  by Defense counsel Have "Do you
7  recall where at Brookfield village was
8  where you first met me?" Her response, was
9  By the Conven Stone At Bree's. "She Lied
10 Under oath. (see RT 844-895 Also RT 271-291
11 Detective Hant Lied, in His Testimony
12 As well (see RT 837-839.) Also RT 403-454
13 Criminalogist Eric collins, Failed To
14 Appear Before Trial. To Attest to the DNA
15 Analysis, That was used As Evidence
16 Against, petitioner Warren (see RT
17 845-848 Also RT 568-588 Susan Smith came To
18 Testify on His Behalf, of Eric collins,
19 Without A Logical Explanation, As For
20 The reasons, Eric collins, was'nt
21 Summoned and decompdated, To Appear.
22 Be Trial. Facts, illustrate,
23 Eric collins, could
24 Have Tampered with DNA Evidence. (see
25 RT 845-848 Also RT 568-588 MR. Woldenufael,
26 Testified At Trial, That the Slides
27 contained No Sperm on it, when He

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV 8-72)

85 34769

1  Tested, the Exam of Reina Webb, on
2  September 11th 1996. But at Trial
3  the slides contained sperm on
4  them, but not semen, belonging,
5  to petitioner, Warren. (See RT 846-847
6  also RT 477-513)  Lisa Calandro, the
7  forensic analyst. Testified that she
8  could only work with what she was
9  given with; where the evidence, was
10 compromised, before she got it. That's
11 the best she could do, to work with. She
12 could not say that the DNA, she analyzed,
13 was a probible fit to petitioner Warren
14 (see RT 847-849 also RT 618-662) only that
15 it was in her opinion
                        that He was a Donor
16 in the case, and that she could not
17 exclude his DNA from the pool; the
18 Defense, was not able to fully present
19 it's Theory, to the Jury in it's entirety
20 For portions of medical records, were
21 not available, for the Jury to base
22 it's Decision, before completing their
23 Deliberations, and pronouncing Judgment
24 on petitioner Warren. (See RT 917-929
25 RT 930-937) petitioner, Warren,
26 suffered a gunshot wound, and was put
27 in a cast. There was no Eyewitness
28

20.

1  TO TESTIFY, TO THAT FACT, ONLY Records
2  confirming when, THE CAST WAS PUT
3  ON PETITIONER WARREN'S Leg. (SEE
4  EXHIBIT (J) (K) (L)        DEFENSE
5  COUNSEL, SUBPOENA,         Records,
6  confirming, when petitioner, WARREN
7  's CAST ___ WAS ACTUALLY REMOVED.
8  medical Records, REVEALED, THAT ON September
9  11, 1996, WELL BEYOND THE DATE OF THE
10  incident. AGAINST Reina webb (SEE
11  EXHIBIT (J) THE medical Report from Highland
12  Hospital) indicated Reports.
13                 THAT, PETITIONER
14  WARREN, WAS placed IN A CAST, FROM
15  July 30, 1996 AND THE CAST WASN'T
16  REMOVED UNTIL September 17, 1996
17  THE JURY, NEVER LEARNED
18                 OF THIS INFORMATION,
19  FOR, Highland, Hospital's FAILURE TO
20  comply WITH THE DEFENSE'S SUBPOENA.
21  (SEE RT 917-929 ALSO RT 930-937 ) AS A RESULT,
22  THIS INFORMATION WAS NEVER ENTERED
23  INTO EVIDENCE, AND DEFENSE COUNSEL
24  MADE REFERENCES, TO THE medical Report, THAT
25  PETITIONER WARREN, WAS STILL IN A CAST.
26  THAT WAS SUSTAINED, BY THE JUDGE, FOR THE
27  ATTORNEY MAKING REFERENCE TO THAT
28  FACT (SEE EXHIBIT (J) (K) (L) RT 853-854

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

5 34769

1  WITHOUT THE medical REPORT, CONFIRMING
2  PETITIONER, WARREN'S, CAST BEING
3  REMOVED FROM HIS LEG ON SEPTEMBER
4  17, 1996. DEFENSE COUNSEL HAD TO
5  URGE THE JURY, TO ASSUME, THAT THE
6  GUN SHOT INJURY TO PETITIONER'S
7  LEG, WAS EVIDENCE, NEEDED TO BE CONSIDERED
8  BEFORE THE JURY REACHED  IT'S FINAL
9  DELIBERATION. DEFENSE COUNSEL IN HIS
10 CLOSING ARGUMENT, MADE A VERBAL
11 REFERENCE, TO THE medical RECORDS,
12 THAT HIGHLAND HOSPITAL, FAILED TO PURVEY
13 TO THE DEFENSE, INFORMATION THAT
14 ESTABLISHED A FACT THAT PETITIONER'S CAST
15                     WASN'T REMOVED, UNTIL.
16 SEPTEMBER 17, 1996 ; THE COURT, SUSTAINED
17 THE PROSECUTION'S OBJECTION, FOR DEFENSE
18 COUNSEL'S STATEMENT TO THAT FACT (SEE
19 RT. 851-856 ALSO RT 176-291    ) AND INFORMED
20 DEFENSE COUNSEL THAT NOTATIONS, FROM
21 JULY 30, 1996, AUGUST 2 AND 15, OF SEPTEMBER 17,
22 1996,        WERE DATES THAT PETITIONER
23 COULD HAVE HAD A CAST TAKEN OFF. BUT
24 THERE WAS NO EVIDENCE TO REFUTE THAT
25 PETITIONER HAD HIS CAST ON, FOR SEPTEM-
26 BER 14, 1996 OR A DOCTOR CONFIRMING THAT
27 STATEMENT, ON A DOCUMENT, THAT WOULD
28 ESTABLISH EVIDENCE, THEREFORE, THE COURT

222

1. declined to overrule the objection;
2. And further proceeded to warn
3. defense counsel, to refrain from
4. any further statements, about the
5. medical reports of 7/30/96 8/15/96 9/17/96
6. That substantiated petitioner Wanken's
7. cast, being on his leg that day. (see
8. RT 855-856 also exhibit (K) and (L) After testimony,
9. was presented, And all the evidence
10. proferred. The jury found petitioner
11. guilty of all charges. (see RT 175-181.
12. ) The court further calen-
13. dared, a date for sentencing. On Septem"
14. ber 2, 2003, a hearing, was held. Before
15. The Superior Court.
16.          Where the court took
17. Judicial notice, of a document
18. addressed from Highland Hospital, which
19. appeared,    Not sealed, in proper
20. condition, on the outer envelope. (see
21. RT 917-918) The court
22. further found, Another envelope, inside
23. of the previous envelope, which appeared
24. To hold original
25.          records, of a preliminary hearing.
26. And documents from Highland Hospital
27. Stamped "received June 24, 2002. The
28. documents where opened. (see

23.

RT 917 - 929 ) The Court observed,
a second envelope, which also had been
opened, and contained documents, of
2002, subpoenaed, by Frank Lowy. The
court presummed, that the "information"
dealt with a preliminary hearing, and
recently, caught up with the file. The
court further found another envelope,
stamped, dated April 21, 2003, (See Exhibit
(J)(K)(L) RT 918 - 919 ) which was perfectly
sealed.  The court, further,
assumed the information had something
to do with the trial. The court proceeded
to open the envelope. Inside the
envelope, was a second envelope, which
was in sealed condition. The court opened
that envelope, subpoenaed by, defense
counsel, Richard Hove, also enclosed
in the envelope, a declaration and
an affidavit of custodian, of records.
And the court observed the information
dealing with petitioner Warren's
medical records. (See Exhibit (J)(K)(L) RT
919 - 920.) The court, inquired, if
defense counsel, Hove, was
concerned with
reviewing the medical records. Counsel

24.

1  Agreed. The Court thereby, informed
2  counsel. Hove, "That a quick Look,
3  would not be sufficient." When the
4  Court unsealed the Envelope, there
5  was Another Envelope Still in A Sealed
6  condition, dated May 2, 2003, from
7  Heartland Hospital. The Court further
8  opened that Envelope, there was Another
9  subpoena by, counsel Hove, and Another
10 Affidavit by the custodian of records. That
11 was A Half an inch thick. The Court, asked
12 if counsel Hove, if He wanted time, to Review
13 Them. The Court Assured, Mr. Hove, that
14 He would. Mr. Hove,
15                        informed the Court, That
16 He only needed, A little time, perhaps
17 Ten minutes. The Court, Assured Mr.
18 Hove, That, was fine. The Court went back
19 An Record, (See RT 917 - 929)
20 The Court further Addressed, the prose-
21 cution, Mr. Schengart, That the Records
22 were subpoenaed in a timely manner.
23 from Heartland Hospital, However, they
24 failed to return the Records in a timely
25 manner. The Court determining if was
26 the first time defense counsel Hove,
27 viewed the Record. After counsel, Hove,
28 Reviewed the medical Reports,

25.

1  He Re-appeared before the court, and
2  informed the court, that he was returning
3  the records. He assured the court, if the
4  court was concerned, if the records were
5  intact, He didn't have a problem
6  stipulating that they could be released
7  to the District Attorney. The court
8  continued the matter on June 30, 2003,
9  the court, reconvened, the hearing,
10 And informed both Defense counsel
11 Hove, And Deputy D.A. Mu Scheingross,
12 that the court received x-rays that appeared
13 to be on the case. Inside the envelope
14 the court received the Subpoena duces
15 Tecum. And discovered, it wasn't sealed
16 in the envelope. It was attached to it
17 little string. Defense counsel, Hove, notified
18 the court, that he was attempting to
19 find this Oath. He alerted the court, that
20 they had located Some, at Highland, and
21 sent them down pursuant to his
22 subpoena. (See Exhibit (J)(K)(L) RT 922-923)
23 the court took a recess. To allow Defense
24 counsel to review the medical reports.
25 the court reconvened the
26                                    hearing, where
27 Defense counsel, Hove addressed the
28

26.

1  count of the following. That X-rays
2  were taken on August 15, 1996 And
3  September 17, 1996. He noted that the
4  court only received X-rays for August
5  31 And the 15th of 1996 And the 17th
6  of September 1996; He further noted
7  that the records, received only received
8  radiological reports; that the X-rays were
9  taken without a cast. Mr. House, further
10 urged the court, with respect to the
11 prosecution's misstatement, based
12 his argument on the fact, that there
13 was a note on his discharge papers,
14 of July 31, 1996 that petitioner Warren,
15 was to return back to the hospital on
16 August 15, 1996 And have an X-ray done without
17 a cast. Mr. House, argued that the
18 prosecution, urged the jury to find that
19 petitioner had no cast, based upon the
20 discharge notice. (see exhibit (K)(L) RT
21 917 - 929) Mr. House, explained to the
22 court, that in fact, petitioner Warren, did have
23 a cast on, where an expert conveyed
24 that interpretation, that a cast was on
25 his leg for August 15, 1996 thru September
26 12, 1996. Mr. House, further, urged the
27 court that; A motion for a New Trial

27.

1  Should be granted, based on the
2  prosecution's argument, that he had
3  no cast on from August 15, 1996 thru
4  September 17, 1996 (see Exhibit (w)(k)(L) Rt
5  917-929) The Court, felt, it would, cast
6  A dispersion, upon the defense's witnesses
7  whether on not the records, showed
8  petitioner Warren, with a cast on or
9  without a cast. Any conclude, it would
10 And, another day, or whether on
11 not, it would be grounds for a new trial.
12 The Court Assumed, Mr. Hove, made a valid
13 point and confirmed, that it was Mr.
14 Warren's right, that Mr. Hove, Angy this
15 Matter. (see Exhibit (J)(k)(L) Rt 917-929.) The
16 Court adjourned for the day
17                on September 3, 2003 The Court
18 reconvened, the matter, and inquired
19 of defense counsel's Mr. Hove And his motion for
20 A "New Trial" Mr. Hove is response to
21 The Court was that, the reason the filed
22 A motion for A new trial, was that he
23 consulted with Dr. Virgil Williams, who
24 was a radiologist with highland hospital
25 And who reviewed the X-rays, or August
26 15, 1996, And it was in his opinion, that the
27 wrote in A letter dated August 29, 1996
28 that Mr. Warren, had a cast on his leg.

28.

1  That's what He informed, defense counsel
2  Hove, from the review of the x-rays.
3  Based on that, Attorney Hove, considered
4  That newly, discovered Evidence, and was
5  Appropriate for a "New Trial" under
6  Penal Code Section 1181(8). Mr. Hove,
7  conveyed to the Court that He discovered
8  The Evidence, substantially, diligent,
9  over a substantial amount of time; He
10  reviewed, Highland's compliance to Be
11  Discernment. Mr. Hove, expressed to the
12  Court, that And this Evidence, were
13  Available, it would have produced a
14  probable different outcome at Trial. He further
15  Articulated before, The Court that this
16  Evidence, would have given Credence
17  To the fact that petitioner, Warren, Had
18  A Case on. Mr. Hove. concluded, that no
19  Evidence, other than petitioner, Warren's
20  witnesses, who, testified that, He was in
21  A Case on 9/11/96, it would have Established
22  credibility to those witnesses who Testified
23  To the fact. Mr. Hove, submitted The
24  Motion for a "New Trial"
25              The Court, took Judicial
26  notice of that motion, and Heard rebuttal
27  from the prosecution, Mr. Schreingant
28  There by, Refuted his position

29

1  (SEE EXHIBIT(J)(K)(L) RT 917 - 929), MR.

2  SCHEINGART, ACKNOWLEDGED, BEFORE THE

3  COURT, THAT HE RECEIVED THE WRITTEN

4  MOTION, FOR NEW TRIAL, BY MR. HOWE

5  AND THE DOCUMENTS, SUBMITTED BY DR.

6  VIRGIL WILLIAMS, WHICH MR. SCHEINGART

7  CONFIRMED THAT HE READ. HE THERE BY

8  INFORMED THE COURT, THAT HE BRIEFLY

9  DISCUSSED WITH MR. HOWE, OF HIS UNCERTAINTY

10  AS TO WHETHER OR NOT HIS COMMENT FOR

11  ACTUALLY, SAID THERE WAS A CAST ON FOR

12  THE X-RAY. HE ACKNOWLEDGED, TO THE

13  COURT, THAT, THE REPORT DID SAY "CAST

14  IN PLACE". (SEE EXHIBIT(J)(K)(L)) RT 931 - 932)

15  ALSO THAT AN INDICATION OF A RIGHT KNEE

16  EXAM ON AUGUST 15, 1996

17  MR. SCHEINGART, ARGUED

18  BEFORE THE COURT, WHILE REFERRING TO TWO

19  CASES, PEOPLE VS. DRAKE( ) CAL. APP 4TH

20  PG 92 AND 98 "IT MUST BE SHOWN THAT THE

21  DEFENDANT HAD WITHOUT FAULT, ON HIS

22  PART, NOT HAD A FAIR TRIAL. ON THE MERITS

23  AND BY REASON OF THE NEWLY DISCOVERED

24  EVIDENCE, THE RESULT WOULD HAVE BEEN

25  DIFFERENT OR SHOULD BE DIFFERENT ON

26  A RETRIAL. MR. SCHEINGART, FURTHER

27  DREW'S THE COURT'S ATTENTION OF THE STANDARD

28  REVIEW OF THE RECENT CASE. THAT GOVERNS THIS

*30.*

1  ISSUE, IN people v Bakelen, A 995 CASE
2  9 Cal. 4th 963; WHERE A FIVE-PRONG TEST
3  IS USED, FOR A COURT TO RULE ON A "MOTION
4  FOR A NEW TRIAL, BASED ON NEWLY DISCOVERED
5  EVIDENCE. (SEE EXHIBIT (J)(K)(L) RT 917 - 929 )
6  MR SCHEINGART, ADDRESSED TO THE COURT,
7  THE FACT, THAT, DEFENSE COUNSEL Richard
8  HOVE, HAD THE MEDICAL REPORT PRIOR TO
9  TRIAL. AND GAVE A COPY TO MR. SCHEINGART
10 IN DISCOVERY, JUST BEFORE TRIAL OR
11 BEFORE THE BEGINNING OF THE TRIAL, AND
12 IN THAT LIST, THE DOCTOR WHO PERFORMED
13 THE SURGERY ON THE DEFENDANT AND
14 OTHER DOCTORS, WHO TREATED THE DEFENDANT
15 IN A FOLLOW-UP. MR SCHEINGART, REVEALED
16 THAT DEFENSE COUNSEL
17              HOVE, NOT ONLY DID NOT
18 INCLUDE THEM AS WITNESSES ON THE WITNESS
19 LIST, BUT CHOSE NOT TO CALL THEM TO TESTIFY
20 (SEE EXHIBIT (J)(K)(L) RT 917 - 929 ) Additionally,
21 MR SCHEINGART Argued THAT THE DATES HE
22 Argued AT FIRST, TO PROHIBITED MEDICAL
23 Records FROM coming IN. DEFENSE COUNSEL
24 Argued TO THE CONTRARY. THE COURT, HOWEVER,
25 RULED THAT A COUPLE OF DOCUMENTS IN THE
26 MEDICAL RECORDS, SHOULD COME IN. MR.
27 SCHEINGART, AT A LATER TIME, Argued TO Brought
28 HAVE THE ENTIRE "MEDICAL RECORD"

31.

1  INTO THE _JURY_. OUR DEFENSE COUNSEL
2  HAVE, ARGUED AGAINST THAT, ASKING ONLY
3  FOR A COUPLE OF PAGES, AND THE COURT
4  RULED IN FAVOR OF THE _DEFENSE_. (SEE EXHIBIT
5  (K)(L) RT 917 - 929 ) MR. _SCHEINGANT_, TOLD
6  THE COURT, IT WAS HYPOCRITICAL, FOR DEFENSE
7  COUNSEL TO BE ASKING FOR A _MOTION_ FOR _NEW_
8  TRIAL, WHEN MR. HOVE, DIDN'T WANT THE
9  MEDICAL RECORDS, THAT THEY SEEM TO RELY
10 ON NOW FOR A BASIS FOR A _NEW TRIAL_. MR.
11 _SCHEINGANT_, FURTHER ARGUED IT WOULD BE
12 _CUMULATIVE_. WHEN THE DEFENSE CALLED
13 TO WITNESSES, PETITIONER _WARREN'S_, MOTHER
14 AND MR. _LAMONTE IRVIN_, HIS UNCLE. TESTIFIED
15 THAT PETITIONER _WARREN_, HAD A CAST ON THE ENTIRE
16 TIME. THROUGH NOVEMBER. MR. _SCHEINGANT_,
17 URGED THE _COURT_ THAT THE _MEDICAL RECORDS_
18 THE _X-RAYS_ AND THE _EVIDENCE_ THAT THE
19 DEFENSE WAS RELYING UPON FOR A _NEW_
20 TRIAL WOULD BE _CUMULATIVE_. MR.
21 _SCHEINGANT_, SUGGESTED TO THE COURT, THAT IT WOULD
22 BE A _VIOLATION_ OF ONE OF THE _ELEMENTS_,
23 THAT THE COURT
24 WOULD FIND IN _ORDER_ TO GRANT A
25 "_NEW TRIAL_" MR. _SCHEINGANT_, FURTHER
26 AND TO THE COURT'S ATTENTION, THAT DEFENSE
27 COUNSEL'S MENTION OF THE _DOCTORS_ WOULD BE

1  ANOTHER ISSUE. (SEE EXHIBIT (J)(K)(L) RT 917-929
2  FINALLY, Mr. SCHWARTZ, INFORMED THE
3  COURT THAT MR. HOVE'S MOTION OF DR.
4  WILLIAMS, OF ANY COMMENT, WITH REGARD
5  TO THE AUGUST 15TH X-RAYS, WHICH HE
6  VIEWED, WAS SILENT TO HIM. THAT THERE
7  WAS NO CASE ON; AND THAT THE COURT SHOULD DENY
8  DEFENDANT'S MOTION AND SENTENCE HIM.
9  THE COURT, THERE BY ASKED MR. HOVE
10  DID HE HAVE A REBUTTAL. (SEE EXHIBIT (J)(K)(L) RT
11  917-929 ) MR. HOVE'S RESPONSE WAS THAT
12  HE WOULD SUBMIT. THE COURT THERE BY,
13  RENDERED, IT'S RULING, FINDING NO LEGAL
14  BASIS, FOR GRANTING THE NEW TRIAL MOTION
15  AND DENIED PETITIONER'S MOTION FOR A
16  "NEW TRIAL" (SEE EXHIBIT (J)(K)(L) RT 917-929 )
17  DEFENSE COUNSEL RICHARD HOVE
18  DECLINED TO USE
19  EXPERT TESTIMONY, OF HIGHLAND HOSPITAL'S
20  PHYSICIANS DR. JERROLD GOLDMAN ALSO DR.
21  KEN AKIZUKI, DR. CLIFFORD JONES AND DR.
22  HERALD GENA, ALSO RADIOLOGIST WHO TOOK X-RAYS
23  M.D. VIRGIL WILLIAMS.) (SEE EXHIBIT (J)(K)
24  (L). AS WELL AS, SUPPRESS THE ENTIRE
25  MEDICAL REPORT, WHEN THE PROSECUTION
26  SUGGESTED, BEFORE THE COURT, THAT THEY
27  RECEIVE A COPY FROM THE DEFENSE. (SEE
28  RT 917-929.)

33.

1  Memorandum of points and
2  Authorities

6
7  (See Memorandum of points and
8  Authorities Attached.)

34.

# EXHIBIT COVER PAGE

*A*

EXHIBIT

Description of this Exhibit: AFFIDAVIT OF ORCELLA A. WARREN

Number of pages to this Exhibit: 2 pages.

JURISDICTION: (Check only one)

☐ Municipal Court

☒ Superior Court

☐ Appllate Court

☒ State Supreme Court

☒ United States District Court

☐ State Circuit Court

☐ United States Supreme Court

☐ Grand Jury

STATE OF CALIFORNIA}                          **AFFIDAVIT OF:**
                                              **ORCELLA WARREN**
COUNTY OF ALAMEDA}

I Orcella Warren, swear to the following:

1. That I am the sister of Melrolando Warren, and that I reside at 20433 Concord Ave in the city of Hayward Ca. 94541 (Alameda County).

2. On the behalf of my brother, I have been requested to recollect my involvement in the request, procurement, and routing to him medical records/ reports disclosed by Alameda County (Highland Hospital).

3. I did not participate in my brother's trial, but I am certain the during September 1996, his leg was Still in a cast until the middle of the month (Sept).

4. I followed the progression of the trial when I talked to Melrolando on the phone, and by staying in Contact with his trial counselor, Richard Hove.

5. I am aware that my brother and Mr. Hove was trying to show that Reina Webb (the victim in the Sept 11, 1996 offense) had misidentified Melrolando.

6. To this end, I was aware that Mr. Hove had unsuccessfully sought any records from Highland Hospital Medical Dept. which illustrated that my brother's leg was in a cast until Sept 17, 1996.

7. Ultimately, Melrolando was convicted and as appeal undertaken by appellate counsel, (George L. Schrarer whom I contacted periodically, monitoring my brother's case.

8. During this time I set out of my own volition to find any records which would show my brother's Medical condition during the month of Sept. 1996.

9. I initiated contact with Highland Hospital Medical Dept. in November, 2005 throughout January 2006, apprising them that I am acting on Melrolando's behalf and requested them to conduct a Search of their record storage system for any records relating to their 1996 treatment and care Of him regarding his admission for knee surgery.

10. On January 10, 2006, I received by fax various medical reports from Highland Medical Dept. In part, confirmed by behalf that he was in a cast up until September 17, 1996.

11. The first person I informed of this discovery was Mr. Hove since he had initially sought the record to no avail, and was told that he reports would only be good if my appeal required a retrial of the charges.

12. I next contacted Mr. Schraer and conveyed the development to him, and the content of my discussion with Mr. Hove and was told that Melrolando's case had already been briefed and that the records could not support the issue on appeal.

13. Following these events, I believe in May 2006, I finally heard from my brother when he called home. I had not written him about my discovery because I wanted to talk to him directly first.

EXHIBIT (A) (1)

14. During our conversation, I explained all that had transpired up to and until that point.

15. My brother instructed me to make a copy of the information I had acquired and route it to him.

16. Due to pressing family, work, and home obligations, I was not able to deal with the matter until the first quarter of 2007.

17. I was recently contacted by my brother during July 2007. He then told me that the information would be used in his appeal.

I swear under penalty of perjury and the laws of California and the above is true and correct, and that if called to do so, I could and would competently testify to the foregoing matter.

Executed on this day at Hayward, California

Dated: 7/31/2007

Orcella Warren
Affiant



FELICIA E. TAYLOR
Commission # 1589964
Notary Public - California
Alameda County
My Comm. Expires Jun 25, 2009

EXHIBIT (A)(2)

# EXHIBIT COVER PAGE

$\mathcal{B}$

EXHIBIT

Description of this Exhibit: *NOTARY PUBLIC, OF FELICIA E. TAYLOR*

Number of pages to this Exhibit: _____/_____ pages.

JURISDICTION: (Check only one)

☐ Municipal Court

☒ Superior Court

☐ Appellate Court

☒ State Supreme Court

☒ United States District Court

☐ State Circuit Court

☐ United States Supreme Court

☐ Grand Jury

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _Alameda_ } ss.

On _7/31/2007_ before me, _Felicia E. Taylor, Notary Public_
      Date                        Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared _____
                                      Name(s) of Signer(s)

☑ personally known to me
☐ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**FELICIA E. TAYLOR**
**Commission # 1589964**
**Notary Public - California**
**Alameda County**
**My Comm. Expires Jun 25, 2009**

WITNESS my hand and official seal.

_Felicia E. Taylor_
                     Signature of Notary Public

――――――――――――― OPTIONAL ―――――――――――――

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

### Description of Attached Document

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

### Capacity(ies) Claimed by Signer

Signer's Name: _____

☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney-in-Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

| RIGHT THUMBPRINT OF SIGNER |
| --- |
| Top of thumb here |

© 1999 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org     Prod. No. 5907     Reorder: Call Toll-Free 1-800-876-6827

_EXHIBIT (B)(1)_

# EXHIBIT COVER PAGE

| $\mathcal{C}$ |
|:---:|

EXHIBIT

Description of this Exhibit: ᗡᴇᴄⲐᴀᴨᴀᴛⲓᴏᴨ ᴏᴛ ᴍᴇⳑⳑⲟⳑᴀᴨⲇ N. ⱳᴀᴨᴨᴇᴨ

Number of pages to this Exhibit: __4__ pages.

JURISDICTION:  (Check only one)

☐  Municipal Court

☒  Superior Court

☐  Appellate Court

☒  State Supreme Court

☒  United States District Court

☐  State Circuit Court

☐  United States Supreme Court

☐  Grand Jury

DECLARATION OF MELROLANDO N. WARREN IN SUPPORT OF ABSENCE OF SUBSTANTIAL
DELAY AND ALTERNATIVE CONSTITUTIONAL ERROR AND ACTUAL INNOCENCE EXCEPTIONS
TO THE BAR FOR UNTIMELINESS

I, Melrolando N. Warren, declare:

1.  I was the defendant in the case of <u>People v. Warren</u> (Superior Court No. H51401.)

2.  I am the Petitioner, pro se counsel in the above-entitled matter incarcerated
within the State's corrections system.

3.  During 2006, I became aware of the existence of information/evidence (patient
medical records) tending to support my claim of factual innoncence of the subject
offenses I was convicted for. Through due diligence and pursuit of this information via
my sister Orcella Warren who interceded on my behalf, this evidence was just recently
forwarded to me during the first quarter of 2007 and substantial enough to state a
prima facie case.

4.  Absence of substantial delay exist to justify the delay in discovering the
claimed impropriety at a time after I might have made a presumptively timely challenge
during the pendency of my direct appeal.

5.  The absence of substantial delay is predicated on my being unaware of the
evidence leading to the claim offered in support of the ground for relief until after
it was disclosed by Alameda County Highland Hospital by my sister in 2006 and thereafter
routed to me in March, 2007.

6.  Prior to my direct receipt of the Highland medical records, my sister Orcella
had contacted the hospital on several occasions initially around January 4, 2006
requesting a search of their record depository for any records relating to my July
through September, 1996 hospital admission, treatment, and follow-up care. (Exh. J,
Declaration of Orcella Warren.)

7.  Subsequently, Highland Medical disclosed various reports to my sister covering
the requested search period, which consisted of numerous radiological and patient
treatment follow-up evaluation reports (inclusive of the 9/17/1996 record which supports
the within claim). Ibid.

*EXHIBIT (C)(1)*

8. After my sister's receipt of the Highland records, she then contacted my trial and appellate counsel's notifying them of her discovery and queried them on the value of the records in correlation to my then pending direct appeal, and was instructed that the records would only be good if I am retried. Ibid.

9. The Highland information was thereafter forwarded to me in late March or early April, 2007.

10. Immediately after receiving the records, I udertook the task of arranging a visitation period to the prison's law library to began researching the matter, and was initially unsuccessful up to and until the week of August 19th 2007, when I received my first library visit since acquiring the records and initiated legal research.

11. Upon completion of the foregoing efforts, I was of the firm belief that the evidence was valuable enough to support, corroborate, and sustain the claim set forth in the petition.

12. The evidence has now been presented in this application in light of its prima facie presumption which it lends to the legal claim.

13. At the time of my trial, counsel nor myself were in possession of the records disclosed by Highland medical. Had it been otherwise, the evidence would have been presented to the jury to support the defense theory.

14. Since my trial until receipt of the records there has been no other available information to support the current claim for relief.

15. I could not have possesd these records at any time before now, due to their previous pre-trial non-disclosure when subpeoned by counsel. And had I possessed them at an earlier time, I would have acted then as I am now doing.

16. The conviction before the trial court is undermined by the information supporting the claimed ground for relief set forth in the petition.

17. The filing of the instant petition at this time since receiving the records was accomplished within weeks of my first library visitation period where I was able to conduct and complete the required legal inquiry in support of the ground.

2.

Exhibit (c)(2)

18. The petition was filed as soon as practical after the factual basis supporting the claim was discovered and could be developed by myself. It is timely, having been filed approximately two weeks after such development.

19. There is no particular situation that should have enabled my filing of the current claim sooner. For no such situation has ever materialized until my sister's mailing and my follow-up legal inquiry took place.

20. The delay since the submission of my reply brief on direct appeal and the filing of        the instant claim is no form of delay attributable to me.

21. A habeas petitioner may establish absence of substantial delay by demonstrating, "facts showing when information offered in support of the claim was obtained, and that it was neither known, nor reasonably should have been known, at any earlier time." (In re Robbins (1998) 18 Cal.4th 770, 787.) By this declarant's showing of acute facts of when the information supporting the petition was obtained and that it was not known nor should it have been reasonably known until it was received by him after his sister's interceding on his behalf, declarant has met his burden to explain and justify or, other words, demonstrate with specificity, facts showing when the information supporting the ground was obtained and that it was neither had, nor reasonably could have been had at any time earlier.

22. The State Supreme Court in In re Clark (1993) 5 Cal.4th 750 held that where the factual basis for a claim was unknown to the petitioner and he had no reason to believe that the claim might be made, the court will continue to consider the merits if asserted as promptly as reasonably possible. Id. at 775. This is one such case, where the facts were unknown and petitioner through due diligence could not proffer the claim at any time earlier. And after I became aware of the facts, I immediately undertook inquiry, developed, and asserted them as promptly as reasonably possible. Thus the claim should be resolved on its merits.

23. Even if this court concludes that there was substantial delay without good cause, the delay may be excused and the claim reviewed on its merits where a manifest

3.

fundamental miscarriage of justice would result. (Attachment 1.)

24. For all the foregoing reasons stated in this declaration, this Honorable Court should as a threhold matter find that the claim advanced in the petition was presented without substantial delay.

25. Furthermore, in the alternative, this Court should find that the claim falls within a recognized exception to the bar for untimeliness and under the showing amplified and fully set forth in Attachment 1 of paragraph 23 consider Petitioner's constitutional claim on its merits.

I declare under penalty of perjury and the laws of the state of California that the foregoing is true and correct based on my personal knowledge and if called to do so, I could and would competently testify as such.

Executed on this day at Susanville, California.

DATED:

Melrolando N. Warren
Declarant

*Exhibit (C)(4)*

4.

# EXHIBIT COVER PAGE



EXHIBIT

Description of this Exhibit: *Medical Report of*
*August 15, 1996 - Confirming X-Rays To*
*Warren's Knee By Dr. Virgil Williams*

Number of pages to this Exhibit: ___1___ pages.

JURISDICTION:   (Check only one)

☐   Municipal Court

☒   Superior Court

☐   Applellate Court

☒   State Supreme Court

☒   United States District Court

☒   State Circuit Court

☐   United States Supreme Court

☐   Grand Jury

FORM NO. 300-MC 5      (4/82)

**CLINIC**
**ALAMEDA COUNTY MEDICAL CENTER**
*Highland Campus • Fairmont Campus • John George Psychiatric Pavilion*
**PROGRESS RECORD**

☐ **FAIRMONT**

☐ **HIGHLAND**

PATIENT ACCOUNT NO: 21-02-24-9

MEDICAL RECORD NO:

PATIENT NAME: WARREN, MELRolando

DATE OF BIRTH:

WARD/UNIT:     DATE: 3-7-69

USE TO RECORD OBSERVATIONS AND OPINIONS REGARDING THE PATIENT'S TREATMENT AND PROGRESS

AUG 15 1996 **ORTHOPEDICS**

DETERMINATION OF DISABILITY.

BEGINNING DATE    RECOVERY DATE

DIAGNOSIS:

RETURN TO WORK DATE:

REASON FOR VISIT:

PATIENT DOCTOR/SERVICE

ALLERGIES / FOOD / DRUGS:

DATA:

NURSING INTERVENTION:

PATIENT'S RESPONSE:

PATIENT EDUCATION / DOCUMENTED   ☑ Y   ☐ N   ☐ N/A

SIGNATURE:

THE PATIENT HAS BEEN DULY EDUCATED ON THEIR PRESCRIBED MEDICATIONS TO INCLUDE EFFECTIVENESS FOOD AND DRUG INTERACTION WHEN APPROPRIATE THE CLIENT AND/OR PARENT/GUARDIAN FULLY UNDERSTANDS THE INFORMATION.

wk   s/p ORIF patella L on cylinder cast

x-ray 3/L

L knee 2L

No pain

PLAN: FU@

RTL 1 month with knee off

+ x-ray before clinic -

Dr Akizuki

EXHIBIT (10)(1)

FORM NO. 300-MCS    (4/82)

**CLINIC**

ALAMEDA COUNTY HEALTH CARE SERVICES AGENCY

**PROGRESS RECORD**

☐ FAIRMONT

☐ HIGHLAND

39 821 194

21-02-24-9

WARREN, Melkolando

DATE 3-7-69

USE TO RECORD OBSERVATIONS AND OPINIONS REGARDING THE PATIENT'S TREATMENT AND PROGRESS

SEP 17 1996    **ORTHOPEDICS**

DETERMINATION OF DISABILITY    REASON FOR VISIT

BEGINNING DATE    RECOVERY DATE    PATIENT DOCTOR/SERVICE

DIAGNOSIS:    ALLERGIES / FOOD / DRUG

DATA:

RETURN TO WORK DATE    NURSING INTERVENTION:

PATIENT'S RESPONSE:

PATIENT EDUCATION / DOCUMENTED    Y ☐  N ☐  N/A ☐

SIGNATURE:

THE PARENT HAS BEEN DULY EDUCATED ON THEIR PRESCRIBED MEDICATIONS TO INCLUDE EFFECTIVENESS, FOOD AND DRUG INTERACTION WHEN APPROPRIATE. THE CLIENT AND/OR PARENT/GUARDIAN FULLY UNDERSTANDS THE INFORMATION.

Removed cast & stiches Sent to X Ray.

KNEE IMMOBILIZED APPLIED TO PATIENT'S Ⓡ KNEE
AS ORDERED —

930

1          WEDNESDAY, SEPTEMBER 3, 2003.

2                PROCEEDINGS

3                  --oOo--

4          THE COURT:  Case of People versus Melrolando

5    Warren, Docket H-31401.

6          Counsel, state your appearances for the record.

7          MR. SCHEINGART:  Roy Scheingart on behalf of the

8    District Attorney's Office.

9          MR. HOVE:  Richard Hove on behalf of Mr. Warren,

10   who is present.

11         THE COURT:  Mr. Hove, you've filed a motion for

12   new trial.

13         MR. HOVE:  I did.  And the reason for that was we

14   had consulted with Dr. Virgil Williams, who is a radiologist

15   with Highland Hospital.  He had reviewed the x-rays,

16   particularly the August 15th x-rays of Mr. Warren, and it

17   was his opinion, as he wrote in a letter dated August 29th,

18   that Mr. Warren had a cast on his leg.  That's what he had

19   informed me from reading the x-rays.

20         Based on that, I thought it was newly discovered

21   evidence and fit under the basis for a new trial under Penal

22   Code Section 1181(8).  We had tried to discover this

23   evidence with substantial diligence over a substantial

24   period of time, and Highland's compliance was piecemeal I

25   guess is the best description.

26         THE COURT:  Less than diligent.

27         MR. HOVE:  It was.  And quite honestly, I can't

28   say much more than to think that perhaps if we had had this

Deborah Wolfe, CSR, RPR

932

1    B-E-E-L-E-R, a 995 case, 9 Cal.4th 953 and specifically page

2    1004.  And it points out a five-prong test, and I'm quoting

3    from that.

4              "In ruling on a motion for a new trial based on

5    newly discovered evidence, the trial court considers the

6    following factors.  Number one, that the evidence and not

7    merely its materiality be newly discovered; number two, that

8    the evidence be not cumulative merely; number three, that it

9    be such as to render a different result probable on a

10   retrial to cause; number four, that the party could not with

11   reasonable diligence discovered and produced it at the

12   trial; and number five, that these facts be shown by the

13   best evidence of which the case admits."

14             THE COURT:  I missed number five.

15             MR. SCHEINGART:  "That these facts be shown by the

16   best evidence of which the case admits."

17             THE COURT:  I haven't the vaguest idea what that

18   means.

19             MR. SCHEINGART:  I couldn't agree more with the

20   Court.  I find that quite ambiguous.

21             What I would like to point out are a couple of

22   things.  Number one, the defense had this medical report

23   prior to the trial.  In fact, defense gave it to me in

24   discovery just before the trial or before the beginning of

25   the trial, and in that it lists the doctor who performed the

26   surgery on the defendant and other doctors who treated the

27   defendant in follow-up.  The defense not only didn't include

28   them as witnesses on the witness list, but chose not to call

933

1  them.

2        Number two, that the dates I argued at first to

3  prohibit the medical records from coming in, the defense

4  argued contrary.  The Court ruled that a couple of the

5  documents in the medical records should come in.  Then at a

6  later point I argued to have the entire medical record

7  brought in to the jury, and the defense argued against that

8  asking only for a couple of pages, and the Court ruled in

9  favor of the defense.

10        So it seems to me to be a bit hypocritical to be

11  asking for a motion for new trial when the defense didn't

12  want the medical records in that they're seeming to be

13  relying on now for the basis for a new trial.

14        This would be cumulative.  The defense called two

15  witnesses, the defendant's mother and a gentleman by the

16  name of Lamonte Irvin, the defendant's uncle or nephew, to

17  testify that the defendant had a cast on the entire time

18  through November.  So the medical records, the x-rays, and

19  the evidence that the defense is relying upon for a new

20  trial would be cumulative, which is again in violation of

21  one of the elements that the Court finds must be present in

22  order to grant a new trial.

23        As I mentioned, the doctors would be another

24  issue.  And I'm relying upon DNA, and I did so in my closing

25  argument and stressed the DNA.  It doesn't matter whether

26  the victim identified the defendant or not.  Even if the

27  victim said she cannot identify her assailant, I would still

28  be arguing this case on DNA.  And the DNA is very powerful

934

1  and completely uncontroverted in this case.   There's

2  absolutely no probable basis whatsoever that there would be

3  a different result.

4          And the defendant could have removed the cast

5  himself following August 15th, the August 15th examination,

6  and that's still over three weeks from the September 11th --

7  three weeks from the September 11th incident of this case,

8  and it's very common for people to remove casts themself.

9          Finally, which I find to be quite interesting,

10  there's absolutely no mention in Mr. Hove's motion of

11  Dr. Williams, of any comment with regard to the September

12  15th x-rays which he looked at, which I presume by that

13  silence to me that there was no cast on on September 15th,

14  which I find quite telling.

15          And based on those reasons and the overwhelming

16  nature of the evidence as I put fourth, I ask that the Court

17  deny the defendant's motion and sentence the defendant at

18  this time.

19          THE COURT:   Any rebuttal, Mr. Hove?

20          MR. HOVE:   I submit it, your Honor.

21          THE COURT:   It appears to the Court there is no

22  legal basis for the granting of a motion for new trial, so

23  that motion is denied.

24          I asked both of you to look at <u>People vs. Johnson</u>.

25  I'm assuming you did so because that would change the

26  recommendation of sentencing.   Anyone?

27          MR. SCHEINGART:   I will submit the matter.   I

28  believe based upon the evidence that I put forth, that he

CXHIBIT (K)(5)

935

1   faces an exposure of as I've indicated in my probation

2   letter to the Court.

3           THE COURT:  Did you look at Johnson?

4           MR. SCHEINGART:  I glanced at it, your Honor, and

5   I spoke with other people in my office, and I would submit

6   the matter to the Court if the Court is contemplating not

7   giving the maximum.

8           THE COURT:  Well, that case I thought suggested

9   that the maximum is different than what you're saying.  So I

10  don't know --

11          MR. SCHEINGART:  May we have a moment?

12          THE COURT:  Sure.

13          MR. SCHEINGART:  Can we approach the bench?

14          THE COURT:  Is it a secret?

15          MR. SCHEINGART:  No.  I wanted to talk to the

16  Court briefly.

17                  (Discussion off the record.)

18          THE COURT:  Your position as to Johnson is since

19  it's a recent case --

20          MR. SCHEINGART:  My position is that, as I stated

21  in my probation letter, that his maximum period of

22  incarceration is as follows:  Counts 1 through 7 plus the

23  667.61(a)(d)(2) and the 12022.3(a) clause accounts for 35 to

24  life sentence.  That's based upon the use of the gun and the

25  kidnapping for purposes of rape charge.

26          And then the prior conviction amounting to five

27  years, the serious prior felony conviction.

28          And then pursuant to the 1170.12(c)(1) and

936

1  667(e)(1) strikes, that would double the base term of 25 to

2  life, which is the underlying offense.  It does not double

3  the use of the gun.  And that would make it a 50 to life

4  sentence.  And then if you add the use of the gun, which

5  would be ten years plus five years for the prior, you're

6  basically looking at 65 to life as a maximum.

7          Simply put, the 25 to life sentence based on the

8  kidnapping for purposes of rape is 25 years to life, doubled

9  makes 50 to life, ten years for the use of the gun, 60 to

10 life, and five years for the prior conviction is 65 to life.

11 And I believe that to be a valid maximum sentence.

12         THE COURT:  Mr. Hove, you had a different view,

13 and I'm trying to find your documents here with the

14 probation.

15         MR. HOVE:  I'm prepared to submit it.

16         THE COURT:  Do I not remember that you submitted

17 something that said you thought the figure was different?

18         MR. HOVE:  I don't think I did in this matter.

19         THE COURT:  I have reviewed the probation report,

20 and I am prepared to adopt the factors in aggravation and

21 the factors in mitigation.

22         Would anyone like to add to those factors?

23         Mr. Scheingart?

24         MR. SCHEINGART:  No, your Honor.  Thank you.

25         THE COURT:  Anything you wish to dispute or add,

26 Mr. Hove?

27         MR. HOVE:  No, your Honor.

28         THE COURT:  Then I find that Mr. Warren is not

937

1    eligible for probation, that the criteria affecting

2    probation as set forth in the probation record under Rule

3    414 are adopted by the Court.  There are eight factors in

4    aggravation and no factors in mitigation.

5         There be no mitigating factors, the Court believes

6    the appropriate sentence is the maximum, which is 65 to

7    life, and the Court does so impose.

8         Any further matters from either counsel?

9         MR. SCHEINGART:  No, your Honor.  Thank you.

10        MR. HOVE:  No, your Honor.

11                    --o0o--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

```
1   STATE OF CALIFORNIA        )
                               )   ss.
2   COUNTY OF ALAMEDA          )

3

4

5            I, DEBORAH M. TRUJILLO, do hereby certify that I am

6   an Official Court Reporter in the Superior Court of the State

7   of California, in and for the County of Alameda, that as such

8   I reported the within-entitled matter, and that the foregoing

9   Reporter's Transcript on Appeal, pages 926 through 928, is a

10  full, true and correct transcription of my shorthand notes so

11  made.

12

13           Dated this _29th_ day of _September_____, 2003.

14

15

16

17                         DEBORAH M. TRUJILLO
                                CSR #5088
18

19

20

21

22

23

24

25

26

27

28
```

```
 1   COUNTY OF ALAMEDA          )
                                )  ss.
 2   STATE OF CALIFORNIA        )

 3

 4

 5           I, DEBORAH WOLFE, do hereby certify:

 6           That I am a Certified Shorthand Reporter of the

 7   State of California, and duly appointed shorthand reporter

 8   in the Superior Court for the County of Alameda, State of

 9   California;

10           That on June 9, June 30, August 26, and

11   September 3, 2003, I fully and correctly reported the

12   within-entitled matter, the REPORTER'S TRANSCRIPT ON APPEAL

13   of the Defendant, MELROLANDO NIGEL WARREN, before the

14   Honorable PEGGY HORA, Judge;

15           That the foregoing pages 916 through 925 and pages

16   929 through 937 are a full, true, and correct transcription

17   of my shorthand notes taken at the aforementioned time and

18   place.

19           IN WITNESS WHEREOF, I have hereunto subscribed my

20   name this 17th day of October, 2003.

21

22

23

24

25
                              Deborah Wolfe, CSR #6121
26

27

28
```

# EXHIBIT COVER PAGE

6

EXHIBIT

Description of this Exhibit: *Reporter's Transcripts*
*303 - of Trial Criminal Case No. A-31901*
*and Record of Wheeler Motion*

Number of pages to this Exhibit: _15_ pages.

JURISDICTION: (Check only one)

☐ Municipal Court

☒ Superior Court

☐ Applellate Court

☒ State Supreme Court

☒ United States District Court

☐ State Circuit Court

☐ United States Supreme Court

☐ Grand Jury

303

1          TUESDAY, APRIL 8, 2003 -- 9:50 A.M.

2                      PROCEEDINGS

3                        --o0o--

4          THE COURT:  This is the case of People versus

5  Merlando Warren, Docket H-31401, and both counsel are

6  present.

7          This is the time and place for the <u>Wheeler</u> motion.

8  Just to recap, after the People exercised their fourth

9  challenge on Ms. Johnson, Mr. Hove approached the bench,

10  made a <u>Wheeler-Batsen</u> motion.  I reserved ruling on that

11  motion.  Then after the peremptory challenge of Number 6,

12  Juror Biddings, Mr. Hove renewed the <u>Wheeler-Batsen</u> motion.

13          Would you make your motion now for the record,

14  Mr. Hove.

15          MR. HOVE:  Yes, your Honor.  I again made that

16  motion as to the challenge of Juror Rosemary Wattsholman,

17  who was the People's 11th challenge.  I made that motion --

18  first of all, there was an original challenge by the

19  prosecutor.  His second challenge was that of Uedico

20  Scatliffe, who was a black female, age 47.  I didn't make

21  anything of that at that time because I thought the exercise

22  of a peremptory challenge of one person didn't constitute

23  grounds for <u>Wheeler</u>.  Upon the second challenge, that of

24  Rischa Johnson, I did make the challenge.

25          The first one was a black female, 47.  Rischa

26  Johnson is a black female, 33.  I renewed my motion again

27  when the prosecutor exercised a challenge as to Melba

28  Biddings, a black female of 45, and finally when he

EXHIBIT 16 (1)

Deborah Wolfe, CSR, RPR

304

1 | exercised the challenge of Rosemary Wattsholman, a black
2 | female, 48.

3 |        I think what's been demonstrated here, although
4 | the prosecutor has urged all these jurors to be jurors and
5 | act with integrity, I think there has been an act of
6 | integrity on the part of the prosecution.  There has been a
7 | systematic move to exclude a specific class.  That class is
8 | black females under the age of 50 as indicated by the four I
9 | just cited.  And with that, I think I've made a prima facie
10 | showing under <u>Wheeler</u> and <u>Batsen</u> to show that he has been
11 | systematically excluding a particular defined class.

12 |        THE COURT:  Actually, the mere exclusion of --
13 |        (A few jurors entered the courtroom.)
14 |        THE COURT:  You need to leave the courtroom.
15 |        MR. SCHEINGART:  Your Honor, that really raises
16 | some big issues.  They've heard Mr. Hove.
17 |        THE COURT:  They just walked in.
18 |        MR. SCHEINGART:  I just turned and saw them
19 | walking out.
20 |        THE COURT:  That's why when they walked in, I told
21 | them to leave.  They weren't here during any words said.
22 |        MR. SCHEINGART:  I appreciate that, your Honor.
23 | Thank you.
24 |        THE COURT:  In fact, the mere exclusion of a
25 | particular protected class without further articulation does
26 | not establish a prima facie showing under <u>People vs. Howard</u>
27 | 1 Cal.4th 1132.  <u>People vs. Clair</u> 2 Cal.4th 629, and
28 | <u>People vs. Garceau</u>, 6 Cal.4th 140.

1           Did you wish to articulate your motion, Mr. Hove?

2           MR. HOVE:  I do, your Honor.  I think the fact

3    that all these women are under the age of 50, the fact that

4    they have -- in the case of, let's say, Rischa Johnson, her

5    brother is in the highway patrol.  She did not like

6    criminals being released due to mere technicalities.  She

7    said on page 7 of her questionnaire she believed that DNA

8    was pretty accurate evidence.  I think that that is one of

9    the things that demonstrates that she was -- in fact, there

10   was no reason for her to be excluded whatsoever.  That's why

11   I made the motion upon her being excluded.  I think that

12   after that happened, the exclusion of the other two jurors

13   then demonstrated that it was a systematic exclusion of

14   black females under the age of 50.

15           THE COURT:  You actually have to articulate as to

16   Biddings and Wattsholman.

17           MR. HOVE:  As to Biddings and Wattsholman, I don't

18   see any evidence as to -- any reason why the prosecutor

19   would have exercised his challenge as to them.  They both

20   articulated they will be fair and impartial.  In fact, as to

21   Ms. Biddings, she had a daughter who was, in fact, a victim

22   of a molest, and prosecutor asked her about that.  She was

23   very candid about that, what she did and why she did it.

24   Indicated her whole family was victimized by a sexual

25   attack.

26           And as to Ms. Wattsholman, there's no indication

27   as to any basis for her to be excluded.  Quite the contrary.

28   She basically felt that the defendant should testify.  She

306

```
 1 │ said both sides should be heard in regards to this case.
 2 │ That certainly is not anything the prosecutor, I would
 3 │ think, would ever dismiss a juror based upon, and I think
 4 │ there is no articulable basis for her to have been excluded.
 5 │         THE COURT:  It appears to the Court that based
 6 │ upon the further articulation of Mr. Hove, that a prima
 7 │ facie case has been made as to the three excluded jurors.
 8 │         Response, Mr. Scheingart?
 9 │         MR. SCHEINGART:  First of all, I respectfully
10 │ disagree with the Court in its conclusion.  However --
11 │         THE COURT:  It's a ruling, not a conclusion.
12 │         MR. SCHEINGART:  I beg your pardon, your Honor.  I
13 │ will state my reasons, nonetheless, for my excusing of
14 │ different jurors if the Court would give me one moment.
15 │         What number was Ms. Wattsholman?
16 │         MR. HOVE:  42.
17 │         THE COURT:  What's the problem, Mr. Scheingart?
18 │         MR. SCHEINGART:  I have all my questionnaires on
19 │ the named jurors with the exception of Wattsholman, and I
20 │ know I turned some in and took them back, and I'm having
21 │ Mr. Painter check downstairs for the last questionnaire, but
22 │ I can address the others.
23 │         THE COURT:  Do you want the Court's copy?
24 │         MR. SCHEINGART:  Maybe.  But first I will go
25 │ through ones I have, and Mr. Painter is checking to see if
26 │ there are some in a different location in my office.
27 │         MR. HOVE:  You can borrow mine if you would like.
28 │         MR. SCHEINGART:  I don't think so.
```

1    First of all, with regard, if I may, to
2  Ms. Scatliffe. She initially responded in her questionnaire
3  that one witness was not enough. She also mentioned in page
4  7 of her questionnaire -- and I asked her about this
5  specifically about her response to question Number 39 with
6  regard to what are your views regarding the effectiveness of
7  the criminal justice system, and she answered with kind of
8  an unusual response. "What is fair?" And I asked her about
9  that at length, and she really -- her answer to me made no
10  sense. It was not in my view not even close to being
11  articulated with any sort of logic, sort of a rambling
12  answer, and it struck me as being very confusing and
13  potential bias.

14    Her response to question 42 on page 8 about the
15  burden of the prosecution proving the defendant's guilt
16  beyond a reasonable doubt, she indicated there are two sides
17  to every story. And very significantly on page 6 she talked
18  about an attorney by the name of Dias Ortiz who represented
19  her son. And with regard to question Number 50 on page 11
20  where she was asked if any members of her family, et cetera,
21  have been arrested, accused, or charged with a crime, she
22  said her son. "Yes. Traffic accident. Stopped randomly.
23  Unfair." When she talk about her son, she talked about her
24  son being arrested and got off. That was another matter
25  entirely.

26    Other than what she stated in her questionnaire
27  with regard to page 50, she hired an attorney to represent
28  him, and that was a very serious matter. So I don't think

308

1   that she was being as forthright as she should have been in
2   filling out her questionnaire. And particularly with regard
3   to the events involving her son, I think that she had a very
4   strong bias that was being concealed that I, in questioning,
5   believed to exist, and that was the basis of my excusing
6   that individual.

7           With regard to Rischa Johnson, with regard to page
8   11 on her questionnaire -- and that has to do with friends,
9   family members ever been arrested, accused, or charged with
10  a crime, her response was "Yes. Too many to list." She
11  also responded "No, this would not impair my ability." But
12  I find those two statements to be oxymorons in nature, and I
13  just felt that her knowledge of family members in this
14  county being involved with the law and that type of casual
15  response, "too many to list," struck me as being quite
16  unusual and someone that would not be a candidate to be a
17  fair and impartial juror.

18          Another thing that struck me about Ms. Johnson
19  right from the beginning is when the Court introduced the
20  lawyers to the jury panel and Mr. Hove introduced himself
21  and then introduced his client, Mr. Warren -- who I might
22  add is persistently staring at me throughout this process,
23  in my view to be mean-mugging me, and I don't think that's
24  appropriate courtroom protocol, and I would ask at some
25  point the Court admonish Mr. Warren to cease doing that.
26  It's annoying to me.

27          THE COURT: I think he was merely looking at you
28  as you spoke. I didn't see any mean-mugging. If you see

EXHIBIT (C)(6)

Deborah Wolfe, CSR, RPR

309

1   it, please point it out.

2          MR. SCHEINGART:   In any event, when the defendant
3   was introduced by his attorney, he responded to the jury.
4   He said, "Hello," and no one responded, and his response
5   was, "What?  No hi's back?"  and at that point Ms. Johnson
6   raised her right hand and looked in the direction of the
7   defendant.   I believe she was looking right at him and
8   raised her right hand in response to what I perceived to be
9   a "hello" or a gesture back to the defendant.

10          That struck me as being extraordinary.   No one
11   else made any response.  And in light of those comments, I
12   don't think that she can be fair.  I did point out, I think,
13   to the Court on the record that there was response by the
14   defendant, which I heard clearly, which I've just stated at
15   an earlier time.

16          With regard to Ms. Biddings, she stated that her
17   cousin is presently serving time in prison for assault.  She
18   did say she didn't think this would impair her ability.  I
19   asked her about that.  She knows her cousin.  She's somewhat
20   close to her cousin.  Besides that, I don't think that she
21   could be fair because of that relationship, and I believe if
22   my recollection is correct, that that was another incident
23   that occurred in this county.

24          And if I may borrow the Court's questionnaire with
25   regard to Ms. Wattsholman, I had it, and I honestly have no
26   idea where it is.  Hopefully that will jog my memory with
27   regard to a couple of responses that I had as a basis of
28   excusing her.   Thank you, your Honor.

310

1          THE COURT:  You're welcome.

2          MR. SCHEINGART:  With regard to page 8, question

3   40, about the presumption of innocence, failure of proof by

4   the People, her response was that "I've never been put in

5   that position before, so I really don't how to answer that."

6   It struck me as being quite an unusual answer to such a

7   significant issue of law.  She also responded that both

8   sides should have to be heard, and I'm mindful that the

9   Court did advise jurors about that issue, and she changed

10  her response.  But again, in light of some of her responses

11  to the questionnaires, it struck me as being that she would

12  have a problem understanding the certain concepts of the

13  law.  And in this case there are going to be some

14  significant concepts with regard to 1108 and 1101 evidence.

15         And again, in her questionnaire with regard to

16  page 9, question 44, she indicated "A person should have to

17  tell their side of the story."  My concern is if somebody

18  does not, that renders her in a situation of confusion and

19  inability to make a decision.

20         She also indicated that her nephew was in jail as

21  a result of an action in this county, and if I recall, it

22  was a homicide trial.  That would have a significant impact.

23         I noticed during the voir dire in the process,

24  whenever I tried to make eye contact with her when I was

25  questioning her, she would look away from me.  I took that

26  posture, those mannerisms, to be evasive.  And in

27  surveilling the jury as a whole, I look at everyone to see

28  if they make eye contact with me when I talk with them.  I

EXHIBIT (6)(8)

Deborah Wolfe, CSR, RPR

311

1    look at their body language to see what I may interpret to

2    be the type of person that is amenable or keeps an open mind

3    to evidence, to questioning, and I did not get that same

4    sense from her as I did from other jurors.

5            There was another reason which I can't recall at

6    this point.  I don't specifically have her questionnaire in

7    front of me, as I mentioned, but those are the items I'd

8    like to bring up at this point in response to the <u>Wheeler</u>

9    challenge by the defense.

10           THE COURT:  Any response, Mr. Hove?

11           MR. HOVE:  Yes, your Honor.  Starting with

12   Wattsholman.  She sat in what would be the seventh chair,

13   first seat in the front row here.  I guess that's chair

14   Number 7.  I paid particular attention to her.  I saw her

15   making direct contact with the prosecutor because it was my

16   belief he was going to bounce her the second she got in that

17   chair, and I wanted to make sure of what she did when she

18   was being questioned with him was exactly.

19           She comported herself properly.  He asked her a

20   number of questions.  In fact, the one about her cousin

21   being prosecuted, she said she wasn't familiar with him.

22   She looked him directly in the eye and discussed that matter

23   fully with him.  That she did not look him in the eye is not

24   correct.  From my seat I could see she looked at him the

25   whole time.  She said she didn't go to the trial.  "The only

26   information I got was basically secondhand through the

27   family."  She said, "It wouldn't affect me whatsoever."  I

28   don't know the situation that came in.

313

1    credible."

2           Janice Maresca, one of the jurors seated right now

3    in response to that question said, "No.  I think at least

4    three witnesses should make it more believable."  How could

5    the prosecutor argue that somebody said they don't believe

6    one witness when Ms. Maresca says you need three witnesses

7    and he leaves her on.

8           THE COURT:  I don't think she's on the jury.

9           MR. HOVE:  Excuse me.  I withdraw those comments.

10   I pulled her -- you're correct.  I stand corrected.

11          MR. HOVE:  JN.05XXXXXXXXXXXXXXXXX, who is a seated

12   juror, she responds to questions about "Have any of your

13   friends been convicted or charged with a crime?"  she

14   answered "yes" to that.  She said of course it wouldn't

15   bother her.  She would still be impartial.

16          JN.02XXXXXX indicated a friend of his spent time

17   in jail for multiple DUIs and subsequent failures to appear.

18   Prosecutor left him.  Of course he's a white male.

19          JN.04XXXXXX, who is seated on this jury, he said

20   his brother and two different friends have been convicted of

21   crimes, but that wouldn't have any effect on him.

22          I think there's numerous indications from other

23   jurors on this panel who have answered the same questions

24   similarly to the jurors in question of my motion that show

25   that the prosecutor's reasons are not correct.  They don't

26   show anything or excuse or give the Court basis to find that

27   there was not purposeful exclusion.  I think they

28   demonstrate that, in fact, the prosecutor was purposely

314

1  excluding a specific class, that of black females under the

2  age of 50.

3           THE COURT:  As to the issue of eye contact, I must

4  admit I was not paying attention to that.  I have no idea if

5  there was or was not eye contact.  And as for the alleged

6  gesture that was made, I did not see that.  I was looking

7  down writing copious notes and trying to get through jury

8  selection and pay attention to the ethnicity and gender of

9  each juror so I could take note of it in case there was a

10 Wheeler motion.  So I have no idea if that was done.

11          However, it's clear that contact with the criminal

12 justice system is enough to defeat Wheeler.  The crimes that

13 the four excluded jurors had familiarity with in terms of

14 their family members were crimes of violence, as of this

15 crime, versus nonviolent crimes with some of the other

16 jurors who were left on the jury.

17          And the Court's relying on People vs. Douglas 36

18 Cal.App.4th 1681 and People vs. Martinez, a 2000 case at

19 Daily Appellate Report 7921.  Unfortunately I forgot to look

20 up the appellate or the official citation for that.  But

21 contact with the criminal justice is enough to defeat

22 Wheeler.  In this case I believe it does.  And the

23 Wheeler-Batsen motion is denied.

24          Are we otherwise ready for the jurors?

25          MR. SCHEINGART:  I have a few other matters to

26 address in an abundance of caution.  I would like to state

27 the racial makeup of the jury.

28          THE COURT:  It doesn't matter what's left under

315

1   Wheeler.

2               MR. SCHEINGART:  Okay.

3               I will point out for the record that there are

4   three African-Americans on this jury at this time.

5               THE COURT:  Irrelevant.

6               MR. HOVE:  I would point out I made this motion

7   long before this jury was picked, and the Court kept

8   deferring the hearing on this motion.  I think that makes

9   the status of the jury irrelevant because the motion kept

10  being delayed.

11              THE COURT:  Which is why I said we didn't have to

12  discuss this.

13              MR. SCHEINGART:  I would make a motion to exclude

14  all witnesses or potential witnesses from sitting in court

15  during the trial.

16              THE COURT:  I thought that had been done.

17              MR. SCHEINGART:  I don't believe I've made that.

18              THE COURT:  Motion to exclude witnesses would be

19  granted.

20              (Whereupon, the jury entered the courtroom.)

21              THE COURT:  Jurors, welcome back.  Thank you.  I'm

22  glad you all made it.  We still have our schedule.  And

23  despite the fact we're getting started a half an hour late

24  this morning, we are still on schedule.  We need to have you

25  sworn in.  So will you all please stand and be sworn.

26                          (Jury sworn.)

27                          --oOo--

28

EXHIBIT (6)(13)

Deborah Wolfe, CSR, RPR

```
 1                    REPORTER'S CERTIFICATE

 2   STATE OF CALIFORNIA )

 3   COUNTY OF ALAMEDA   )

 4          I, MARY JANE M. HILL, a Certified Shorthand

 5   Reporter in and for the State of California, hereby certify:

 6          That on the 1st day of April, 2003,

 7   I fully, truly and correctly took down in shorthand writing all

 8    of the proceedings had and all of the testimony given in said

 9    court and cause;

10          That I thereafter truly, fully and correctly

11   caused the same to be transcribed into typewriting; that the

12    foregoing, Pages 166 through 217, inclusive, is a full, true

13    and correct transcript of my shorthand notes taken at said

14    time and place therein named.

15

16          DATED:   January 21, 2004

17

18

19                        _____

20                        MARY JANE M. B. HILL

21                        COURT REPORTER, CSR #8556

22

23

24

25

26

27

28
```

```
 1   COUNTY OF ALAMEDA          )
                                )   ss.
 2   STATE OF CALIFORNIA        )

 3

 4

 5          I, DEBORAH WOLFE, do hereby certify:

 6          That I am a Certified Shorthand Reporter of the

 7   State of California, and duly appointed shorthand reporter

 8   in the Superior Court for the County of Alameda, State of

 9   California;

10          That on April 1, 2003, and April 8, 2003, I fully

11   and correctly reported the within-entitled matter, the

12   Augmented Reporter's Transcript on Appeal of the Defendant,

13   MELROLANDO WARREN, before the Honorable PEGGY HORA, Judge;

14          That the foregoing pages 218 through 315, both

15   inclusive, are a full, true, and correct transcription of my

16   shorthand notes taken at the aforementioned time and place.

17          IN WITNESS WHEREOF, I have hereunto subscribed my

18   name this 23rd day of January, 2004.

19

20

21

22

23

24                              Deborah Wolfe, CSR #6121

25

26

27

28
```

# EXHIBIT COVER PAGE

*H*

EXHIBIT

Description of this Exhibit: *Court of Appeal for the*
*STATE OF CALIFORNIA First Appellate District*
*Opinion of Lower Super. Ct. No. H-31901*

Number of pages to this Exhibit: *19* pages.

JURISDICTION:   (Check only one)

☐   Municipal Court

☒   Superior Court

☐   Appellate Court

☒   State Supreme·Court

☒   United States District Court

☐   State Circuit Court

☐   United States Supreme Court

☐   Grand Jury



Filed: 08/08/06

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

F I L E D

AUG - 8 2006

Court ........ ....... ... Dist.
DIANA HERBERT
By.......................

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MELROLANDO WARREN,<br><br>    Defendant and Appellant. | A103913<br><br>(Alameda County<br>Super. Ct. No. H31401) |

A jury found Melrolando Warren guilty of forcible rape (Pen. Code, § 261, subd. (a)(2)) and six counts of sexual penetration with a foreign object (*id.*, § 289, subd. (a)(1)), finding true special allegations of kidnapping and gun use (*id.*, §§ 667.61, subd. (d)(2), 12022.3, subd. (a)) and a prior strike conviction for forcible rape (*id.*, §§ 1170.12, subd. (c)(1), 667, subd. (e)(1)). Sentenced to a prison term of 65 years to life, Warren appeals claiming error in denying defense motions under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and seeking a remand to decide possible entitlement to presentence custody credits. We reject the claim of *Batson/Wheeler* error but remand regarding the credits.

### BACKGROUND

The trial evidence is immaterial except to note that Warren is Black, as were four venire women against whose peremptory challenges he raised *Batson/Wheeler* objections.

Pertinent to the *Batson/Wheeler* claim, however, is a factual recitation given to the court by prosecutor Roy Scheingart before voir dire. The victim, Scheingart said, was waiting for a bus to go to work early one September 1986 morning in San Leandro when

EXHIBIT (H) (1)

1

Warren approached her and, after some small talk, put a gun to her chest and forced her
to walk with him a few blocks to a small alleyway beside a store. There he forced her to
disrobe and, over several minutes, committed the charged penetrations and rape. The
victim at one point grabbed the gun from the ground and tried to shoot Warren, but it did
not fire. They wrestled over the gun, and he got it back after slapping her and biting her
in the back of the head. He penetrated her once more, then threatened to kill her if she
told anyone and ordered her to count to 50 as he left. She called her boyfriend, and went
to the sheriff's department and had a sexual assault exam. Over the next few weeks, she
was shown three photo lineups assembled from her descriptions. But none contained
Warren's picture, and she said each time that her assailant was not in them. Warren went
unapprehended for these crimes for years but gave DNA samples while in prison for a
rape conviction in 1991 and sexual battery in 1997. Forensic testing in 1997 of semen
from the 1986 victim's underwear yielded a DNA profile, and Warren was matched as
her assailant in mid-2001 through a "cold hit" in the DNA database. A blood sample
obtained from him then produced a "positive match in the nature of one in 13 billion,"
and the victim immediately identified him from a new photo lineup.

### *Voir Dire*

Defense counsel Richard Hove objected to Scheingart's second, fourth, sixth and
eleventh peremptory challenges because they were used against Black women "under the
age of 50."[1] We refer to the women as U.S., R.J., M.B. and R.W.H. The court reserved
ruling until the end of voir dire and, in argument, had its attention called to answers that
the four women, and some jurors who did serve, had given in written questionnaires.

**U.S.** Each questionnaire asked, "In general, what are your views concerning the
effectiveness of the criminal justice system[?]" and U.S. wrote in hers, " 'What is Fair.' "
Asked whether she agreed with the principle of law that the testimony of one witness, if

---

[1] Warren concedes on appeal that the women's *ages* were not legally relevant
(citing *People v. McCoy* (1995) 40 Cal.App.4th 778, 783-786 [age-based groups do not
constitute cognizable classes for fair cross-section requirement]) and so bases his claims
simply on them being Black women.



2

believed, is sufficient to prove a fact, she wrote, "No, how would be sure [*sic*] if not an assumption." The questionnaire explained the presumption of innocence and that failure by the People to meet the reasonable-doubt burden entitled the defendant to a verdict of not guilty; asked if she agreed, and to "please explain" if not, she wrote, "Not Guilty." Asked if she agreed with the principle that the prosecution has the burden to prove guilt beyond a reasonable doubt and that a defendant is not obligated to present any evidence, she wrote, "No, their [*sic*] two sides to every story." Asked if friends or family members had been arrested, charged or convicted criminally and whether the experience would impair her ability to be fair and impartial, she wrote, "Yes, son—traffic accident, stop randomly & secure—'unfair.' " Asked for any experience with police that would impair her ability should a police witness testify, she wrote: "Yes, being question[ed] on issue that had no bearing on issue at that time." Asked for anything about "the nature of the charges alone" here that would impair her ability to be fair and impartial, she wrote, "Yes, mainly I feel rape is such a violent crime."

In initial questioning by the court about her "two sides to every story" answer and the court's explanation why "there would not be two sides necessarily" in the courtroom, U.S. said she understood and agreed with the explanation. She said she was comfortable following the law about the testimony of one witness being enough, said she did not think her strong feelings about the crimes would affect her ability to be fair, said, "Yes, I think so," when asked if she could put aside those feelings and be fair, adding that she was "willing to do it."

Asked later by Scheingart what she meant by her " 'What is Fair' " answer, U.S. offered: "Talking personally, to me I'm just saying fair in what way? Meaning — how should I put this — not looking at one issue or the other, just saying that I'm not sure if I have evidence of something, I can live with that, and if I don't, it's kind of like weighing whether or not I feel it's fair or not fair. I don't know how to explain it. It's not like I'm saying something isn't or is. It's just that I'm saying that off the top of my head I would say some things seem fair. Some things don't." Asked what she meant by some things seeming fair and some not, she cited "an example stopping individuals. Sometimes it

EXHIBIT (H)(3)

3

seems like a more particular individual gets stopped more than others. I just draw that concept of what is fair in there." She added: "A certain race or against another race. Whereas people do the same thing in all races, but it seems like more would get stopped more than the other." Asked if she was suggesting "prejudice inherent in the criminal justice system against members of a certain race," she said "No" and added: "I'm just saying that I see or I hear or I see the media. I'm not saying I'm particularly saying that it's one race or the other. I'm just saying that you see it mostly sometimes on one and not — it's kind of confusing. I'm trying to say that — it's not that I'm saying that — I see it may be one race more than the other and maybe it's not. I just say, 'What is fair?' " On her questionnaire answer about the impact of police experience on her ability to be fair regarding a police witness, she explained: "I was being questioned about my son, and it went off into a different direction that had nothing to do with why they were asking me a particular question, yes." The questionnaire asked about any attorneys she knew and her relationship with them, and U.S. named one for which she wrote, "Represent my son." She elaborated: "He was arrested for driving under the influence [DUI], but it was proven that he wasn't drunk and tested. He wasn't stopped. There was an accident, and they say they found a bottle cap in his car." "[T]hey tested him for alcohol."

**R.J.** R.J. answered, in her questionnaire, that "a few friends & family members" had been victims of sexual offenses but that this would not impair her ability to be fair. Confusingly, as to whether she agreed with the law that the testimony of one witness, *if believed*, is sufficient to prove a fact, she wrote: "[N]o. That person could be lying." On friends or family having been arrested or charged or convicted, she wrote: "Yes. Too many to list! No, this would not impair my ability." She also felt no impairment from knowing attorneys from work (as a secretary for a utilities agency) and family law, or knowing people in law enforcement—a brother in the California Highway Patrol (CHP) and the police officer husband of a friend. On the general effectiveness of the criminal justice system, she wrote: "Sometimes there are too many technical issues. If the person committed a crime, that person should not be found innocent because of a technicality."

*Exhibit (H)(4)*

In examination by the court on her "technicality" answer, the court explained to R.J. that the court would decide any questions about admitting evidence; jurors would not and would hear only things they were permitted to hear. R.J. said she was okay with that. She was also comfortable, having heard the court explain to another juror, with the idea of one witness being enough and would follow that law.

Prosecutor Scheingart probed R.J.'s too-many-to-list reply about arrested, charged or convicted friends and family. These were for grand theft and drugs, as recent as a year or two past, she said, were brought against "[c]ousins, stepbrother, friends," and involved jail. None were still ongoing as far as she knew. Asked how she felt about a case being thrown out on a technicality, she said: "It depends on what it is. It just depends on what it is and what it involves and who it involves." Asked if it would make a difference "if it was a theft versus a violent crime," she replied: "It depends on the circumstances, what was involved, the crime." On knowing people in law enforcement, R.J. said that her brother had been with the CHP for two years or less, in Northern California, but that she did not talk to him much about his work and was not close to him.

**M.B.** To the questionnaire item on arrests, charges or convictions, M.B. wrote: "Yes I have a cousin serving time for assault. This I don't feel would impair my ability to be a fair juror." On knowing victims of sexual offenses, she wrote: "[M]y daughter was a victim although no charges were filed due to lack of evidence in 1986[.]" In-chambers questioning of M.B. (Juror No. 48 in the transcript) revealed that this was in Oakland. The child, at age three, had revealed oral copulation by an uncle, the husband of M.B.'s sister, and child protective services told M.B. that lack of physical trauma to the child meant that charges could not be brought. Around the same time, the sister moved with the uncle to Los Angeles, disappeared and was never heard from again. M.B. felt the uncle was involved and should be held responsible but did not go to the police, fearing further trauma to her child and that the child might disappear, too. M.B. thought that she could set this aside.

Scheingart asked if the cousin's matter was handled in that county (Alameda). M.B. said it was in San Leandro in 1997 and confirmed that someone in Scheingart's

*EXHIBIT (H) (S)*

5

office had prosecuted him. The case went to trial and resulted in conviction. Asked if she was "close with" the cousin, M.B. said, "No, not really."

**R.W.H.** To the written query about views concerning the effectiveness of the criminal justice system, R.W.H. wrote: "I never dealt with it, so I really would not have anything to say about it." On agreement with the law presuming innocence, she wrote: "Once again, I have never been put in that position before so I really don't know how to answer that." On whether she agreed with the principle that penalty or punishment was not a proper consideration for the jury in determining whether a case had been proved, she answered, "I really don't know how to answer that." On whether she agreed with the idea of the prosecution having the burden of proving guilt beyond a reasonable doubt and the defendant having no obligation to present any evidence, she wrote: "No[,] I do not agree. I believe both sides should be heard in order to get a full understanding of what I have to make a decision on." On whether she agreed with the principle of one witness's testimony being sufficient if believed, she wrote, "It depends on how close the person is to the testimony." On the principle that a defendant had a right to remain silent, even at trial, and that jurors could not consider this in any way in determining guilt, she wrote: "No, a person should tell their side[.]" On whether she had been the victim of a crime, she wrote, "Not anything that has to do with the court system." On the arrests of friends or family for crime, she wrote: "Yes—my nephew was in jail for 2 years. I never been to any of his trail [sic] so I can not answer that!"

Asked by the court about the nephew's case, R.W.H. said it was a California prosecution for "murder as far as I know," but that she had not been involved in the trial and did not think it would affect her service here. On a defendant's right not to testify, she was now "[c]rystal clear," having heard explanations during the preceding voir dire, could follow the law in this case, and was willing to serve.

When later questioned by Scheingart about her need to hear both sides to make a decision, she said this was "something that I try to teach my children, that there's two sides to every story . . . ." She had heard the court's explanations, however, and said if she had to listen to only one side "and that's the law, I'll do my best with that," adding:



6

"I think just to be fair, you should hear the other person if they want to be heard. If they chose not to be heard, then you have to make the best decision with the information that you have." Questioned further about the nephew's case, she said it was a jury trial in Alameda County, that the nephew had been "just released this year" and not convicted. She had been very close with the nephew "[w]hen he was growing up" but did not know whether he was treated fairly in the case. All of her information about it had been "third- and fourth-hand," she said: "I didn't go to the trial or have anything [sic]. I distanced myself from it because I couldn't deal with it."

**Argument and ruling.** The court, after hearing defense counsel Hove argue that there were insufficient reasons for challenging the four Black women, ruled that a prima facie case had been made out and asked Scheingart for responses.

For U.S., Scheingart cited U.S.'s written qualms about the one-witness rule, her "unusual" what-is-fair response to the effectiveness question, and her oral replies on the same subject, which Scheingart felt "made no sense," were "rambling," were "not even close to being articulated with any sort of logic," and struck him as being "very confusing and [showing] potential bias." He also cited her reasonable-doubt need to hear both sides of every story, her feeling that the son's stop was random and "unfair." While she said the stop was for a traffic accident, it was evidently serious since she hired an attorney for him. "So," Scheingart said, "I don't think that she was being as forthright as she should have been in filling out her questionnaire. And particularly with regard to the events involving her son, I think that she had a very strong bias that was being concealed that I, in questioning, believed to exist, and that was the basis of my excusing [her]." Hove offered no rebuttal specific to U.S.

For R.J., Scheingart cited her too-many-to-list answer yet claim that this would not impair her ability, saying he found the statements to be "oxymorons in nature." Also, the casual, too-many-to-list answer, given "family members in this county being involved with the law," seemed "quite unusual" and a sign that she would not be fair. Scheingart was also put off at start of voir dire after Hove introduced himself and his client. Warren

*Exhibit #1(7)*

7

said hi and then, " 'What? No hi's back?' "[2] R.J. then raised her right hand and looked right at Warren, which Scheingart "perceived to be a 'hello' or a gesture back" to him. Scheingart thought this "extraordinary" since no one else responded at all. Hove countered, evidently referring in error to M.B.: "As to . . . the other jurors, especially Ms. B[.], I didn't notice Ms. B[.] make any movement whatsover. Had she made some indication, the prosecutor would have brought that up at the recess, just as he did when he said he heard Mr. Warren make a statement [see fn. 2, *ante*]. I think he would have indicated that Ms. B[.] made a movement with her arm in direction of, I guess, some sort of affiliation or affection with the defendant. I didn't see that occurring whatsover."

Regarding M.B., Scheingart cited her cousin serving prison time for an assault, apparently in Alameda County. While M.B. said she did not think this would impair her ability to be fair, Scheingart reasoned: "She knows her cousin. She's somewhat close to her cousin. Besides that, I don't think that she could be fair because of that relationship . . . ."

Finally, Scheingart explained that he had misplaced his questionnaire for R.W.H. (apparently notated), but worked from the court's copy to jog his memory. He cited her never-been-put-in-that-position answer to the presumption of innocence query, seeing it as unusual for "such a significant issue of law." Regarding her answer that both sides must be heard, the response struck him as indicating that she would have a problem understanding some legal concepts. As to her both-sides answer, Scheingart acknowledged that she had later changed her answer, but he feared that if one side did not testify, "that renders her in a situation of confusion and inability to make a decision." He also cited her written reply that persons should have to tell their side of the story. He felt

---

2 Scheingart had stated back then, out of the panel's presence: "When we were introduced, Mr. Hove introduced his client. The defendant looked at the jury and said, 'No hi's back.' I heard it. I wrote it down. I asked the court reporter if she recorded it. [She] indicated that she couldn't hear because of someone else talking, and I would ask that that be placed on the record. And I would ask Mr. Hove [to] respond whether he heard that as well." Hove said only, "He said something." The court indicated that it knew Warren had said something but had not heard what.

Exhibit (H)(8)

8

that her nephew having been "in jail as a result of an action in this county," apparently for homicide, "would have a significant impact." Finally, he had noticed: "[W]henever I tried to make eye contact with her when I was questioning her, she would look away from me. I took that posture, those mannerisms, to be evasive. . . . I look at everyone to see if they make eye contact with me when I talk with them. I look at their body language to see what I may interpret to be the type of person that is amenable or keeps an open mind to evidence, to questioning, and I did not get that same sense from her as I did from other jurors."

Most of Hove's comments centered on R.W.H. Hove said he had paid particular attention to her, believing Scheingart would "bounce her" immediately, and felt that she "comported herself properly" and had "looked him directly in the eye." The nephew's trial, Hove noted, had not been attended by R.W.H., who got secondhand information from the family and said it would not affect her. Hove urged that the both-sides answer meant that if Warren did not testify, R.W.H. would not show "confusion" but, rather, be inclined to find guilt, making Scheingart's reliance on that factor "totally disingenuous."

Hove then invited comparisons with questionnaire answers from some retained jurors. On agreement with the one-witness rule, Juror No. 8 wrote, "It depends," and Juror No. 1 wrote, "No, the testimony of all witnesses should be used to determine if the testimony is credible." On friends or family having been charged or convicted, Juror No. 4 listed a brother and two friends, and Juror No. 2 wrote that a friend spent time in jail for multiple DUI's and subsequent failures to appear.

The court ruled: "As to . . . eye contact, I must admit I was not paying attention to that. I have no idea if there was or was not eye contact. And as for the alleged gesture that was made, I did not see that. I was looking down writing copious notes and trying to get through jury selection and pay attention to the ethnicity and gender of each juror so I could take note of it in case there was a *Wheeler* motion. So I have no idea if that was done. [¶] However, it's clear that contact with the criminal justice system is enough to defeat *Wheeler*. The crimes that the four excluded jurors had familiarity with in terms of their family members were crimes of violence, as [with] this crime, versus nonviolent

EXHIBIT (H)(9)

9

crimes with some of the other jurors who were left on the jury." The court cited cases on family exposure to the system (e.g., *People v. Douglas* (1995) 36 Cal.App.4th 1681) and reiterated: "[C]ontact with the criminal justice [system] is enough to defeat *Wheeler*. In this case I believe it does. And the *Wheeler-Batson* motion is denied."

Scheingart then stated for the record, "in an abundance of caution," that there were three Black jurors left on the jury. The court, however, said: "It doesn't matter what's left under *Wheeler*"; "Irrelevant." Hove urged that the remaining jurors were "irrelevant" because the court "kept deferring the hearing on this motion," and the court said, "Which is why I said we didn't have to discuss this."

DISCUSSION

I. <em>Batson/Wheeler</em>

Race-based use of a peremptory challenge violates the federal constitutional guaranty of equal protection of the law, as held in *Batson*, and the state constitutional right to a jury drawn from a representative cross-section of the community, as held in *Wheeler* (*People v. Cornwell* (2005) 37 Cal.4th 50, 66); "Blacks . . . are a cognizable group for purposes of both *Wheeler* [citation] and *Batson* [citation]," and "Black women are a cognizable subgroup for *Wheeler*. [Citations.]" (*People v. Clair* (1992) 2 Cal.4th 629, 652.) ". . . *Batson* states the procedure and standard to be employed by trial courts when [a challenge is] made. 'First, the defendant must make out a prima facie case by "showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "if a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' [Citation.]" (*People v. Cornwell, supra*, 37 Cal.4th at pp. 66-67, quoting *Johnson v. California* (2005) ___ U.S. ___, ___ [125 S.Ct. 2410, 2416], fn. omitted.)

Here, the court found a prima facie case (unchallenged on appeal), thus shifting the burden to the prosecutor, and the prosecutor gave facially neutral reasons for each

*Exhibit (H)(10)*

strike. We are therefore concerned with the third step of the analysis (*People v. Silva* (2001) 25 Cal.4th 345, 384; accord *Purkett v. Elem* (1995) 514 U.S. 765, 767)—whether there was purposeful racial discrimination.[3] That step required the court to make " ' "a sincere and reasoned attempt to evaluate the prosecutor's explanation[s] in light of the circumstances of the case as then known" ' " (*People v. Reynoso* (2003) 31 Cal.4th 903, 919)—i.e., "all of the circumstances" (*People v. Johnson, supra,* 30 Cal.4th at p. 1322). A prosecutor's explanations need not rise to the level justifying a challenge for cause. "Rather, adequate justification . . . may be no more than a 'hunch' about the prospective juror [citation], so long as it shows that the peremptory challenges were exercised for reasons other than impermissible group bias and not simply as 'a mask for race prejudice'

---

[3] After regular briefing, we solicited letter briefs on the impacts of the federal high court decisions in *Johnson v. California, supra,* ___ U.S. ___ [125 S.Ct. 2410], and *Miller-El v. Dretke* (2005) ___ U.S. ___ [125 S.Ct. 2317] (*Miller-El*). The parties agree that *Johnson* has no direct impact. It overruled California case law (*People v. Johnson* (2003) 30 Cal.4th 1302, 1306) that equated a strong-likelihood standard (drawn from *Wheeler*) with the inference-of-discrimination standard that *Batson* sets as establishing a prima facie case, but the trial court here found a prima facie case, with no party disputing the threshold standard used.

*Miller-El* was a procedurally complex case involving a Texas trial that predated *Batson,* then numerous appeal proceedings, a remand at one point to reassess peremptory challenges in light of *Batson* and, decades later, a federal habeas corpus decision that, a majority on the high court held, erroneously found lack of purposeful discrimination. (*Miller-El, supra,* 125 S.Ct. at pp. 2322-2323, 2339-2340.) The Attorney General notes that the case is factually inapposite, involving not only unsupported race-neutral reasons but evidence of jury shuffling, and prosecutorial use of disparate juror questioning plus the existence of past racially discriminatory practices.

Warren does not urge factual similarity but notes that a point spurring dissent in *Miller-El*—the majority's resort to comparative juror analysis from questionnaires and other matters not before the trial court—is arguably inconsistent with our state high court's rule against use of comparative juror analysis for the first time on appeal (*People v. Johnson, supra,* 30 Cal.4th at pp. 1306, 1318-1325; compare *People v. Gray* (2005) 37 Cal.4th 168, 189 [distinguishing *Miller-El*] with *People v. Cornwell, supra,* 37 Cal.4th at p. 71 [assuming, without deciding, that a comparative analysis should be undertaken]). He concedes, however, that the trial court here did employ some comparative analysis, thus allowing us to do likewise consistent with the state rule.

EXHIBIT (H) (11)

11

[citation]." (*People v. Williams* (1997) 16 Cal.4th 635, 664.) The trial court had to ask: "[W]as the reason given . . . a 'legitimate reason,' legitimate in the sense that it would not deny defendant[] equal protection of law [citation], or was it a disingenuous reason for a peremptory challenge that was in actuality exercised solely on grounds of group bias?" (*People v. Reynoso, supra,* 31 Cal.4th at p. 925.)

On appeal, we review that determination with great deference because it turns largely on evaluations of credibility. (*People v. Reynoso, supra,* 31 Cal.4th at p. 918, 924.) California appellate courts do not engage in comparative juror analysis for the first time on appeal but do use it where, as here, it was part of the circumstances offered at trial. (*People v. Cornwell, supra,* 37 Cal.4th at p. 71; *People v. Johnson, supra,* 30 Cal.4th at pp. 1306, 1324-1325; see fn. 3, *ante.*)

Warren does not claim lack of substantial evidence for most of the race-neutral factors cited by the prosecutor; nor does he dispute the court's stated reliance on each of the challenged prospective jurors having had family members or friends prosecuted for crime. Rather, Warren parses out the court's statement that family members' crimes were "crimes of violence, as [with] this crime, versus nonviolent crimes with some of the other jurors who were left on the jury." Pointing out that U.S. said her son was arrested in a DUI stop and that R.J. said her friends' and family's offenses involved grand theft and drugs, Warren contends that the record does not show that all four jurors revealed crimes that were *violent* and, thus, that the ruling cannot stand. The court, he proposes, "based its ruling entirely on the characteristic that they all had family members associated with crimes that were violent rather than nonviolent," and this "necessarily means that the court found that none of the other reasons stated by the prosecutor justified the challenges . . . ."

We disagree, first, with the notion that the court relied solely on family's or friends' law enforcement experiences, to the exclusion of all else in the record. We are cited no authority that the court had to state every factor influencing its finding of no purposeful discrimination. Case law is to the contrary. A court must make a sincere and reasoned effort to evaluate prosecutors' explanations in light of the circumstances then

*Exhibit (H)(12)*

12

known (*People v. Reynoso, supra*, 31 Cal.4th at p. 919), "[b]ut in fulfilling that obligation, the trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." (*Ibid.*) Thus, unlike Warren, we cannot deem the court's articulation of one factor an implied rejection of every other. "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not . . . make detailed findings" (*People v. Silva, supra*, 25 Cal.4th at p. 386), and that describes our case. This is not a case where more specificity was needed because "the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both . . . ." (*Ibid.*)

Looking to the court's words, we also see no *statement* that the court rejected all other reasons. It said it had not seen R.J. gesture to Warren, but this does not necessarily imply that it *disbelieved* the prosecutor's account. The court only said, in effect, that it had not been paying attention and therefore could not independently resolve the factual conflict arising between the prosecutor and defense counsel, who said he had not noticed anything. The court went on to state: "So I have no idea if that was done. [¶] However, it's clear that contact with the criminal justice system is enough to defeat *Wheeler*." As part of our great deference to a *Batson/Wheeler* ruling we draw appropriate inferences to support a ruling. (E.g., *People v. Reynoso, supra*, 31 Cal.4th at p. 918, fn. 4.) Warren's view that the court relied on only one factor, to the exclusion of all others, contravenes that principle by asking us to draw an inference *against* the ruling.[4] So does his view that, because the court did not itself see R.J. gesture toward Warren, the court "rejected

---

[4] Deferential review of a *Batson/Wheeler* ruling entails a test for substantial evidence (*People v. Williams, supra*, 16 Cal.4th 635, 666; cf. *People v. Boyette* (2002) 29 Cal.4th 381, 423 [no prima facie case]), and substantial evidence review entails deference to credibility matters, viewing the record most favorably to the ruling, and presuming in its support all supported implied findings (*In re Manuel G.* (1997) 16 Cal.4th 805, 822; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11). We cannot ignore supported favorable inferences and rely, instead, on contrary inferences we might find supported. (*People v. Rodriguez, supra*, 20 Cal.4th at p. 11; *In re Manuel G., supra*, 16 Cal.4th at p. 823.)


EXHIBIT (H)(13)

13

the prosecutor's reason" for that challenge. Rather, and more appropriately, we infer *in support* of the ruling that the court was otherwise satisfied with the prosecutor's good faith and, having no personal basis for resolving the attorneys' conflicting impressions, accepted the prosecutor's account as made in good faith.

We reject also the inflated worth Warren attaches to the court's reliance on the term "crimes of violence." The court initially said only that "contact with the criminal justice system is enough to defeat *Wheeler*," and closed by saying: "[C]ontact with the criminal justice [system] is enough to defeat *Wheeler*. In this case I believe it does." Precedent solidly holds that family's or friends' negative contact with the criminal justice system is a reason which, if not sham or pretextual, justifies a peremptory challenge in the face of a *Batson/Wheeler* claim (*People v. Garceau* (1993) 6 Cal.4th 140, 172 [family members had "run afoul of the law" and been incarcerated]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1282 [brother convicted of a crime possibly prosecuted by another deputy in the same office]; *People v. Walker* (1988) 47 Cal.3d 605, 626 [juror believed police had followed her husband home and harassed him by stopping him without cause]; *People v. Douglas, supra,* 36 Cal.App.4th 1681, 1690 [son convicted for grand theft auto]), and no case of which we are aware requires that such negative contact must be for crimes of violence. Indeed, a case cited by the trial court involved grand theft auto that apparently entailed no violence. (*Ibid.*)

Warren stresses, however, this single sentence between the court's opening and closing lines: "The crimes that the four excluded jurors had familiarity with in terms of their family members were crimes of violence, as [with] this crime, versus nonviolent crimes with some of the other jurors who were left on the jury." Warren would have us infer, *against* the ruling, that "crimes of violence" were crucial to the court finding good faith by the prosecutor. A supported inference *in favor of* the ruling, however, is that the court was satisfied, for all four of the challenged women, that family members' negative crime contacts were genuine and enough under the law it cited, and went on to mention crimes of violence only to address defense counsel's invitation to do a comparative juror analysis, counsel having argued that other jurors with similar negative contacts were not

*Exhibit (H)(14)*

14

challenged. Viewing the record in that favorable light, error in characterizing two of the challenged jurors' family experiences as "crimes of violence" has little apparent impact on the ruling as a whole. First, as the trial court was presumably aware, case law deems comparative juror analysis to be, while "not *irrelevant*," " 'largely beside the point' because of the legitimate subjective concerns that go into selecting a jury. [Citation.]" (*People v. Johnson, supra*, 30 Cal.4th at p. 1323.) Moreover, as Warren concedes, two of the women did have family members who were tried for crimes of violence. M.B.'s cousin had been convicted of "assault," which was M.B.'s term and, since she declared "no" legal training, most likely not used in any legal sense of mere attempted battery or a " 'least touching' " (*People v. Colantuono* (1994) 7 Cal.4th 206, 214). The case was prosecuted by someone in this same Alameda County prosecutor's office, and the cousin was still serving time (reinforcing the inference that violence was involved). R.W.H.'s nephew had been tried for murder, also in Alameda County, and while he had been released just that year without being convicted, had spent two years in jail. R.W.H. said she had been close to this nephew as he was "growing up" and said she had "distanced" herself from the trial, "because I couldn't deal with it." Neither the prosecutor nor the trial court was bound to accept at face value a prospective juror's answer (*People v. Boyette, supra*, 29 Cal.4th at p. 422), and the record here raises legitimate doubt about either of these women's claimed ability to serve impartially and without bias despite the relatives' negative experiences.

Any error, then, was the court perceiving crimes of "violence" for the other two women. U.S. wrote of her son being stopped "randomly & secure" (apparently meaning arrested), called it " 'unfair,' " and said police had questioned her "on [an] issue that had no bearing on issue at that time." From her oral answers, we learn that the incidents were related, for she was questioned about the son. She explained that the son was "arrested" for DUI after "an accident"; yet inconsistently, "He wasn't stopped"; and "it was proven that he wasn't drunk and was tested" (sic). We do accept that DUI is not what lawyers think of as intrinsically a "crime of violence," but the court may well have linked the DUI to the "traffic accident" that precipitated the arrest, in which case there clearly was some

*EXHIBIT (H)(15)*

15

unspecified physical impact. Obviously, this arrest of a son, which U.S. deemed unfair and resulted in her being questioned by police in a way that she found offensive, legitimately supports the court's conclusion that her challenge was not purposeful racial discrimination. Bearing in mind that any error in characterizing the DUI as a "crime of violence" related specifically to a comparative juror analysis, we see no conceivable prejudice. True, as Warren points out, Alternate Juror No. 1 wrote of his brother having been involved in a DUI as well, but nothing from that juror fueled the strong implication of lingering bias that M.B.'s answers did. The juror said that a friend of his wife's who had quit the San Francisco Police Department left him with some qualms about certain long-term officers, but that his brother's case had nothing to do with this and that he felt fine about it. With or without characterizing the crime of U.S.'s son as violent, the record still amply supports race-neutral reasons for challenging U.S. but not the alternate.

R.J. wrote, "Too many to list," to the query about friends or relatives who had been arrested, charged or prosecuted. She revealed little detail in follow up except to say they were cousins, friends and a stepbrother, and, when asked the crimes' *type* or *range*, said: "Grand theft, drugs. That's about it." Warren is correct to say that the record does not show, with certainty, that any of these offenses was a crime of violence, but again we see no conceivable prejudice in that distinction. The point, for R.J., was not so much the seriousness of the offenses, but that there were so many she could not list them and, yet, asserted that this would not "impair" her ability to serve fairly. The prosecutor felt that the two statements were "oxymorons in nature," and that the too-many-to-list reply was unusual and casual, given so many "family members in this county being involved with the law." It was taken as a sign that she would not be fair. None of this was significantly altered by any mistaken notion by the court that one or more of the family or friends had committed a "crime of violence." The prosecutor, whose good faith and reasons were the paramount concerns, articulated no such distinction or misapprehension.

Also on the subject of violent crimes, Warren correctly observes that Juror No. 3 had a nephew who was convicted of armed robbery, a violent crime, but he mistakenly concludes from this that the court erroneously thought that "none of the selected jurors



16

had family members who were involved in violent crimes." The court did not, in fact, find that "none" had that involvement; it spoke of "nonviolent crimes with *some* of the other jurors who were left on the jury" (italics added).

Warren invites comparison of the challenged women with passed jurors, pointing out the alternate's brother's DUI conviction (discussed above), that Juror No. 2 had a friend who spent time in jail for multiple DUI's and related failures to appear, that Juror No. 1 had a friend with a DUI, and that Jurors No. 3, 4, 5 and 6 had largely unspecified friends or family members who had been arrested or convicted of unspecified crimes. However, none of those mostly vague responses compares with the sheer number of experiences for J.R., the stop and jailing of a son that U.S. deemed random and unfair, the once-close nephew's conviction that R.W.H. had to distance herself from because she "couldn't deal with it," and the assault conviction of M.B.'s cousin, something for which the cousin was still serving time.

Also, the prosecutor articulated *multiple* race-neutral reasons for three of the women. Warren would have us isolate the arrest/conviction factor as the sole basis for ruling, but as already explained, we cannot do that and imply that the court rejected all others. For U.S., the record supports Scheingart's additional concern that her oral replies were rambling and made little sense, suggesting confusion with legal concepts, a good reason for challenge (*People v. Turner* (1994) 8 Cal.4th at p. 169), and/or concealed bias. For R.J., there was Scheingart's concern over a gesture made to Warren, which the court's could not personally verify due to inattention and defense counsel said he had not noticed; but the court could have believed the account and found this to be an added good reason (*People v. Reynoso, supra,* 31 Cal.4th at p. 917 [smiling or glaring at defendant]). If the court entirely disregarded that observation, as Warren urges, the challenge was still solidly justified given the too-many-to-list arrests and convictions. For R.W.H., there was Scheingart's concern that her never-been-in-that-situation answers regarding various legal concepts legitimately raised suspicion of her inability to understand them, and this remained so even if, for sake of argument, the court was troubled by defense counsel's insistence that M.B. had not, as Scheingart claimed, also avoided eye contact. The court

EXHIBIT (H)(17)

17

presumably rejected defense counsel's cynical argument—shamelessly urged again on appeal—that, if M.B. evinced any confusion about the single-witness rule, this would *favor* the prosecution and was therefore a "disingenuous" ground for challenge. A prosecutor is entitled to seek jurors capable of understanding the law, regardless of whom any confusion might benefit.

In short, this was not a close case, for any of the challenges, so that error in the comparative analysis on the issue of whether relatives or friends had experienced crimes of "violence" would have been prejudicial.

Finally, the court's remarks discounting as "[i]rrelevant" the prosecutor having left three Black jurors on the jury are perplexing. "Although not a conclusive factor, 'the passing of certain jurors may be an indication of the prosecutor's good faith in exercising his peremptories, and may be an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection' " (*People v. Reynoso, supra*, 31 Cal.4th at p. 926; accord *People v. Turner, supra*, 8 Cal.4th 137, 168 [passed jurors considered]; *People v. Gray* (2001) 87 Cal.App.4th 781, 787 [passed group members a factor]). Warren defends the remarks by positing that the passing of jurors is relevant only in finding no prima facie case, but this is incorrect. Our Supreme Court has also declared it relevant in reviewing a finding of no purposeful discrimination. (*People v. Reynoso, supra*, 31 Cal.4th at p. 926.) The trial court's further remarks deeming the factor inappropriate, because the court had reserved ruling on all objections until the end of jury selection, are also perplexing. The court never intimated that it deemed the prosecutor's passing of Black jurors an effort to mask purposeful discrimination, and such a finding would be hard to reconcile with its overall finding of no purposeful discrimination. Still, Warren correctly observes that the record does not show the *gender* of the passed Black jurors, and that if they were not women, this arguably did diminish their relevance in assessing a claim of improper challenges against Black *women*. Whatever the court's reasoning, it clearly did not rely on passed jurors, and its implied finding of no purposeful discrimination is supported without that additional factor.

Substantial evidence supports the ruling.

*EXHIBIT (H)(18)*

18

## II. *Presentence Credits*

The probation officer's report states, without elaboration, "DAYS IN JAIL THIS CHARGE 568 days," but no credits were awarded, denied or mentioned at sentencing. Perhaps, due to the lengthy prison term of 65 years to life imposed on a defendant who was already 34 years old, the matter was simply overlooked. Warren asks that, since we cannot determine from the record an appropriate disposition on credits or how the 568 days indicated in the report were calculated, we remand for the court to do so.

The Attorney General agrees that the court had a duty to determine and award any credits that might be due (*People v. Goodloe* (1995) 37 Cal.App.4th 485, 492; Pen. Code, § 2900.5 subd. (d); see, e.g., *People v. Wiley* (1994) 25 Cal.App.4th 159, 165) and should act accordingly on a remand for that purpose. We agree.

### DISPOSITION

The judgment is affirmed; the case is remanded for the trial court to consider and award any presentence credits to which Warren may be entitled.

*Exhibit (H)(19)*

19

Kline, P.J.

We concur:

Lambden, J.

Richman, J.

A103913, *People v. Warren*

EXHIBIT (4)(20)

# EXHIBIT COVER PAGE



EXHIBIT

Description of this Exhibit: *California Supreme Court opinion Case No. S146677 of Lower Court opinion. Case No. A108913*

Number of pages to this Exhibit: _____/_____ pages.

JURISDICTION:   (Check only one)

☐   Municipal Court

☒   Superior Court

☐   Appellate Court

☒   State Supreme Court

☒   United States District Court

☐   State Circuit Court

☐   United States Supreme Court

☐   Grand Jury

Court of Appeal, Fourth Appellate District, Div. 1 - No. A103913
**S146677**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

THE PEOPLE, Plaintiff and Respondent,

v.

MELROLANDO WARREN, Defendant and Appellant.

Petition for review DENIED.

SUPREME COURT
F I L E D

OCT 25 2006

Frederick K. Ohlrich Clerk

DEPUTY

GEORGE

Chief Justice

EXHIBIT (I) (I)

# EXHIBIT COVER PAGE



EXHIBIT

Description of this Exhibit: *HiGHLAND GENERAL Hospital MEDICAL REPORT OF 7/30/96*

Number of pages to this Exhibit: ___/___ pages.

JURISDICTION: (Check only one)

☐ Municipal Court

☒ Superior Court

☐ Appellate Court

☒ State Supreme Court

☒ United States District Court

☐ State Circuit Court

☐ United States Supreme Court

☐ Grand Jury

ER 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
07730
AK 55 217 15 2

00-21-02-24-9    26  HGM
WARREN, MELROLANDO NIGE
03 07 69    M B NON H CA   VH

**ALAMEDA COUNTY HEALTH CARE SERVICES AGENCY**
**HIGHLAND GENERAL HOSPITAL**

## DISCHARGE SUMMARY

Admission Date: 7/30/96
Discharge Date: 7/31/96
Service: ORTHO

(IF NOT ENOUGH SPACE, DICTATION IS REQUIRED)

| Principal Diagnosis: the condition established after study to be responsible for admission | ICD-9-CM CODE |
|---|---|
| OPEN GUN SHOT WOUND TO RIGHT PATELLA, | 822.1 |
| COMMINUTED FRACTURE OF RIGHT PATELLA | E965.0 |
| Secondary Diagnosis: NONE | |
| | |
| | |

Reason for hospitalization: SURGICAL REDUCTION OF PATELLAR FRACTURE PAIN CONTRO

Significant Findings: COMMINUTED RIGHT PATELLA

Clinical Course: PT ADMITTED 7/30/96 FOR OPEN PATELLAR COMMINUTED
FRACTURE SECONDARY TO GSW. GIVEN IV ANCEF
TAKEN TO O.R. FOR ORIF ON 7/30/96 WITH
NO COMPLICATIONS. (R) LEG CASTED IN LONG LEG
CYLINDER & PT DISCHARGED TO HOME 7/31/96.

Complications: NONE

| Procedures Performed: (Diagnostic and Therapeutic) | DATE | ICD-9-CM CODE |
|---|---|---|
| Principal Procedure: OPEN REDUCTION & INTERNAL FIXATION OF RIGHT PATELLAR FRACTURE | 7/30 | 79.36 |
| Secondary: IRRIGATION & DEBRIDEMENT OF RIGHT KNEE | 7/30 | 96.59 |

Condition of Patient upon discharge: GOOD

Specific Instructions Given to Patient: NON WEIGHT BEARING ON (R) LEG

Medications: VICODIN i - ii PO q 4-6° PRN PAIN

Physical Activity: NON WEIGHT BEARING RIGHT LEG AS TOLERATED    Diet: REGULAR

Follow-up Care: ORTHO CLINIC 8/15 at 9Am Dr. Akizuki

Referring or Primary care Physician          Attending Physician          (signature/title of staff discharging)
Original/Chart; Canary/Primary physician-clinic    Thomason

301-MC-3 (9/90)

EXHIBIT (J) (1)

# EXHIBIT COVER PAGE



EXHIBIT

Description of this Exhibit: *HiGHland LanD Hospital*
*MEDiCAL REPORT oye Dn JENNALD GoLDMAN*
*also Dn.Ken KARUKi, Dn.ChifoRD JONES , Dn.KARN*
*GENE* Number of pages to this Exhibit: __ *3* __ pages.

JURISDICTION:   (Check only one)

☐   Municipal Court

☒   Superior Court

☐   Appellate Court

☒   State Supreme Court

☒   United States District Court

☒   State Circuit Court

☐   United States Supreme Court

☐   Grand Jury

HIGHLAND GENERAL HOSPITAL    **HGH**    PA:
1411 E. 31st ST., OAKLAND, CA 94602

☐ NARRATIVE SUMMARY      MR:   21-02-24-9

☐ REPORT OF OPERATION      PN:   WARREN, Melrolando

☐ HISTORY & PHYSICAL      DB:

D7-3

## OPERATIVE REPORT

DATE OF OP:      07/30/96.

PREOP DIAGNOSIS:      Status post gunshot wound, right knee, resulting in comminuted fracture of right patella.

POSTOP DIAGNOSIS:      Same.

OPERATION:      Open reduction, internal fixation of right patella.

SURGEON(S):      Dr. Jerrald Goldman;
Dr. Ken Akizuki;
Dr. Clifford Jones;
Dr. Hern, Gene

ANESTHESIA:      General endotracheal anesthesia.

SPECIMEN(S):      None.

EST. BLOOD LOSS:      Approximately 100 cc.

IV FLUID(S):      Approximately 1000 cc of crystalloid.

TOURNIQUET TIME:      60 minutes.

CONDITION OF PATIENT AT CONCLUSION OF PROCEDURE: The patient's right lower extremity was found to be neurovascularly intact postoperatively, with good capillary refill and a +2 dorsalis pedis pulse.

FINDINGS AT SURGERY: The patient had a comminuted fracture of the right patella, with four large fragments and total ablation of the central aspect of the patella, with no sign of any bone in this area. There also were other smaller comminuted pieces, which were denuded of any periosteal soft tissue covering.

PROCEDURE TECHNIQUE: The patient was brought into the Operating Room, and he was placed in a supine position on the operating table, following which general endotracheal anesthesia was induced without difficulty. A tourniquet was placed about the right thigh, and the right lower extremity was then prepped and draped in the

(Continued)

EXHIBIT (K)(1)

LF-1 (REV. 5/84)

HIGHLAND GENERAL HOSPITAL
1411 E. 31st ST., OAKLAND, CA 94602

HGH

☐ NARRATIVE SUMMARY

☐ REPORT OF OPERATION

☐ HISTORY & PHYSICAL

PA:

MR:

PN:         WARREN, Melrolando

DB:

---

## OPERATIVE REPORT

PAGE 2

usual sterile fashion. The right lower extremity was exsanguinated, following which the tourniquet was inflated to 225 mm of mercury pressure.

A midline incision was made over the knee, incorporating the bullet wound and ellipsing out the bullet wound as part of the incision. This was carried through the skin and soft tissue until the retinacular tissues overlying the knee were identified. A soft tissue flap was then developed both medially and laterally at the level of the retinaculum, and this was carried down to the level of the patellar tendon and quadriceps tendon. The paratenon overlying the quadriceps and patellar tendons was next incised in a parallel fashion, following which a large defect was identified in the central aspect of the patellar, with disruption of the retinaculum and soft tissues covering this area. Flaps were developed medially and laterally along the plane of the paratenon on the medial and lateral aspects.

At this point, we were able to gain full exposure of the comminuted fracture of the patella, which was subsequently close-reduced, with removal of any loose bullet fragments and the actual bullet itself, removing these en bloc from the central aspect of the patella. The area was then copiously irrigated with the pulse lavage using approximately 5.0 liters of normal saline solution. The fracture was then reduced, and this was maintained using a K-wire. The anterior, superior, and inferior aspects of the fracture were reduced, and a K-wire was inserted across from lateral to medial at the proximal pole, thereby achieving a good reduction at the proximal aspect.

A 4.5 cannulated screw system was then placed, drilling across the K-wire and then tapping, following which the 4.5 cannulated cancellous screw was put into position, thereby maintaining the reduction at the proximal pole without difficulty. A second K-wire was then placed across the inferior pole to maintain the reduction at this point. Another K-wire was placed; the inferior pole was comminuted in two pieces, which were incomplete. As such, it was decided to insert the longitudinal K-wire from inferior to superior rather then superior to inferior as is normally performed; by placing the K-wire in this manner, we could incorporate each part

(Continued)

EXHIBIT (K)(2)

(REV. 5/84)

1411 E. 31st ST., OAKLAND, CA 94602

☐ NARRATIVE SUMMARY

☐ REPORT OF OPERATION

☐ HISTORY & PHYSICAL

PA:

MR:

PN:        WARREN, Melrolando

DB:

---

## OPERATIVE REPORT

PAGE 3

of the comminution in the inferior pole with a single K-wire.
Next, we inserted a 0.45 K-wire from inferior to superior in a
parallel fashion, across the inferior fracture site, through the
defect and into the distal fracture component; this was done in
both the medial and lateral aspects, with care taken to ensure that
the K-wires were within the bone and out of the articulating
surface.

An intraoperative x-ray was obtained at this point to confirm that
K-wire placement was in good position and that good reduction was
maintained, as well as to ensure that no hardware was within the
joint.

We then proceeded to make a small incision at the distal aspect of
the quadriceps tendon, and we then bluntly dissected down to
identify the ends of the K-wire on that side.  We also introduced
a #18 gauge intravenous set and incorporated this at the distal
pole, just beneath the two ends of the K-wire; this was done, and
the needle was pulled out, maintaining the intravenous set within
the soft tissues, following which a #18 gauge cerclage was placed
through this and beneath the K-wires for use as a tension band.
This entered the lateral side, and it was twisted over the anterior
aspect of the patella, following which it could be inserted beneath
the two wires superiorly; this could then be swung across to the
medial side, and the two ends were then tied together.  The lateral
side was then shaped into a circle, thereby creating a double
figure-of-eight tension band line.

A tension band tightener was then used to sequentially tighten the
medial and lateral knots down to the point where the K-wire and
cerclage wire were snug in both the anterior and inferior aspects,
maintaining a good reduction on either side.  The ends of the K-
wire were then cut and buried within the soft tissues; both the
inferior aspect and the anterior aspect wires were cut and buried
within the soft tissues, and the ends of the K-wire that protruded
out superiorly were cut as well.

At this point, satisfied with the reduction, the tourniquet was let
down after a total tourniquet time of 60 minutes.  The wound was
gain irrigated copiously, and attention was then turned to closure.

(Continued)

EXHBIT (K)(3)

☑ 011/011

01/10/2006 10:28 FAX  5104375052          ACMC HEALTH INFO

ALAMEDA COUNTY MEDICAL CENTER
HIGHLAND GENERAL HOSPITAL          HGH          PA:
1411 E. 31st ST., OAKLAND, CA 4602

☐ NARRATIVE SUMMARY                              MR:

☐ REPORT OF OPERATION                            PN:          WARREN, Melrolando

☐ HISTORY & PHYSICAL                             DB:

---

### OPERATIVE REPORT

PAGE 4

#0 Vicryl was used to close the interruption between the tendon planes both in the inferior and superior and the central aspects of the tendon; this was done in an interrupted fashion in an over-over stitch. The paratenon was then closed using #2-0 Vicryl sutures in an interrupted fashion, following which the deep superficial fascia was closed using interrupted #2-0 Vicryl. The superficial fascia was closed using interrupted #2-0 Vicryl, and the skin was closed using a running #2-0 nylon in a running fashion utilizing an external stitch.

Throughout the closure, copious irrigation was performed, and good hemostasis was achieved using the electrocautery.

After the skin had been closed, a Xeroform dressing was placed, followed by a 4 x 4 gauze and Kerlix roll. The right lower extremity was then put into a knee immobilizer.

The patient was awakened from the general endotracheal anesthesia without difficulty in the Operating Room, and the patient was then transferred to the Post-Anesthesia Recovery Room in stable condition.

The patient's right lower extremity postoperatively was noted to be neurovascularly intact with good motor and sensory function distally, good capillary refill and a normal neurological examination.

KEN AKIZUKI, M.D.
DICTATING PHYSICIAN

JERRALD GOLDMAN, M.D.
ATTENDING PHYSICIAN

KA:met
D:07/30/96
T:08/01/96

EXHIBIT (K)(4)

# EXHIBIT COVER PAGE

$\angle$

EXHIBIT

Description of this Exhibit: *Medical Report of Highland Hospital Dr. Virgil Williams · MD*

Number of pages to this Exhibit: _ *3* _ pages.

JURISDICTION:    (Check only one)

☐    Municipal Court

☒    Superior Court

☐    Appellate Court

☒    State Supreme Court

☒    United States District Court

☒    State Circuit Court

☐    United States Supreme Court

☐    Grand Jury

## ALAMEDA COUNTY MEDICAL CENTER
### HIGHLAND HOSPITAL
1411 East 31st Street    Oakland, CA 94602

# RADIOLOGY REPORT

PT. NAME **WARREN, MELROLANDO NIGE**    SEX __M__ DCB __03/07/1969__ MED. RECORD NO. __00 21 02 24 9__

FILMS MADE __08/02/1996__    ORDER NO. __6__    DICTATED __8/20/96__    TRANS. __21-AUG-96 JAC__

ORDERING DOCTOR __GOLDMAN, JERALD R__    PATIENT LOCATION __SUR__

HISTORY:

FULL REPORT: RIGHT KNEE: Intraoperative films with surgical fixation wires,
pin and screw are noted extending across the patella.

V. Williams, M.D.

EXHIBIT (L)(1)

21-AUG-96   14:14:47

## ALAMEDA COUNTY MEDICAL CENTER
### HIGHLAND HOSPITAL
1411 East 31st Street    Oakland, CA 94602

# RADIOLOGY REPORT

PT. NAME __WARREN, MELROLANDO NIGE__  SEX __M__ DOB __03/07/1969__ MED RECORD NO. __00 21 02 24 9__

FILMS MADE __08/15/1996__  ORDER NO. __1__  DICTATED __8/20/96__  TRANS. __21-AUG-96 JAC__

ORDERING DOCTOR __AKIZUKI, KENN__  PATIENT LOCATION __151__

HISTORY:

FULL REPORT:  RIGHT KNEE:  Fixation wires, screws and pins are noted
extending across the patellar fracture site.  No change in alignment is noted
since the prior examination.

V. Williams, M.D.

CHART

EXHIBIT (L)(2)

**ALAMEDA COUNTY MEDICAL CENTER**
HIGHLAND HOSPITAL
1411 East 31st Street    Oakland, CA 94602

# RADIOLOGY REPORT

PT. NAME **WARREN, MELROLAND NICE**    SEX **M** DOB **03/07/1969**    MED. RECORD NO. **00 21 02 24 9**

FILMS MADE **07/30/1996**    ORDER NO. **1**    DICTATED **8/20/96**    TRANS **21-AUG-96 JAC**

ORDERING DOCTOR **SIMON, BARRY C**    PATIENT LOCATION **100**

HISTORY:    **GSW**

**FULL REPORT: RIGHT KNEE:** There is a fracture of the patella with adjacent bullet fragments. There is extensive soft tissue edema with gas present.

V. Williams, M.D.



EXHIBIT (L)(3)

# EXHIBIT COVER PAGE

M

EXHIBIT

Description of this Exhibit: *Copy of Court Orders, filed 7/24/08 by US Dist Ct northern Dist. case no. C-08-0754 PJH (PM)*

Number of pages to this Exhibit: _____ *6* _____ pages.

JURISDICTION: (Check only one)

☐　Municipal Court

☐　Superior Court

☐　Appellate Court

☒　State Supreme Court

☒　United States District Court

☐　State Circuit Court

☐　United States Supreme Court

☐　Grand Jury

ORIGINAL
FILED

JUL 2 4 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1

2

3          UNITED STATES DISTRICT COURT

4          NORTHERN DISTRICT OF CALIFORNIA

5

6

7   MELROLANDO WARREN,

8                  Petitioner,                     No. C 08-0754 PJH (PR)

9   vs.                                            **ORDER DENYING MOTIONS
                                                   TO PROCEED IN FORMA**
10  TONY HEDGPETH, Warden,                         **PAUPERIS AND FOR STAY
                                                   AND DISMISSING PETITION**
11                 Respondent.                     **WITH LEAVE TO AMEND**
    _____/

12

13         Petitioner, a California prisoner currently incarcerated at Kern Valley State Prison,

14  has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He

15  also requests leave to proceed in forma pauperis and has filed a motion to stay the case

16  while he exhausts.

17         Venue is proper because the conviction was obtained in Alameda County, which is

18  in this district. *See* 28 U.S.C. § 2241(d).

19                              **BACKGROUND**

20         An Alameda County jury convicted petitioner of kidnaping and rape with a foreign

21  object. He was sentenced to prison for sixty-five years to life. Petitioner unsuccessfully

22  appealed his conviction to the California Court of Appeal and the Supreme Court of

23  California denied review. Petitioner has also filed state habeas petitions.

24                              **DISCUSSION**

25  **I.   Motion for Stay**

26         Petitioner presents (1) a claim based on *Batson v. Kentucky*, 476 U.S. 79, 89

27  (1986), (2) a claim that the court erred in not awarding presentence credits, and (3) a claim

28  that new evidence shows he "could not have" committed the crime. He has moved for a

EXHIBIT (M)(1)

United States District Court

For the Northern District of California

1   stay while he exhausts the last of these.

2       It is appears from references in the motion that petitioner is aware of *Rhines v.*

3   *Webber*, 544 U.S. 269 (2005), and its requirement that such stays be granted only upon a

4   showing of good cause for petitioner's failure to exhaust the issues before filing the federal

5   petition, and a showing that the issues which the petitioner proposes to exhaust are

6   "potentially meritorious." *Id.* at 277.

7       As to good cause, petitioner asserts that the claim was not suitable for consideration

8   on direct review because it is based on facts outside the trial record, and that his appellate

9   counsel failed to raise it. The direct appeal was completed on October 25, 2006, according

10  to petitioner. He also alleges that he filed state habeas petitions, one of which was denied

11  in superior court on September 14, 2007, and another of which was pending in the

12  California Court of Appeal when this petition was filed on January 31, 2008. He says that

13  the issues in the state petitions were the same as those here.

14      A review of the California appellate courts' website shows that the court of appeal

15  petition was denied on November 27, 2007. That was before the petition was filed here,

16  but petitioner says in the petition that it was pending, so he may not be aware that it has

17  been denied. The same website shows that petitioner has not filed any California Supreme

18  Court habeas petitions. Although petitioner might have made his position a little clearer,

19  the court concludes from this that petitioner wants to exhaust the new-evidence claim by

20  way of state habeas petitions, which is the only practical way to exhaust such a claim, and

21  that he wants the stay so as to be able to do so.

22      *Rhines* requires a petitioner who seeks a stay to show good cause for the

23  petitioner's failure to exhaust before filing the federal petition. Given that the statute of

24  limitations for filing a federal petition is stayed while state collateral remedies, such as state

25  habeas petitions, are pending, petitioner's claim that his need to file state habeas petitions

26  constituted good cause is unconvincing. He has not shown good cause.[1]

27

28      [1] If petitioner were to file another motion for a stay and establish by way of a declaration (a statement signed under penalty of perjury) that he did not know that the statute of limitations was tolled by filing state habeas petitions, and so filed this petition prematurely

*Exhibit (M)(2)*                                    2

1    Petitioner also has not shown that his new-evidence claim is "potentially

2  meritorious." He says that "medical records" show that he "could not have been the

3  perpetrator," but does not say what the medical records show nor how they bear on his

4  guilt or innocence.

5    For these reasons, the motion for a stay will be denied.

6  **II.    Review of Petition**

7    **A.    Standard of Review**

8    This court may entertain a petition for a writ of habeas corpus "in behalf of a person

9  in custody pursuant to the judgment of a State court only on the ground that he is in

10  custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.

11  § 2254(a).

12    Habeas corpus petitions must meet heightened pleading requirements. *McFarland*

13  *v. Scott,* 512 U.S. 849, 856 (1994). An application for a federal writ of habeas corpus filed

14  by a prisoner who is in state custody pursuant to a judgment of a state court must "specify

15  all the grounds for relief which are available to the petitioner ... and shall set forth in

16  summary form the facts supporting each of the grounds thus specified." Rule 2(c) of the

17  Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. "'[N]otice' pleading is not sufficient,

18  for the petition is expected to state facts that point to a 'real possibility of constitutional

19  error.'" Rule 4 Advisory Committee Notes (quoting *Aubut v. Maine*, 431 F.2d 688, 689 (1st

20  Cir. 1970). "Habeas petitions which appear on their face to be legally insufficient are

21  subject to summary dismissal." *Calderon v. United States Dist. Court (Nicolaus)*, 98 F.3d

22  1102, 1108 (9th Cir. 1996) (Schroeder, J., concurring).

23  **B. Legal Claims**

24    As noted above, petitioner asserts that: (1) his rights as set out in *Batson v.*

25  *Kentucky*, 476 U.S. 79, 89 (1986), and its progeny, were violated; (2) the court erred in not

26  awarding presentence credits, and (3) new evidence shows he "could not have" committed

27

28  from a misunderstanding of the law, that might suffice to establish good cause.



3

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  the crime.

2    Claim two is a state-law claim and cannot be the basis for federal habeas relief.

3  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (federal habeas unavailable for

4  violations of state law or for alleged error in the interpretation or application of state law). It

5  will be dismissed without leave to amend.

6    Both claims one and three suffer from the same defect. In claim one petitioner

7  asserts that his Batson rights were violated, but provides no factual support whatever. He

8  does not say even say which peremptory strikes by the prosecution were discriminatory.

9  This claim does not meet the requirement that the petitioner state facts that point to a 'real

10  possibility of constitutional error.'" Rule 4 Advisory Committee Notes (quoting Aubut v.

11  Maine, 431 F.2d 688, 689 (1st Cir. 1970). Claim three has already been discussed above,

12  and as with claim one, petitioner does not provide enough information. He does not say

13  what the newly-discovered medical records say, nor what it is about them that shows he

14  could not have committed the crime. These two claims will be dismissed with leave to

15  amend.

16                              **CONCLUSION**

17    1. Petitioner's motion for a stay (document number 4 on the docket) is **DENIED**

18  without prejudice to renewing it with proper support.

19    2. Petitioner's request for an extension of time to file his corrected in forma pauperis

20  application (document 6) is **GRANTED**. The application is deemed timely. In view of

21  petitioner's deposits to his prisoner trust account and his balance, his motion for leave to

22  proceed in forma pauperis (document number 7) is **DENIED**. His earlier motion (document

23  2) is **DENIED** as moot. He must pay the five dollar ($5) filing fee within thirty days of the

24  date this order is entered (the date the clerk has stamped on the first page) or the case will

25  be dismissed.

26    3. Claim 2 is **DISMISSED**. Claims one and three are **DISMISSED** with leave to

27  amend within thirty days. The amendment must include the caption and civil case number

28  used in this order and the words AMENDED PETITION on the first page. Failure to amend

EXHIBIT (M)(4)

4

1  within the designated time will result in the dismissal of these claims.

2      4. Petitioner must keep the court informed of any change of address and must

3  comply with the court's orders in a timely fashion.  Failure to do so may result in the

4  dismissal of this action for failure to prosecute pursuant to Federal Rule of Civil Procedure

5  41(b).  *See Martinez v. Johnson*, 104 F.3d 769, 772 (5th Cir. 1997) (Rule 41(b) applicable

6  in habeas cases).

7      **IT IS SO ORDERED.**

8  Dated:  July 24, 2008.

                            PHYLLIS J. HAMILTON

9                              United States District Judge

10

11

12

13

14

·15

16

17

18

19

20

21

22

23

24

25

26

27

28  G:\PRO-SE\PJH\HC.08\WARREN754.DWLTA.wpd

EXHIBIT (M)(5)

**United States District Court**
For the Northern District of California

5

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

MERLROLANDO N WARREN,

Petitioner,

v.

TONY HEDGPETH,

Respondent.

Case Number: CV08-00754 PJH

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on July 24, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Melrolando N. Warren V-09970
CSP-Corcoran
3A04-140-U
P.O. Box 3461
Corcoran, CA 93212

Dated: July 24, 2008

Richard W. Wieking, Clerk
By: Nichole Heuerman, Deputy Clerk

Exhibit (M)(6)

DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare the following:

I am over 18 years of age, and a party to the within action.

My address is: *Melchelando Warren V-29970*
*CSP-Corcoran P.O.Box 3461*
*Corcoran CA. 93212*

On *8/19/08*, I served a copy of the attached

*First Amended Federal writ of*
*Habeas Corpus per 28 USC 2254 and 2254(d)(1)*

On the below-named persons by placing a true copy thereof
in envelope addressed as follows, with first class postage
thereon fully prepaid, and delivering the sealed envelopes,
according to the procedures prescribed for sending legal
mail, to the proper institutional official : · deposit
in the United States mail at Corcoran, in the County of

Kings, California.

*United States District Court*       *Tonia McLoseth, attorney*
*For Northern District*              *Respondent Attorney General*
*US Courthouse*                      *Edmond D. Brown & Real party interest*
*450 Golden Gate Ave*                *office 1300 I St, Ste 125*
*San Francisco CA. 94102-3483*       *Sacramento CA. 94244-2550*

Executed under penalty of perjury this *19* day of
*August*, 200*8*, at Corcoran, California.


*Melchelando Warren*
DECLARANT

Affidavit of Dwight Staten

I Dwight A. Staten, declare, the foregoing. That on 8/ /08 I Submitted Melrelands Warren's legal documents to prison officials of CSP-Corcoran State prison, P.O. Box 3461 Corcoran CA. 93212 who there by, retrieved the legal documents from me

and mailed them

before their mail box of outgoing legal mail

I declare the foregoing is true and correct executed on this day August 19, 2008

Declarant



Dwight A Slaters A-18498
Spt LCCCCCCCCC 3(A) 04-293
P.O. Box 3461
Corcoran  Ca. 93212

CORCORAN STATE PRISON

Confidential
" Legal mail "
Copies

PRIORITY MAIL
UNITED STATES POSTAL SERVICE ®
www.usps.com
Label 107R February 2006

PJH

United State District Court
For Northern District
US Courthouse
430 Golden State Ave
San Francisco  Ca. 94102 -