CSP Corcoran p.o. box 3461

Corcoran  CA. 93212

In propria persona

COPY

FILED

AUG 2 2 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

United States District Court

Northern District of California

Melrolando Warren,                 Case no. C-08-0754, (PJH)

              Petitioner,          Memorandum of
                                   Points and Authorities
        vs.                        In support of First amended
                                   Petition to Federal
Tony Hedgpeth,                     writ of Habeas Corpus
                                   Pursuant to 28 USC
              Respondent,          2254 also 2254(d)(1)
                                   and Fed R Civ P. 15


                    Introduction

This First amended petition, Should be
granted to allow petitioner warren, to
Cure the new petition, to proceed justice.

                         1.

I.

This Court Should grant petitioner
Warren's motion to Stay in
abeyance to resolve the mixed
petition before this Court on the
issues of (1.) Ineffective Assistance
of Trial Counsel (2.) New Evidence
of medical records the Jury
did not review that Shows
petitioner was not the perpatrator
(3.) The Trial Court erred, when
it denied petitioner Warren's
wheeler, Batson motions

Standard of Review

Stay and Abeyance, where several
circuits, including the Ninth Circuit
have adopted a procedure known as
"Stay and Abeyance" or "withdrawal
and Abeyance" to deal with mixed
petitions. This procedure permits the
petitioner to amend
a mixed petition to
delete the unexhausted claims. (see
Rivera v Timbins (9th Cir 2004) 371

2.

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)
85 34769

1  Anthony v Cambra (9th Cir 2000) 236
2  Calderon v District Court Thomas, 144
3  F.3d 618-620-621, (9th Cir 1998) also
4  Simmons v Bledgett 110 F.3d 39 (9th Cir
5  1997) A district court holds federal
6  proceedings in abeyance, while petitioner
7  exhaust "new" facts, in State court
8  (see Stewart v martinez-villareal, 523
9  U.S. 637, 118 S.Ct. 1618 (1998) Blair v
10  California 340 F.2d 741, 745 (9th Cir 1965)
11  Thomas v Teets 205 F.2d 236, 240 (9th Cir 1953)
12  Duffy v Wells 20 F.2d 503-505 (9th Cir 1953)
13  other circuits routinely follow the
14  abeyance practice,
15             (See Lawson v Dixon, 3
16  F.3d 743, 748 (4th Cir 1993) Stano v Singletary
17  952 F.2d 1275 (11th Cir 1992) Andrews v Deland
18  943 F.2d 1162-1168 (10th Cir 1991) Michels v
19  Perini 818 F.2d 554-556 (6th Cir 1987)
20  Burris v Farley, 51 F.3d 655, 659; (7th Cir
21  1995) Lambrix v Singletary, 72 F.3d 1500
22  Espinosa v Florida, 515 U.S 1079 (1992)
23  Satah v Oklahoma, 58 F.3d 1447-1452 (10th
24  Cir 1995) Appeal held in abeyance
25  pending petitioner's exhaustion of
26  claims, Bush v Singletary 988 F.2d 1082
27  (11th Cir 1993; Palmer v Grammar 863 F.2d
28  588; (8th Cir 1988) Moore v Kemp 809

F.2d 702-731 (11th Cir) also Schriro v
Calderon 977 F. Supp 987; A petitioner
may also request the court to hold
in abeyance the petition containing
the remaining exhausted claims, while
the petitioner exhausts the unexhausted
claims in state court. when petitioner
has completed the exhaustion process
with regard to the dismissed claims,
the petitioner will be permitted to
amend the still pending petition
with the previously dismissed claims.
If the newly exhausted claims and
if the claims that were exhausted when
the federal petition
                    was initially filed arise
out of a "common core of operative
facts" the newly exhausted claims are
timely because they "relate back to
the original petition, which was timely
filed mayle v Felix (2005)
when it was filed ___
US, 162 Led 2d 582, 125 S.Ct. 2562; It is
error for a Federal Court, simply to dismiss
a "mixed" petition, without offering
the petitioner the opportunity to amend
the petition to delete the exhausted claims
see Jefferson v Budge (9th Cir 2005) 419
F.3d 1013. If the federal court does

4.

1  erroneously dismiss the petition, the
2  petitioner may be entitled to equitable
3  tolling, while the state court exhaustion
4  proceedings are pending, Jefferson v
5  Budge (9th Cir 2005) 419 F 3d 1013

7
8  United States Supreme Court
9  precedent

11  The United States Supreme Court has
12  approved the use of this procedure
13  when the "unexhausted" claims are
14  not plainly "meritless" and there is
15  "good cause" for the petitioner's failure
16  to exhaust state remedies. (See Rhines
17  v weber (2005) 544 us 269, 161 Led 2d 440
18  125 Sct. 1528; where "good cause" is shown
19  by petitioner, of his failure to exhaust
20  a claims, before
21         filing a federal petition. A
22  Stay and sequence, will be issued
23  (See Jackson v Roe (9th Cir 2005) 425 F 3d 654

25  The ninth Circuit
26           has clarified that the petitioner
27  need show only "good cause" and not
28  "extraordinary circumstances" to be

5,

1  entitled to a Stay and Abeyance of
2  the federal case, so that the petitioner
3  can exhaust state remedies (see
4  Anthony v Cambra (9th Cir 2000) 236 F.3d
5  568, 574;

7  The Ninth Circuit

9  Held that neither Statutory nor
10  equitable tolling was available to a
11  petitioner whose totally "unexhausted"
12  federal habeas petition was dismissed
13  after the AEDPA deadline had lapsed
14  However, that if at least one claim is
15  exhausted, it may be possible to preserve
16  the unexhausted claims. (see Jefferson v
17  Budge (9th Cir 2005) 419 F.3d 1013; where a
18  Federal Court, dismissed a mixed petition
19  without offering petitioner opportunity
20  to amend petition to
              omit unexhausted claims
21
22  petitioner was entitled to equitable tolling
23  while State exhaustion proceedings pending

28

6.

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34769

II.

petitioner warren will Show
Cause why the issue of Ineffective
Assistance of Trial Counsel on
Richard Horle who was exhausted
on Direct Appeal before filing
the federal petition and why
this issue is meritorious for
this court to grant Stay of
Abeyance to exhaust this issue
before the California Supreme
Court.

Standard of Review

The existence of Cause, for not
presenting this issue before filing the
federal petition, before this court,
ordinarily turns on whether the prisoner
can show that some objective factor
external to the defense, impeded Counsel's
efforts to comply with the State procedural
Rule. Murray v Carrier (1986) 477 US 478, 106
S.Ct. 2639, 91 L.Ed.2d 397;
          without attempting an exhaustive
catalog of such objective impediments
to compliance with a procedural rule.
the United States Supreme Court has

7.

determined that a petition, showing
that the factual or legal basis for a
claim was not reasonably available
to counsel. (see Reed v Ross 448 US at 6
or that "some interference by of officials
Brown v Allen 344 US 443, 486 (1953) made
compliance impracticable, would constitute
Couse under this standard; quoting
Murray v Carries (1986) 477 US 478, 106 Sct.
2639, 91 Sd.2d 397; In this case petitioner
Warren + sister, orcella warren,
notified Trial defense counsel Robert
Beles, about the medical records,
Davolies, restated the reports would
only be good the
petitioner Warren's appeal
required a notice of the charges (see
Exhibit (D)(1)(2) The Medical Reporter
Medical petitioner's counsel was in
a full day at on the day of the
crime against Deena Webb. (see Exhibit
(D)(1) and (E)(1). orcella warren
there by notified
petitioner warren's appeal counsel
George L. Schraves, about the new
evidence, and the development of
the medical records, delayed, by
Highland Hospital's medical department

-8-

1  and the discussion she had with trial
2  defense counsel Richard Here,
3  However, Mr. Schrarer's, response,
4  was that petitioner warrant case had
5  already been briefed and that the
6  records could not support the issue
7  on appeal. (see Exhibit (A)(1)(2) So
8  the evidence of these "medical records
9  were not available for both trial and
10  appellate counsel, this issue could
11  not have been presented before filing
12  the federal petition. (see Murray v.
13  Carrier (1986) 477 US 478, 106 Set. 2639, 91
14  Led 2d 397; Also Reed v Ross 468 US 1, 104
15  Sct 2901; 82 Led 2d 1, and Brown v Allen
16  344 US 443, 486 (1953)

17             The US Supreme Court has
18  held cause, render the Cause and
19  prejudice test must be something
20  external to the petitioner, something
21  that cannot fairly be attributed to him.
22  The Court further declared, that Cause
23  for a procedural default, must ordinarily
24  turn on whether the prisoner can show
25  that some objective factor external
26  to the defense impeded counsel's efforts
27  to comply with the state's procedural
28  rule. (see Murray v Carrier 477 US at 488

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)
85 34769

1  For example, "a showing that the factual
2  or legal bases for a claim was not
3  reasonably available to counsel... or
4  that some interference by officials...
5  made compliance impracticable, would
6  constitute cause under this standard.
7  "Cause for a procedural default on
8  appeal, ordinarily, requires a showing
9  external impediment, preventing
10  Counsel from constructing, or raising
11  the claim. Both attorneys, representing
12  petitioner Warren, trial attorney
13  Richard Howe who initially, before trial
14  Subpoened, Highland hospital's medical
15  department for the medical records,
16  nevertheless, they were
17  unavailable, for defense
18  counsel to preserve the issue for
19  appeal. (See exhibit (D)(.) and (D)(.) Appeal Counsel
20  George Scherer, could do no better,
21  when petitioner Warren's sister, Stella
22  Warren, notified him that she was, in
23  receipt, of medical reports faxed to her
24  front Highland Hospital, to he explained,
25  he already filed petitioner Warren's
26  opening brief, and could not raise the
27  issue with the existing issues already
28  filed, before the court.

10.

1  The basis for application of the indepen-
2  dent and adequate, State ground doctrine,
3  in federal habeas is somewhat different
4  than on direct review by the federal
5  court, when the federal court, reviews
6  a State Court decision on direct review
7  pursuant to 28 USC 1257, it is Reviewing
8  the Judgment. If resolution of a federal
9  question, cannot affect the judgment,
10  there is nothing for the court to do. This
11  is not the case in Habeas. when a federal
12  district Court reviews a state prisoner's
13  habeas corpus petition pursuant to 28
14  USC 2254, it must decide whether the
15  petitioner is "in custody, in violation of
16  the Constitution or
17                        laws or treaties of the
18  United State. (See Celeman v. Thompson
19  (1991) 501 US 722, 111 Sct. 2546; 115 Led 2d 640; clv,
20  Herrera v Collins, 506 US 390; The United
21  States Supreme Court unequivocally
22  declared that claims of "actual innocence"
23  based on "newly" discovered evidence, do
24  not constitute, an independent, ground for
25  granting federal habeas Corpus relief
26  Herrera v Collins, 506 US at 400-01, 113 Sct
27  at 868-61; However, in Herrera, The
28  Supreme Court also reaffirmed that a

11,

State prisoner who supplements his
federal habeas claims with a colorable
showing of "actual innocence" can
thereby circumvent procedural barriers
to obtaining federal habeas review on
the merits for his constitutional
claims. Herrera v Collins 506 US at 404,
113 Sct at 863; quoting Moore v Quart-
erman (2007) 526 F. Supp 2d 654; The

US Supreme Court
                        has recognized exception
to the doctrine of procedural default
where a federal habeas corpus petitioner
can show "cause and actual prejudice
for his default, or that failure to address
the merits of his procedurally defaulted
claim will work a "fundamental
miscarriage" of justice" Coleman v
Thompson 501 US at 750, 111 Sct at 2565;
Harris v Reed, 489 US 255, 262, 109 1038, 1043
103 Sct 2d 308 (1989)
                        nevertheless, the US Supreme
court, noted in Engle v Isaac, 456 US 107
(1982) in appropriate cases "the principles
of comity and finality that inform the
concept of cause and prejudice must
yield to the imperative of correcting a

12.

a fundamentally unjust incarceration
Engle v Isaac 456 US 107, at 135; the
Supreme Court Justices, remain
confident that for the most part
"victims of a fundamental miscarriage
of justice will meet the cause and
prejudice standard" else; where a
constitutional violation has probably
resulted by a conviction of one who
is actually innocent, a federal
habeas court may grant the writ
in the absence of a showing of cause
for the procedural default; There is an
additional safeguard against miscarriages
of justice in criminal
cases and one not yet
recognized in State Criminal trials, when
many of the opinions on which the concur-
ence relies were written. That safeguard
is the right to effective assistance of counsel
which as the U.S. Supreme Court has indicated
may in a particular case be violated by
even an isolated error of counsel, if that
error is sufficiently egregious and
prejudicial. United States v Cronic, 466 US
648, 657 (1984) See also Strickland v Washington
466 US at 693-696. The presence of such a
safeguard may properly inform the Court

13.

's judgment in determining what
standards should govern the exercise
of the habeas court's equitable discretion
with respect to procedurally defaulted
claims. Reed v Ross 468 US at 9. The ability
to raise ineffective assistance claims
based in whole or in part on counsels
procedural defaults, substantially,
vindicate any predictions of unremedied
manifest injustices. The Supreme
Court justices, further remain of the
view that adherence to the cause and
prejudice test in the conjunctive, [see
Engle v Isaac, Supra at 134, will not
prevent federal habeas Courts from
ensuring "fundamental fairness, that
is the central concern
                              of the writ of habeas corpus
[see Strickland v Washington, (1984) 466
US at 693-696; despite Trial defense
Counsel, Richard Howe's, inability to
get the medical reports from Highland
Hospital, when they delayed sending
the documents. He could have secured
expert testimony of Dr. Virgil williams
and two other physicians who treated
the leg Cast placed on petitioner warren.
the leg, Even the prosecution, pointed out to

14.

1  the trial court, upon the defenses motion
2  for new trial, that during recovery
3  defense counsel presented a copy of
4  the medical reports that revealed who
5  placed the leg cast on petitioner warrens
6  leg the prosecution was surprised to learn
7  that defense counsel Richard Hove, would
8  not present expert testimony of
9  Dr. virgil williams or the additional
10 physicians who placed the leg cast on
11 petitioner warren's leg. (see Exhibit (L)
12 As a result of a bad tactical decision
13 to rely on non-expert testimony,
14 instead of expert testimony, and the fact
15 he fails to subpoena
16             two other physicians, who
17 structured the leg cast on petitioner
18 warrens leg, was not competant of
19 An Attorney, who should have proven that fact
20 with more reliable evidence of
21 presenting expert testimony (see
22 Dovey v. Myers (2006) 458 F.3d 892 also
23 Dugas v. Coplan (2005) 428 F.3d 317; when
24 defense counsel, Richard Hove, motioned
25 the court for a new trial, based on the
26 new evidence, man before this court
27 The prosecution argued, before the trial
28 court that the motion should be

                    15.

1. denied, because the non-expert testimony
2. was found to be inconsistent. The
3. trial court agreed. And denied
4. petitioner Warren a new trial. The
5. prosecution further suggested to
6. the court that, defense counsel had
7. opportunity to present expert testimony
8. of Dr. Virgil Williams, and four
9. additional physicians who treated
10. petitioner Warren's leg. (See, Exhibit
11. ) but counsel chose not to present
12. that testimony, and instead
13. relied on non-expert testimony (see
14. Exhibit (F)(1) thru (10) that was found inconsistent
15. by the jury and judge.
16.                    So should this court
17. not accept cause for the "new" evidence
18. not being available to trial defense
19. counsel Richard Foul, because of
20. Highland Hospital's delay, Then this
21. court can conclude trial defense
22. counsel Richard Foul, was incompetent
23. in failing to subpoena three expert
24. physicians, who surgically, placed a
25. leg cast on petitioner Warren's leg
26. and who could have testify that petitioner
27. Warren was in a cast, on the day of
28. the crime against Reina webb. (see Exhibit
   (I)(1) also (K)(1) and (L)(1)  16.

1  ordinarily the purpose of a "writ of
2  habeas corpus, is to place one one's
3  discharge from custody alleged to
4  be illegal. Make v Cameron (1966) 36 ?
5  F.2d 657, 124 U.S. 963, 15 Led 2d 100. The basic
6  purpose of a writ of habeas corpus
7  is to enable those unlawfully
8  incarcerated to obtain their freedom
9  28 USC 2241 2255  Johnson V Avery
10 (1979) 393 US 483;

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

17

1 A WRIT OF HABEAS CORPUS IS THE APPROPRIATE
2 PROCEEDING TO ASSERT A CLAIM OF INEFFECTIVE
3 ASSISTANCE OF COUNSEL. PEOPLE V. POPE (1979)
4 23 CAL. 3d 412. "WHERE THE RECORD DOES NOT
5 ILLUMINATE THE OASIS FOR THE CHALLENGED ACTS
6 OR OMISSIONS, A CLAIM OF INEFFECTIVE ASSISTANCE
7 IS MORE APPROPRIATELY MADE IN A PETITION
8 FOR HABEAS CORPUS. IN HABEAS CORPUS
9 PROCEEDINGS, THERE IS AN OPPORTUNITY IN AN
10 EVIDENTIARY HEARING TO HAVE TRIAL COUNSEL
11 FULLY DESCRIBE HIS OR HER REASONS FOR ACTING
12 OR FAILING TO ACT IN THE MANNER COMPLAINED
13 OF." (PEOPLE V. POPE (1979) 23 CAL. 3d 412; (SEE
14 CAL. PENAL CODE SECTION 1483, 1484; E.G. IN
15 RE WILLIAMS (1969) 1 CAL. 3d 168

16
17 IN THIS CASE, TRIAL DEFENSE COUNSEL RICHARD
18 HOVE, FAILED TO PURVIEW EXPERT TESTIMONY
19 OF THE PHYSICIANS, WHO DID SURGERY ON PETITIONER
20 WARREN, (SEE EXHIBIT (I)(K)(L) DR. VIRGIL WILLIAMS
21 DR. JERRALD COLEMAN, DR. KEN BAKER, DR. JONES
22 WHO WOULD HAVE CONFIRMED PETITIONER WARREN,
23 WAS IN A CAST, FROM JULY 30, 1996 THRU
24 SEPTEMBER 17, 1996, THEREBY, MAKEN IT
25 IMPOSSIBLE, FOR PETITIONER WARREN, TO
26 HAVE COMMITTED THE ALLEDGED ACTS OF RAPE
27 AGAINST REINA WEBB, ON SEPTEMBER 11, 1996
28 DEFENSE COUNSEL, HOVE; HOWEVER, CHOSE TO USE
WITNESS TESTIMONY OF SHIRLEY WARREN
(SEE RT 706-708 AND LAMONTE IRVIN

RT 718-724                          which the Jury
found unreliable, due to their inconsis-
tant statements. (see RT 706-708 also RT
718-724 The prosecution, even suggested
to the court that defense counsel have,
provided, them with a List of the Doctors
who TREATED petitioner Warren's Leg with
a cast, but, were surprised that defense
counsel failed to    have them Testify
as experts, to support the defense of
Theory (see RT 917-929    ) and
corroborate the new evidence, submitted
by Highland Hospital, on the dates requested
by defense counsel Richard Hove, either
side in a criminal Trial, and the court
may appoint an expert
                    on its own motion
(see California Evidence Code 730; with
an indigent defendant, the motion
is almost always made by defense counsel
(see Torres v Municipal Court (1975) 50 CA 3d
778, 783; The Right to effective assistance
of counsel entitles indigent defendants
access to public funds for expert services
Ake v Oklahoma (1985) 470 US 68, 76-85, 84
Led 2d 53, 61-68, 105 Sct 1087; Cornevsky v
Superior Court (1984) 36 C3d 307, 319; Counsel
for an indigent defendant may move for

1  APPOINTMENT OF AN EXPERT, BY THE COURT.
2  (SEE CALIFORNIA EVIDENCE CODE 730-731
3  THE COURT HAS THE AUTHORITY TO APPOINT AN
4  EXPERT, WHEN IT APPEARS TO THE COURT, THAT
5  EXPERT EVIDENCE, IS OR MAY BE REQUIRED
6  UNDER CALIFORNIA EVIDENCE CODE 730
7  IN THIS CASE, IT WAS REQUIRED, THAT
8  DEFENSE COUNSEL PRESENT EXPERT TESTIMONY
9  OF DR VIRGIL WILLIAMS, RADIOLOGIST AND TWO
10  ADDITIONAL PHYSICIANS WHO TREATED, PETITIONER
11  WARREN'S, CAST, BECAUSE IT WOULD HAVE
12  ALLOWED THE JURY TO CONSIDER WARREN,
13  NOT BEING THE PERPETRATOR, AND WOULD HAVE ALLOWED
14  THE JURY TO CONSIDER MISIDENTIFICATION, OF
15  REINA WEBBS, ALLEGATIONS,
                        THAT PETITIONER WARREN,
16
17  WAS THE PERSONS WHO RAPED HER, THE
18  PROSECUTION, EVEN BROUGHT TO THE COURT'S
19  ATTENTION, AT THE TIME DEFENSE COUNSEL
20  RICHARD HOVE, SUBMITTED THE MOTION FOR NEW
21  TRIAL, IN LIGHT OF THE "NEW EVIDENCE" TAKEN UNDER
22  THE COURT'S JUDICIAL NOTICE, THAT IT HAD KNOWLEDGE
23  AND A COPY OF THE MEDICAL DOCUMENTS, SENT
24  TO THE COURT, BY HIGHLAND HOSPITAL; NEVERTHELESS,
25  THE PROSECUTION
                        POINTED OUT, THAT DEFENSE COUNSEL FAILED
26  TO CONFIRM ANY OF THE NEW EVIDENCE, BY
27
28  PRESENTING EXPERT TESTIMONY, OF DR VIRGIL

1  WILLIAMS, on the two additional physicians
2  Dr. Terrell Goldman, Dr. Ken Akizuki (See Exhibit
3  (K) and (L) who could have testified that
4  Petitioner WARREN, was in a cast from
5  the dates of JULY 30, 1996 thru September
6  17, 1996, thereby, making it virtually,
7  impossible, for petitioner WARREN, to
8  have committed the RAPE against REINA
9  Webb, (See Exhibit (J)(K)(L) RT 917-929.)

10
11                          II.
12      Constitutional Right to Effective
13             Assistance of Counsel
14
15  A criminal defendant, is constitutionally,
16  entitled to effective assistance of counsel
17  (United States Constitution 6th Amendment,
18  Also California, Constitution, Article I K 15
19  (See Struckland v Washington (1984) 466 US 668
20  685, 104 Sct. 2052, 80 Led 2d 674; People v Pope
21  (1979) 23 Cal. 3d 412, 422, 152 Cal. Rptr. 732; To
22  show denial of effective assistance of
23  counsel, a defendant
24               must show (1.) His or Her
25  counsel's performance was below an
26  objective standard of reasonableness, under
27  prevailing professional norms; And (2) the
28  deficient performance prejudiced the

1  Defendant (see (Strickland, supra, at pp. 687, 691

2  692, 104 Sct. 2052; People v Ledesma (1987)

3  43 Cal. 3d 171, 216-217, 233 Cal. Rptr. 404. (see Pope

4  supra at p. 425, 152 Cal. Rptr. 732, to show

5  prejudice, a defendant must show there is a

6  reasonable probability He or She would Have

7  received a more favorable result Had counsel's

8  performance not been deficient. (Strickland

9  supra, at pp. 691-694, 104 Sct. 2052; Ledesma,

10  supra at pp. 217, 218, 233 Cal. Rptr. 404; when

11  a defendant challenges a conviction, the

12  question is whether there is a reasonable

13  probability that absent the trial counsel's

14  errors, the factfinder would have had a

    reasonable doubt

15  reasonable doubt respecting guilt." (Strickland, supra

16  at p. 695, 104 Sct. 2052" A reasonable probability

17  is a probability sufficient to undermine

18  confidence in the outcome." (People v williams,

19  (1997) 16 Cal. 4th 153, 215; 66 Cal. Rptr. 2d 123. It is

20  the defendant's burden on appeal to show

21  He or She was denied effective assistance

22  of counsel and is entitled to relief. (see

23  Ledesma, supra at p. 218, 233 Cal. Rptr. 404;

24  quoting In re Novin, (2006) 52 Cal. Rptr. 3d

25  3/d, 145 Cal. App 4th 820; the Burden of proof

26  that the defendant must meet in order to

27  establish his or her entitlement to relief

28                          22

1  on an ineffective assistance claim is
2  preponderance of the evidence (see in re
3  NOVEN (2006) 52 Cal.Rptr.3d 310, 145 Cal. App
4  4th 820; (see also ducas v coplan (2005) 428
5  F.3d 317; the court's evaluation of a defendant's
6  claim of deficient performance by
7  counsel, is a strong presumption that
8  counsel's conduct falls within the wide
9  range of reasonable professional assistance
10  and the court accords great deference to
11  counsel's tactical decisions. Accordingly
12  the reviewing court will reverse a conviction
13  on the ground of inadequate counsel, only
14  if the record on appeal affirmatively
15  discloses that counsel had no rational
16  tactical purpose for his or their act or omission
17  (see people v fraye (1998) 18 Cal.4th 894, 979, 980
18  77 Cal.Rptr.2d 25; in this case, Richard
19  Hove, can not give a logical explanation
20  as to why, he chose not to make the necessary
21  tactical decision to enter, the expert testimony
22  of Dr virgil williams, on the other two
23  physicians, Dr Jerrald Coldman, Dr Ken
24  Akizuki, that should have been presented
25  into evidence, their testimony that petitioner
26  warren, was medically equipted with a cast
27  on his, leg, after suffering a gun shot
28  wound to his knee

23

1   Between the dates of ~~July 30, 1996~~
2   thru ~~September~~ 17, 1996, would have
3   confirmed petitioner WARREN'S innocence
4   that he was mistakenly, identified by Leina
5   Webb, as the perpatrator. And defense
6   counsel Richard Hove, had been.
7   effective in his assistance, to petitioner
8   Warren, the jury could have considered these
9   facts, before reaching their verdict. Because
10  of the poor tactical discretion of Richard Hove
11  failing to use expert testimony of Dr. Virgil
12  Williams And the two additional physicians.
13  An Jerirold Goldman, Dr. Ken Akizuki (see exhibit (V)(K)(L) prejudice
14  surmounted, makes it less likely, petitioner
15  Warren would receive an acquital of the
16  charges. In sum, the Federal Court, it was
17  upheld, as a reasonable determination of the
18  facts, in light of the new evidence, presented
19  As the state court's finding such as, the case in Ramio
20  who is a thorough investigation of the pros ands
21  cons of hiring a consulting an expert, prior
22  to making his decision (see 28 USC 2254(d)(2) It led the
23  federal courts to conclude that the state courts
24  federal courts to conclude that the new trial motion, led to unrea-
25  denial of the new trial motion, led to unrea-
26  sonable application of "Strickland. (see 28 USC
27  2254(d)(1). (see Strickland, 466 US at 691, 104 S.Ct.
28  2052; quoting Dugas v. Coplan (2005) 428 F.3d 317

24.

1  ALSO HOVEY v AYERS (2006) 458 F.3d 892;

2  IN THAT CASE HOVEY, ARGUED THAT HE RECEIVED

3  "INEFFECTIVE ASSISTANCE OF COUNSEL DURING

4  THE PENALTY PHASE OF HIS CASE. WHERE HE

5  ALLEDGED HIS ATTORNEY FAILED TO ADEQUATELY

6  INVESTIGATE AND PRESENT EVIDENCE OF HOVEY'S

7  MENTAL CONDITION, AT AND AROUND THE TIME OF

8  HIS CRIME. HOVEY, FURTHER ALLEDGED THAT

9  HIS ATTORNEY FAILED TO PROVIDE HIS PSYCHIATRIC

10  EXPERT DR. SATTEN, WITH KEY INFORMATION

11  ABOUT HOVEY'S, MENTAL HEALTH HISTORY, AND

12  FAILED TO ADEQUATELY, PREPARE DR. SATTEN

13  TO TESTIFY. AS A RESULT, THE TESTIMONY OF HOVEY'S

14  KEY

15  WITNESS, WAS UNDERMINED, AND

16  HIS MITIGATION CASE, WAS SUBSTANTIALLY

17  PREJUDICED. THE DISTRICT COURT CONCLUDED

18  THAT ALTHOUGH, COUNSEL'S PERFORMANCE WAS

19  DEFICIENT, HOVEY, WAS ENTITLED TO HABERS

20  RELIEF ON THIS CLAIM. THE DISTINGUISH AUTHORITY

21  HERE REVEALS THAT DEFENSE COUNSEL AT

22  LEAST PRESENTED EXPERT TESTIMONY. UNLIKE

23  THE ATTORNEY RICKAND HOVE, WHO FAILED TO EVEN

24  PRESENT EXPERT TESTIMONY, TO SUPPORT

25  WARREN'S, DEFENSE THEORY; THAT HE WAS

26  IN A CAST, THE DAY OF THE ALLEDGE RAPE

27  AGAINST REINO WEBB. INSTEAD, HIS WITNESS

28  ES, WERE AS WELL, UNDERMINED, BECAUSE OF

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)
85 34769

1  their inconsistent testimony. (See RT-706-708
2  also RT 718 - 724) Certainly, it was crucial
3  that Defense Counsel Rickland Hove,
4  present Expert, Testimony, To Confirm
5  the "New" Evidence, now presented before
6  this Habeas Application, of which, Attorney
7  Rickland Hove, made several attempts to
8  Supress; However, Hickland Hospital failed
9  to Quawvey that information before Trial
10  Began. (See Exhibit [J](K)(L) RT 1 - 85) It was
11  not until Sentencing that the Court came
12  in receipt of the medical Reports, Sent in
13  by Hickland Hospital. (See Exhibit [J](K)(L) RT
14  917 - 929) At which point, the Court notified
15  counsel of the medical
16                               Reports mailed to the Court.
17  And Attorney Rickland Hove, Acknowledged
18  the Courts inception of those Documents.
19  In light of this information, Rickland Hove,
20  there by, filed a "New Trial" motion pursuant
21  To P.C. 1181; Before the Court could Rule on
22  the motion, the prosecution made it's infor-
23  mal Response as to urge the Court To Deny
24  the motion, based on a List of
25                               potential witnesses
26  from Hickland Hospital that could testify,
27  As Experts, in the case To Confirm, petitioner
28  Warren was Wearing a Cast on his knee on

1  The day of the Alledged offense. (See
2  Exhibit (5)(K)(L) RT 917-929) The prosecution
3  urged the court that Defense Counsel
4  had an opportunity to have the witnesses
5  Dr. Virgil Williams, And two other physicians
6  confirm the evidence if Petitioner Warden,
7  being in a cast, on the day of the Alledged
8  Rape, (See Exhibit (5)(K)(L) RT 917-929); however,
9  the prosecution moved the court to deny
10  the "New Trial" motion based on
11  Defense Counsel's failure to act on this
12  information sooner. (See Exhibit (5)(K)(L)
13  917-929) The prosecution notified the court
14  that they were in receipt
15                          of a list of medical
16  reports, with radiology Dr. Virgil Williams
17  And two other physicians, who the prose
18  cution, Assumed that Defense Counsel
19  would, would Anticipate, their testimony
20  As experts, to confirm Petitioner was
21  in a cast, the day of the Rape; however,
22  Petitioner Warden, suffered the prejudice
23  of Counsel's Admitted, tactical discretion
24  to have two Non-experts
25                          testify that Petitioner
26  Warden, was in a cast, on the day of the
27  Rape Against Keena Webb, (See Exhibit
28  (L) RT 706-708) And RT-718-724

1  HAD THE NEW EVIDENCE, IN THIS HABEAS
2  APPLICATION, BEEN PRESENTED BEFORE THE
3  JURY, THROUGH EXPERT TESTIMONY. THE JURY
4  WOULD HAVE CONSIDERED THIS EVIDENCE
5  IN LIGHT OF MISTAKEN IDENTIFICATION THAT
6  PETITIONER WARREN WAS THE PERPETRATOR,
7  THIS WOULD HAVE ESTABLISHED HIS INNOCENSE
8  ENOUGHT FOR THE JURY TO CONSIDER THE
9  PROSECUTION, FAILED TO PROVE THEIR CASE.
10 (SEE DUYES V. COPLAN (2005) 428 F.3D 317; WHERE
11 THE FEDERAL COURT, APPLIES THE STRICKLAND
12 STANDARD TO EVALUATE AN ATTORNEY'S STRATEGIC
13 CHOICE

14
15 THE FEDERAL COURT
16
17  HAS DETERMINED, STRATEGIC CHOICES
18 MADE AFTER LESS THAN A COMPLETE INVESTI-
19 GATION, ARE REASONABLE PRECISELY TO THE
20 EXTENT THAT REASONABLE PROFESSIONAL
21 JUDGMENTS, SUPPORT THE LIMITATIONS ON
22 INVESTIGATION; COUNSEL HAS A DUTY TO MAKE
23 REASONABLE DECISION THAT MAKES A PARTICULAR
24 INVESTIGATIONS UNNECESSARY. IN ANY INEFFECTI
25 VENESS CASE A PARTICULAR
         DECISION NOT TO INVESTIGATE
26 MUST BE DIRECTLY ASSESSED FOR REASONABLENESS IN
27 ALL THE CIRCUMSTANCES, APPLYING A HEAVILY MEASURE
28

1  or deference to counsel's Judgments. (SEE
2  Strickland v Washington 466 US at 690-91, 104 Sct.
3  2052. This State Court, identifies, the correct
4  governing legal principle, i.e., the Strickland
5  performance test, from the Supreme Court's
6  decisions." It's conclusions on performance
7  Should, find Defense counsel, Richard Hove,
8  deficient, which constitutes an "unreasonable
9  application of that law only if the court
10  "unreasonably applied that principle to the
11  facts of the prisoner's case" (see williams v
12  Taylor, 529 US 362 413, 120 Sct. 1495; Youking
13  Avgas v Coplan (2005) 428 F.3d 317; this court
14  Should direct it's focus on whether the
15  Investigation Supported The pursuit of the defense
16  for misidentification, was it Reasonable (see
17  Wiggins v Smith, 539 US 510, 523, 123 S.Ct. 2527,
18  156 Led 2d 471 (2003) The courts principal
19  cocern Should be, whether defense counsel
20  Richard Hove, made a valid tacticle decision
21  in presenting non Expert Testimony,
22  when it was crucial to use Expert
23  Testimony of Dr. virgil williams, Radiologist
24  Who dressed petitioner Warren, with a
25  cast, along with two other physicians at
26  Highland Hopital, who could have confirmed
27  petitioner Warren, was in a cast on
28

1  September 11, 1996 the day of the crime
2  against Reint Webb ; (see Dugas v Coplan
3  (2005) 428 F.3d 317; also Hovey v. Ayers (2006)
4  458 F.3d 892; In a case contrary to
5  petitioner wherein, but similian with
6  regand to An Attorney's Tactical discretion
7  of using expert testimony. A Defendant
8  peter Dugas, who was convicted of Anson
9  petitioned the Federal court via writ of Habeas
10  Corpus on the ground, inter alia, that he
11  had received constitutionally, ineffective
12  Assistance of Counsel Under Strickland v
13  Washington, 466 US 668, 104 S.Ct. 2052, 80
14  L.Ed.2d 674 (1984); The District Court found
15  That trial Counsel's performance was deficient
16  The Court also found the record demon-
17  strated that defense Counsel's investigation
18  Consisted of his own visual assessment
19  of the fire scene, his conversations with
20  the State's experts, some limited reading
21  and his conversations with other defense
22  Attorneys after work. The Court concluded
23  the investigation, of defense Counsel
24  Amounted a "not Anson" defense. The
25  Court further found, that defense counsel
26  did not consult an "expert" in the Anson
27  investigation; (see Dugas v Coplan (2005)
28  investigation;

30.

1  428 F.3d 317; Also WIGGINS 539 US AT 524
2  123 Sct.2527; The Court Has Recognized
3  That Attorneys, Are Not Always Required
4  To Consult An EXPERT As part of a pre-
5  Trial Investigation, in a case involving
6  The Use Of EXPERT Witnesses by the State;
7  However, where defense counsel's FAILURE
8  to Consult Scientific EXPERTS Constituted
9  deficient performance, where the defense
10  was That DEFENDANT was not PRESENT
11  At Scene of The Crime), A Remand Order
12  was modified by Stipulation (See MILLER V ANDERSON
13  (7TH Cir. 2001,) 268 F.3d 485; quoting...
14  Dugues V Coplan (2005) 428 F.3d 317; Such as The
15  case Here; petitioner
16          WARREN's defense, was That
17  He was not present on September 11, 1996
18  when REINA WEBB, was RAPED. Defense
19  counsel Richard Hove, provided The prosecution
20  with a list of Medical Reports, That Disclosed
21  Attending physicians and medical personal
22  of HIGHLAND Hospital. The prosecution there by
23  Assumed Defense Counsel would Have Those
24  physicians, Testify As EXPERTS; However,
25  defense counsel chose to Have NON EXPERTS
26  Testify That petitioner WARREN, was in a
27  cast on September 11, 1996; (See EXHIBIT (J)(K)(L)
28  RT 917 - 929.) This was very Damaging to

                        34

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34769

1  Petitioner ability, to establish Any credibility

2  with the Jury, Because the non-expert

3  testimony was found inconsistent by the

4  Jury, which the Jury nor the Judge could

5  Rely on As Holding Any veracity, to support

6  petitioner Warren's defense that he was

7  in a cast on the day, Reina Webb was Raped.

8  (See Exhibit (J)(K)(L) RT 917-929) Defense Counsel

9  Rexand Hove, not only committed, Error

10  in His tactical discretion, But was prejudicial

11  in His ability, to motion the Court for A

12  "New Trial" inspite of the "New" evidence

13  the Court came in receipt of (See Exhibit (J)(K)

14  (L) RT 917-929) Had Rexand Hove, presented

15  Expert Testimony of Dr. Virgil Williams, And the

16  Two additional physicians who dressed the

17  cast on petitioner Warren, the Court

18  Would not have denied petitioner Warren's

19  New Trial Motion; Had it Not Based it's

20  New Trial Motion; Had it Not Based it's

21  Ruling on the Non-expert Testimony,

22  of being inconsistent with it's Testimony,

23  (See RT 706-708 ) RT 718-724 )

24

25  Expert Testimony

26        While Not Necessary, is Sometimes

27  Relied upon in determining claims of Ineffective

28  Assistance of Counsel. (See Karis v Calderon

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34769

1  , 283 F.3d 1117, 1133 (9th Cir 2002) A court
2  reviewing an "ineffective assistance claim
3  should consider counsel's performance in
4  the context of the "prevailing professional
5  norms," which include a context-dependent
6  consideration of the challenged conduct as
7  seen from counsel's perspective time.
8  (See Wiggins v Smith, 539 US. 510, 523, 123 Sct.
9  2527, 156 Led2d. 471 (2003) (quoting Strickland
10  466 US at 688-89, 104 Sct 2052). If scientific,
11  technical or other specialized knowledge
12  will assist the trier of fact to understand
13  the evidence on to determine a fact in
14  issue, a witness qualified as an expert, may
15  testify thereto in the form of an opinion
16  on otherwise. (See Hovey v Ayers (2006) 458
17  F.3d 892; The Anti-terrorism and effective death
18  penalty act of 1996 (A.E.D.P.A) requires a
19  federal court to review, a District court's
20  decision to grant on deny a 28 USC 2254
21  habeas petition de novo. (See Alcala v
22  Woodford, (9th Cir 2003) 334 F.3d 862, 868;
23  on all legal questions and mixed
24  questions of law and fact, and reviewed
25  de novo. (See Swan v Peterson (9th Cir 1993
26  6 F.3d 1373, 1379; quoting Hovey v Ayers (2006)
27  458 F.3d 892; Therefore, petitioner warren's
28  conviction must be reversed for the insufficiency
   of Ricardo Hove

## VII.

petitioner warren will now amend
claim 3 with clarification, that
this claim of new evidence
substantiates merit, that had
the medical records been sent
prior to trial by Highland Hospital
when subpoenaed by defense counsel
Richard Foule, the jury could have
heard factual evidence that three
physician's placed a full leg cast
on petitioner warren's leg in efforts
to consider a defense theory of
misidentification by Delora
webb

Standard of Review

A person, when first charged
with a crime, is entitled to a presump-
tion of innocence, and may insist
that his guilt be established beyond
a reasonable doubt. In re winship
(1970) 397 US 358, 90 S.Ct. 1068, 25 LEd 2d 368
quoting Herrera v Collins (1993) 113 S.Ct 853
506 US 390; where newly
discovered evidence is
alleged in a habeas application, evidence
which could not reasonably have been

34

1  presented to the state trier, of facts, the
2  federal court must grant an evidentiary
3  hearing, Townsend v Sain (1963) 372 US 293
4  83 Sct. 745, 9 Led 2d 770; quoting Heracas
5  v Collins (1993) 113 Sct. 853, 506 US390; The
6  reasons why this new Evidence, was,
7  not presented in the earlier application
8  was because, it was not available
9  to trial defense Counsel Richard Heue
10  who, when, Subpoened Highland
11  Hospital, for the medical records, they
12  delayed, surveying this information
13  until after trial was complete; neverth
14  less, defense Counsel, Richard Heues
15  representation, was incompetant, to
16  a professional norm
17            of representation,
18  where defense counsel, Richard Heue,
19  had Knowledge, of the new evidence,
20  and provided the prosecution with a
21  copy of the medical reports, however,
22  he failed to present expert, testimony,
23  which would have confirmed petitioners
24  warrens, was in a cast on 9/11/96; The
25  prosecution, argued against his
26  motion for new trial, because the non
27  expert testimony, was inconsistant. The
28  Court there by, denied petitions

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34769

1  warren's neutral meljor on that
2  fact alone. The prosecution was
3  surprised to learn defense counsel,
4  would not have expert testimony of
5  Dr. Virgil Williams, and the two
6  additional physicians who constructed
7  the leg cast on petitioner, warren's leg.
8  (see exhibit (L) This was nevertheless,
9  prejudicial to petitioner warren, because
10 counsel chose to rely on non-expert
11 testimony, to verify petitioner warren
12 was in a leg cast on the day of the
13 crime against Reina webb, As a result
14 the jury and the judge, found the non-
15 expert testimony inconsistant,
16                                to establish
17 any velacity, that petitioner warren was
18 not the perpatrator. petitioner warren,
19 Suffered the consequences, of being
20 denied a new trial, based on a bad
21 tactical discretion, to prove petitioner
22 warren's innocense. The medical Records
23 were not available, to defense counsel
24 Richard Hove, however, he had knowledge
25 to Subpoena, all three physicians, to
26 testify they Surgically fashioned a leg
27 cast on petitioner warren.
28

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34769

6. GROUNDS FOR RELIEF:

 State briefly the ground on which you base your claim for relief.

NEW EVIDENCE ESTABLISHES PETITIONER'S INNONCENCE

PETITIONER'S CONVICTION IS UNLAWFUL AND UNCONSTITUTIONAL SINCE NEW EVIDENCE
THE JURY NEVER CONSIDERED — MEDICAL TREATMENT RECORDS.— SHOWS THAT HE COULD
NOT HAVE BEEN  THE PERPETRATOR OF THE SUBJECT OFFENSES AS  IDENTIFIED. THIS
VIOLATES PETITIONER'S RIGHTS, AS GUARANTEED BY AMENDMENTS 5, 6, 8, AND 14
TO THE UNITED STATES CONSTITUTION. <u>Herrera v. Collins</u> (1993) 506 U.S. 390.

//
//
//
//
//
//

//
//
//
//
//

//
//
//
//
//

## PETITION FOR WRIT OF HABEAS CORPUS

Tell your story briefly without citing cases or law.

Petitioner, Melrolando N. Warren seeks writ relief alleging his conviction has been unlawfully imposed, since new evidence of his innoncence never presented at trial has been obtained, and by this verified petition avers as follows:

### Grounds for Relief

### NEW EVIDENCE ESTABLISHES PETITIONER'S INNONCENCE

Petitioner's conviction is unlawful since new evidence the jury never considered --medical treatment records-- shows that he could not have been the perpetrator of the substantive offenses as identified. And such conviction violates his constitutional rights as guaranteed by Amendments 5, 6, 8, and 14. <u>Herrera v. Collins</u> (1993) 506 U.S. 390.

### a. Supporting Facts:

1.  The state charged Petitioner with the September 11, 1996 San Leandro kidnapping, rape, and foreign object penetration of Reina Webb. (Exhibit B, CT 94-103.)

2.  Reina Webb was accosted at gun point in the pre-dawn hours while waiting on a bus stop to get to work, taken to a pathway alongside a house, raped and penetrated by her assailant. The state's theory was that Petitioner committed the offenses. The defense maintained otherwise, and that Petitioner had been misidentified.

3.  The state's only witness to support its theory was testimony proffered by Ms. Webb. Who testified that Petitioner carried out the offense commencing shortly after she arrived at the bus stop and ending on the side of the house where she had been taken to until being released.

4.  Webb testified she initially noticed the assailant when he walked up and engaged her in conversation. (Exhibit C, RT 180-181.) Webb testified that he then asked her to stand up, and she conveyed that it was not necessary. And he then exposed a gun in his waist band and told her again to stand and she refused. Ibid. at 183-184. After being told that he had shot another lady earlier that morning, Webb relayed she complied and at gun point

**PETITION FOR WRIT OF HABEAS CORPUS**

walked with the assailant. Ibid. at 184-185. Finally, Webb testified that after arriving on the side of the house, Petitioner knelt down to the side of her, unzipped his pants, and positioned himself between her legs and inserted his penis into her. (**Exhibit D, RT 200-202.**)

5.    Relying on infromation generated from   pre-trial conferences with Petitioner  and subpeoened medical reports showing that he had been admitted to Highland Hospital in Oakland, California on July 30, 1996 due to a gun shot wound to his right knee and had his leg casted in a full leg cylinder, the injury's inability to allow the subject acts as averred, Ms. Webb's description of a non-incapacitated body part assailant, and colloquy from Petitioner that his cast was not removed until the latter half of September, 1996, trial counsel argued with admission into evidence of the Highland reports that Petitioner was not the offending party. (**Exhibit E, RT 705-706.**)

6.    None of the pre-trial reports disclosed by Highland Medical evinced a "cast removal" beyond the 9/11 offense date.

7.    In his closing and rebuttal arguments, and relying on the existence that nothing ever  presented by the defense conclusively showed that Petitioner's leg was casted at the time of the offense, the prosecution noted in regards to the adopted strategy that "he [petitioner] has a cast on, but he's out of plaster before his vist to the clinic two weeks later. (**Exhibit F, RT 807, lns 11-13.**)

Relying further on this absence, the prosecution inferred "does it sound like you're going to be in a cast for months and months especially when you're told to come back in two weeks?" Ibid. at 23-26. Finally, the state argued that "based upon the evidence you heard convict the defendant of every single count, charge, and allegation."

8.    Highland hospital medical progress records dated September 17, 1996 regarding Petitioner's visitation treatment, was not disclosed by Highland Medical upon service of the defense subpoena nor presented at trial. Had it been, the jury would have learned that

**PETITION FOR WRIT OF HABEAS CORPUS**

the leg cast applied to Petitioner on July 30, 1996 was still intact beyond the September 11, 1996 offense. (**Exhibit G, Patient's Treatment Record/Radiology Report.**)

9.    The jury never learned that Petitioner's September 17, 1996 medical evaluation was where it was initially determined that his wound had healed well and that his <u>cast and surgical stiches were removed</u>, and that he was sent to x-ray. Ibid., passim.

10.    Nor did the jury learn that the prosecution's inference to it that Petitioner's cast was removed at his two week August 15, 19996 patient follow-up appointment was inaccurate. (**Exh. F, lns 10-11.**)

11.    Finally, the jury never learned that the true outcome of Petitioner's August 15, 1996 first clinic follow-up visit resulted in a determination that his cast was noted to be okay, and that he was ordered to "RTC" (return to clinic) in one month. (**Exhibit H, Patient's treatment Record.**)

12.    Instead, the jury was **given** a grossly misleading profile of Petitioner being without a cast at the time of substantive offenses, thus capable of carrying out the subject acts and thus was correctly identified by Reina Webb.

13.    Based on the state's argument and inferences, the jury found that Petitioner was the assailant who perpetrated the charged acts. (**Exhibit I, RT 878-882.**)

Had the jury been given the referenced reports the outcome would have been different. The state's entire theory was that Petitioner cast was removed several weeks before the September 11th offense. Petitioner has presented new evidence recently obtained showing otherwise. Based on his inability to dispositively show his medical disposition at the relevant time, the prosecution urged his conviction precisely because he was the perpetrator. The jury agreed with the state's theory.

Given the prosecution's arguments in this case, and the jury verdict, it is plain that the Highland reports undermines the state's case against Petitioner. And if they are given

credence, their contents shows that it was physically impossible for Petitioner to commit the offense as testified to and that he was misidentified. Because the conviction rest on the theory that Petitioner was uncasted hence capable, the evidence undermines the state's case of the subject acts. As such, relief is warranted.

### b. Supporting Authorities:

**A.** Herrera v. Collins (1993) 506 U.S. 390, 417; Carriger v. Steway (9th Cir. 1997) 132 F.3d 463, 476. See also Spivey v. Rocha (9th Cir. 1999) 194 F.3d 971, 979; Fuller v. Roe (9th Cir. 1999) 182 F.3d 699, 704.

Under federal law, the state is precluded from punishing a defendant who can present new evidence which undermines the state's case.

**B.** In re Branch (1969) 70 Cal.2d 200, 213; In re Imbler (1963) 60 Cal.2d 554, 569; In re Hall (1981) 30 Cal.3d 408, 417; In re Weber (1974) Cal.3d 703, 724.

State law too, entitles a defendant to post-conviction relief based on newly discovered evidence that undermines the prosecution's entire case.

**C.** People v. Gonzalez (1990) 51 Cal.3d 1179, 1246.

If newly discovered evidence cast fundamental doubt on the accuracy and reliability of the proceeding, the criminal judgment may be collaterally attacked on such evidentiary basis.

**D.** People v. Soals (1992) 8 Cal.App.4th 475, 486.

Evidence is new if the jury did not hear the evidence and it could not have been discovered with reasonable diligence .

//

//

//

//

//

**PETITION FOR WRIT OF HABEAS CORPUS**

*41*

page

IV.

1. petitioner Warren will now Amend
2. claims 2 with clarification of
3. the Batson Error, providing
4. factual support, that as a matter
5. of law two of the dismissed
6. African American women and
7. their relatives involved in the
8. criminal justice System, were
9. not crimes of violence and the
10. record confirms that According
11. -ing to Batson v Kentucky (1986)
12. 476 US 79, 106 Sct 1712 90 Led 2d 69
13. Reversal is Required
14.
15.
16.
17. Standard of Review
18.
19. The Ninth Circuit has found Batson
20. error when the prosecutes States Reasons
21. that are not supported by the record
22. Batson v Kentucky (1986) 476 US 79, 106 Sct
23. 1712, 90 Led 2d 69; In this case, out of
24. the Four jurors, all of which were
25. African American
26.                     were challenged by the
27. prosecutor, Two of the African American
28. women reduce Schuffle's Son was

42

1  arrested for drunk driving, but test
2  showed he was not intoxicated (see
3  foot p.5.) irrespective of the peremptory
4  challenge, the alledged offense, were no
5  crime of non-violence. (see Exhibit (A)
6  the 2nd jurist Ruscha johnson, also
7  an African American, was challenged
8  for group bias, for her retainer being
9  involved in a prior offense of grand
10 theft and a drug offense (see Exhibit
11 (H) These were not crimes of violence
12 so the reasons stated by the prosecutor,
13 were unsupported by the record and
14 therefore substantiates merit of this
15 ~~exhausted~~ claim.
16                     to be heard before this
17 court of federal jurisdiction.
18
19
20
21
22
23
24
25
26
27
28

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)
34769

## A. Factual and Procedural Background

Uedico Scatliffe and Rischa Johnson were two of the original group of prospective jurors. (ART[4] 21.) The prosecutor exercised his second peremptory challenge against Ms. Scatliffe and his fourth peremptory challenge against Ms. Johnson. (ART 139.)[5] Immediately after the prosecutor challenged Ms. Johnson, appellant made a motion under People v. Wheeler (1978) 22 Cal.3d 258 and Batson v. Kentucky (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69] on the ground that the prosecutor was systematically challenging female African-American jurors. (ART 140-141.) The court stated that it wished to continue with jury selection and would hear the motion later. (ART 141.)

---

[4]ART refers to the two-volume, 315-page, augmented reporter's transcript of the jury selection proceedings.

[5]The prosecutor exercised his first peremptory challenge against Roy Kaneshiro (ART 21, 113), and his third peremptory challenge against Jennifer Cherry. (ART 113, 140.)

44,



When the prosecutor exercised his sixth peremptory challenge against a juror identified in the transcript as Juror No. 48, appellant stated he had another "motion" (by which he meant <u>Wheeler/Batson</u> motion) to make.[6] The court took note that appellant was making the motion and told appellant it would "follow the same procedure that we did before" (by which the court meant it would hear the motion later). (ART 180-181.)[7]

When the prosecutor exercised his eleventh peremptory challenge against Rose Watts Holman (CT[8] 1611),[9] appellant told the court he had a motion that he wanted to have "heard now." (ART 235.)[10] The court told appellant it would handle the motion in due course. (ART 235.)

After jury selection proceedings concluded, but before the jurors were

---

[6]Later, the juror was identified as Melba Biddings. (ART 303.)

[7]The prosecutor exercised his fifth peremptory challenges to a prospective juror identified in the transcript as Juror No. 38. (ART 180.)

[8]The jury questionnaires appear in five volumes which are marked supplemental clerk's transcript. However, the first numbered page of these transcripts is 205, and the original clerk's transcript ends with numbered page 204. Because of this, appellant will cite to the pages containing the questionnaires using the abbreviation CT.

[9]In the reporter's transcript Ms. Watts Holman appears as one word – Wattsholman. (See ART 141.) On her jury questionnaire, however, Ms. Watts Holman wrote this as two words. (CT 1611.)

[10]The prosecutor exercised his seventh through tenth peremptory challenges to prospective jurors identified in the transcript as Jurors Nos. 11, 12, and 57 and Gamez. (ART 205-206, 234.)



sworn, the court heard appellant's <u>Wheeler/Batson</u> motion. (ART 302-303.)
The court noted that appellant had made the motion after the prosecutor
exercised his fourth challenge to Ms. Johnson and his sixth challenge to Ms.
Biddings, and asked appellant to proceed with his motion. (ART 303.)

Appellant noted that he also made the motion after the prosecutor
exercised his eleventh peremptory challenge against Ms. Watts Holman.
(ART 303.) Appellant said that he did not make a motion when the prosecutor
challenged Ms. Scatliffe, because he thought that the challenge of a single
person would not provide an adequate basis for the motion, but he did made
the motion when the prosecutor challenged Ms. Johnson and renewed it with
the prosecutor's challenges of Ms. Biddings and Ms. Watts Holman. (ART
303-304.) Appellant noted that all four were African-American women who
ranged in age from 33 to 48. (ART 303-304.)[11]  Appellant stated that the
challenges were an effort at systematic exclusion of African-American women
under the age of 50. (ART 304.)[12]

The court stated that the mere exclusion of a protected class of jurors

---

[11]Appellant observed that Ms. Scatliffe was 47, Ms. Johnson was 33,
Ms. Biddings was 45 and Ms. Watts Holman was 48. (ART 303-304.)

[12]On appeal, appellant will contend there was a violation of <u>Wheeler</u>
and <u>Batson</u> only insofar as the four challenged jurors were African-American
women. It appears that age is not an appropriate criterion for defining a
cognizable group. (See generally <u>People v. McCoy</u> (1995) 40 Cal.App.4th
778, 780-786.)

46.



does not establish a prima facie case and asked appellant if he wished to articulate any additional facts. (ART 304-305.) Appellant said that he did not see a reason why the prosecutor would not want Ms. Johnson as a juror since she had a brother in the highway patrol, did not like criminals released due to mere technicalities, and believed in the accuracy of DNA evidence. (ART 305.) Appellant said he did not see any reason why the prosecutor challenged Ms. Biddings since she said she would be fair and impartial and she had a daughter who was a victim of molestation. (ART 305.) Appellant also said that he did not see any reason why the prosecutor challenged Ms. Watts Holman since she, too, said she would be fair and impartial, felt that appellant should testify, and said both sides should be heard. (ART 305-306.)

The court ruled that appellant had made a prima facie case and asked the prosecutor if he wished to respond. (ART 306.)

The prosecutor began with Ms. Scatliffe. He said she wrote on her questionnaire that one witness was not enough. In response to a question on the questionnaire asking about her views about the criminal justice system, she wrote: "What is fair?" The prosecutor felt that her answers to his questions about this during void dire were inarticulate, rambling, illogical, confusing and indicative of potential bias. In response to a question on the questionnaire about the prosecution proving guilt beyond a reasonable doubt, she said there were two sides to every story. At another place on her questionnaire, she

*47.*

spoke about an attorney who represented her son. In response to a question about family members being arrested or charged with a crime, she said her son had been stopped randomly for a traffic accident and this was unfair. (ART 307.) The prosecutor said he felt Ms. Scatliffe was not forthright because she said she hired an attorney to represent her son and it was a very serious matter. (ART 307-308.) The prosecutor also said that particularly with regard to her son, Ms. Scatliffe had a very strong bias that she was concealing, and this was his basis for challenging her. (ART 308.)

With respect to Ms. Johnson, the prosecutor said she wrote on her questionnaire, with respect to friends and family members who had been arrested for, charged with or convicted of a crime, that there were too many to list. She also wrote that this would not impair her ability to be fair. The prosecutor believed that these two statements were "oxymorons in nature." (ART 308.) The prosecutor felt that the response "too many to list" was unusual and indicated Ms. Johnson could not be fair and impartial. (ART 308.) The prosecutor also said that when appellant's attorney introduced appellant to the jury, he said hello and no one responded. When appellant commented that no one had responded, Ms. Johnson, according to the prosecutor, raised her right hand and looked at appellant, and was the only one who made a response. The prosecutor felt that because of this, Ms. Johnson could not be fair. (ART 309.)

*48.*

With respect to Ms. Biddings, the prosecutor said she had a cousin who was serving time in prison for assault. Although Ms. Biddings said she could be fair, the prosecutor said he thought she could not be because of her cousin, and said he believed her cousin had been convicted in Alameda County. (ART 309.)

As for Ms. Watts Holman, the prosecutor said her response about the presumption of innocence and failure of proof was usual because she said that she had never been in the position to deal with this and did not really know how to answer. (ART 310.) She also said that both sides should be heard, but after the court spoke about this issue (apparently in reference to the court saying the defendant had no burden of proof), she changed her response. (ART 310.) In addition, she said she had a nephew in jail as a result of a homicide trial in Alameda County. The prosecutor also said she looked away when he tried to make eye contact with her. (ART 310.)

The court asked appellant if he had any response. (ART 311.) Defense counsel said that he paid particular attention to Ms. Watts Holman because he believed the prosecutor would challenge her. Defense counsel said Ms. Watts Holman looked the prosecutor directly in the eye when talking about her cousin and said she was not close to him, did not attend his trial and learned about the trial secondhand through her family. She said her cousin would not affect her because she was not aware of the circumstances of his case. (ART

49

311.) With regard to Ms. Watts Holman's desire that both sides testify, defense counsel pointed out that this indicated she would view appellant's failure to testify as a sign of guilt, and it was disingenuous for the prosecutor to advance this as reason for challenging her. (ART 312.)

Defense counsel stated he did not see any juror make a movement when appellant made his statement. (ART 312.) Defense counsel also said that Juror No. 8 had stated in response to the question about whether one witness would be sufficient, "it depends." (ART 312.) Juror No. 1 had said the testimony of all witnesses should be used to determine if the testimony is credible. (ART 312-313.) Appellant noted that these responses were inconsistent with the statement that one witness would be sufficient. (ART 313.)

Defense counsel also pointed out that three of the selected jurors said they had friends who had been charged with or convicted of crimes. Juror No. 5 was one. Juror No. 2, a white male, said a friend had spent time in jail for multiple drunk drivings and subsequent failures to appear. And Juror No. 4 said his brother and two friends had been convicted of crimes. (ART 313.) [13] Defense counsel stated that other jurors also had given position responses on

---

[13]The relevant portion of Juror No. 5's questionnaire is at CT 275. The relevant portion of Juror No. 2's questionnaire is at CT 230. The relevant portion of Juror No. 4's questionnaire is at CT 260.

*50.*



this issue. (ART 313.)[14] Defense counsel said that these responses provided

the court with a basis for finding purposeful exclusion of female African-

American jurors. (ART 313-314.)

The court stated that it had not observed the lack of eye contact or the

making a gesture. (ART 314.) The court noted that contact with the criminal

justice system was a valid ground for a peremptory challenge by the

prosecutor. The court acknowledged that some of the selected jurors had such

contacts, but it distinguished between the jurors the prosecutor had challenged

and the ones he had not on the ground that the relatives of the challenged

jurors had been involved with crimes of violence, while the friends and

relatives of some of the selected jurors had been involved with nonviolent

crimes. (ART 314.)[15] On this basis, the court denied the Wheeler/Batson

motion. (ART 314.)

---

[14]For example, Juror No. 3 wrote on his questionnaire that "a family
member has been arrested & convicted." (CT 245.) Juror No. 6 also said on
his questionnaire that a friend or family member had been arrested for, charged
with or convicted of a crime. (CT 290.) And Alternate Juror No. 1 wrote on
his questionnaire that his brother had been convicted of drunk driving. (CT
395.)

[15]The court expressed its ruling as follows: "However it's clear that
contact with the criminal justice system is enough to defeat Wheeler. The
crimes that the four excluded jurors had familiarity with in terms of their
family members were crimes of violence, as of (sic) this crime, versus
nonviolent crimes with some of the other jurors who were left on the jury."
(ART 314.)

## B. The Error

### 1. General Principles of Law

When a party, on the basis of a presumed group bias, removes members of a racial, religious, or ethnic group from a jury, this action violates the opposing party's right under Article 1, §16 of the California Constitution to a trial by a jury drawn from a representative cross-section of the community. (People v. Turner (1986) 42 Cal.3d 711, 715-716; People v. Wheeler (1978) 22 Cal.3d 258, 276-277.)  Such action is also a violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution.  (People v. Turner, supra, 42 Cal.3d at p. 716; Batson v. Kentucky (1986) 476 U.S. 79, 89 [106 S.Ct. 1712, 90 L.Ed.2d 69].) Cognizable groups in this context include African-American women. (People v. Clair (1992) 2 Cal.4th 629, 652; People v. Motton (1985) 39 Cal.3d 596, 605-606; People v. Rojas (1992) 11 Cal.App.4th 950, 957.)[16]  The defendant

---

[16]Cognizable groups also include include African-Americans (People v. Clair, supra, 2 Cal.4th at p. 652), African-American men (People v. Gray (2001) 87 Cal.App.4th 781, 783), Hispanics (People v. Trevino (1985) 39 Cal.3d 667, 683-686), women (id. at p. 686; People v. Macioce (1987) 197 Cal.App.3d 262, 280), men (People v. Williams (2000) 78 Cal.App.4th 1118, 1125), whites (Romans v. Abrams (2d Cir. 1987) 822 F.2d 214, 227-228), jurors of Chinese descent (People v. Lopez (1991) 3 Cal.App.4thSupp. 11, 15) Jews (United States v. Gelb (2d Cir. 1989) 881 F.2d 1155, 1161), gay men and lesbians (People v. Garcia (2000) 77 Cal.App.4th 1269, 1281) and Native Americans. (See United States v. Childs (9th Cir. 1993) 5 F.3d 1328, 1337.)

need not be a member of the challenged group in order to raise the issue under the United States or California Constitution. (People v. Catlin (2001) 26 Cal.4th 81, 116-117; Powers v. Ohio (1991) 499 U.S. 400, 402 [111 S.Ct. 1364, 113 L.Ed.2d 411].)

Under California case law, "[i]f a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in a timely fashion and make a prima facie case of such discrimination to the satisfaction of the court." (People v. Wheeler, supra, 22 Cal.3d at p. 280.) "If the court finds that a prima facie case has been made, the burden shifts to the other party to show if he can that the peremptory challenges in question were not predicated on group bias alone." (Id. at p. 281; footnote omitted.) Likewise, under Batson, once the defendant establishes a prima facie case of discrimination, the burden shifts to the opposing party to come forward with neutral explanations for challenging the jurors. (Batson v. Kentucky, supra, 476 U.S. at p. 97.)

If a party uses even a single improper peremptory challenge, this can constitute a prima facie case under both Wheeler and Batson. (People v. Fuentes (1991) 54 Cal.3d 707, 715-716 [and cases cited]; People v. Gonzalez (1989) 211 Cal.App.3d 1186, 1193, 1202; People v. Granillo (1987) 197 Cal.App.3d 110, 123.) The preferred procedure in California is for the trial court to make an express ruling on whether a prima facie showing has been

made. (People v. Fuentes, supra, 54 Cal.3d at pp. 716-717, fn. 5.) The trial court made such a finding here. (ART 306.)

After the trial court makes a finding that there has been a prime facie case of discrimination, the party who made the challenges in question can sustain the burden of proving lack of group bias by showing he made the challenges on grounds that were reasonably relevant to the case on trial or its parties or witnesses, i.e., "for reasons of specific bias." (People v. Wheeler, supra, 22 Cal.3d at pp. 281-282.) Wheeler explains that specific bias includes a range of racially neutral factors such as prior arrests or complaints of police harassment by the juror, or things that suggest an unconventional lifestyle such as the juror's clothes or hair length, or even the juror's looks and gestures. (Id. at pp. 275-276.) The reasons for the questioned challenges need not rise to the level justifying challenges for cause, but must be racially neutral reasons relating to the cause being tried. (Batson v. Kentucky, supra, 476 U.S. at pp. 97-98.)

When a race-neutral explanation is stated by the party who made the questioned challenges, the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination. (Puckett v. Elem (1995) 514 U.S. 765, 767 [115 S.Ct. 1769, 131 L.Ed.2d 834].) The trial court has a duty to determine the credibility of the explanations for the challenges that are offered by the party that exercised the challenges. (People v. Silva

(2001) 25 Cal.4th 345, 385; McClain v. Prunty (9th Cir. 2000) 217 F.3d 1209, 1220.) The trial court should be suspicious when the challenging party offers explanations which are implausible or are unsupported by the facts in the record. (People v. Silva, supra, 25 Cal.4th at p. 385.)

Appellate courts review with restraint a trial court's determination regarding the sufficiency of the challenging party's stated justification for the questioned challenges. (People v. Catlin, supra, 26 Cal.4th at p. 117.) The trial court's determination, which is factual, is entitled to deference as long as the trial court (1) makes a sincere and reasoned effort to evaluate the nondiscriminatory justification offered and (2) substantial evidence supports the trial court's ruling. (Ibid.)

Essentially the same standards govern both a state constitutional issue under Wheeler and a federal constitutional issue under Batson. (People v. Catlin, supra, 26 Cal.4th at p. 117, fn. 4.) There is, however, one significant difference with respect to the nature of appellate review of trial court's ruling accepting the reasons for the questioned challenges. Under California law, appellate courts do not conduct a de novo comparative analysis of challenged and unchallenged jurors to see whether the prosecutor failed to challenge jurors who display characteristics which the prosecutor gave as a reason for excusing the challenged jurors. (E. g., People v. Ervin (2000) 22 Cal.4th 48, 76; People v. Jackson (1996) 13 Cal.4th 1164, 1197; People v. Montiel (1993)

55

5 Cal.4th 877, 909; People v. Johnson (1989) 47 Cal.3d 1194, 1220-1221.)

However, as Justice Mosk has pointed out, California's approach is used in a

minority of jurisdictions. (People v. Jackson, supra, 13 Cal.4th at p. 1249

[concurring opn. of Mosk, J.] citing cases from a number of other jurisdictions

that use a comparative analysis.) The Ninth Circuit, which has jurisdiction

over California criminal cases in which federal constitutional issues are raised

on federal habeas corpus, employs de novo comparative juror analysis and has

set aside California convictions based on such analysis. (E.g., Collins v. Rice

(9th Cir. 2004) 365 F.3d 667, 681-682; McClain v. Prunty, supra, 217 F.3d at

pp. 1220-1222; Turner v. Marshall (9th Cir. 1997) 121 F.3d 1231, 1233, 1251-

1255; see also Rankins v. Carey (C.D.Cal. 2001) 141 F.Supp.2d 1231, 1240-

1242.)

However, although California appellate courts do not employ

comparative juror analysis for the first time on appeal, they do employ such

analysis where the party objecting to the challenges employs such analysis in

the trial court. (People v. Johnson (2003) 30 Cal.4th 1302, 1318-1325.)

Appellant employed such an analysis in the trial court by pointing out that

several of the selected jurors had characteristics which the prosecutor listed as

his reasons for challenging the four African-American women, including

having relatives or friends who were arrested for, charged with or convicted

of crimes. (See ART 311-314, summarized at pp. 18-20, above.)



56,

There are a number of recent cases in which courts have found that the reasons offered by a prosecutor for a challenge were insufficient to establish that the challenges were proper and reversed a conviction for error under Wheeler and Batson.

In one recent case the California Supreme Court reversed a judgment imposing capital punishment after rejecting the prosecutor's statement that he challenged a minority juror because the juror would be reluctant to return a death verdict and was an extremely aggressive person. (People v. Silva, supra, 25 Cal.4th at pp. 385-386.) The Supreme Court found that the record of the voir dire did not support the stated reasons. (Ibid.)

In another recent case the Court of Appeal reversed a conviction after rejecting the prosecutor's statement that he challenged an African-American prospective juror because she lived in Inglewood, had no children and appeared unfriendly. (People v. Turner (2001) 90 Cal.App.4th 413, 418-420.) The Court noted that the prosecutor placed the greatest emphasis on the juror's place of residence, an area where African-Americans comprised 49.9% of the population, and in which African Americans are twice as likely as any other race to be a juror. (Id. at p. 420.) The Court found that the "residence" reason was a surrogate or proxy for group membership. (Ibid.)

In another case, the Supreme Court reversed a judgment imposing a sentence of death after the trial court found that some stated reasons for

57.

challenging African-American prospective jurors were genuine and some were false, but failed to consider which of the valid reasons applied to which jurors or to determine whether a valid reason prompted the challenges. (People v. Fuentes (1991) 54 Cal.3d 707, 718-721; see also People v. Tapia (1994) 25 Cal.App.4th 984, 1006-1020 [also finding that the trial court failed to make a proper attempt to evaluate the proffered reasons for the peremptory challenges].)

In addition, there are a number of recent cases in which federal courts have set aside a conviction after finding that the reasons offered for a challenge were insufficient to establish that the challenge was proper or after finding that the trial court's ruling accepting the offered reasons was erroneous.

In a recent case, the Second Circuit remanded the case to the district court because the state trial court failed to fulfill its obligation under Batson to adjudicate the credibility of the reasons the prosecutor offered for challenging two minority jurors. (Galarza v. Keane (2d Cir. 2001) 252 F.3d 630, 639-641.) In another recent case, the Ninth Circuit held that the prosecutor's reasons for challenging two minority jurors were unsupported by the record and were pretextual when analyzed in comparison to unchallenged jurors. (McClain v. Prunty, supra, 217 F.3d at pp. 1221-1224.) In addition, the prosecutor articulated an explanation which the court found not to be a

_58.

reasoned one – namely, the juror had her elbow on her chair – since it was not at all apparent why this characteristic made the juror unfavorably disposed toward the prosecution. (Id. at p. 1223.)

In another case, the Seventh Circuit found Batson error after concluding that the state trial court erred because it accepted facially race-neutral reasons that the prosecutor did not employ to challenge similarly situated Caucasians. (Coulter v. Gilmore (7th Cir. 1998) 155 F.3d 912, 921-922.) Several other federal cases also found Batson error based on the fact the prosecutor justified a challenge on a facially nondiscriminatory ground that did not cause the prosecutor to challenge Caucasian jurors who had the identical characteristic. (E.g., Turner v. Marshall, supra, 121 F.3d at pp. 1251-1254 [prosecutor challenged an African-American male on the ground of hesitancy to look at homicide photographs but seated a Caucasian juror who had the same characteristic]; Devose v. Norris (8th Cir. 1995) 53 F.3d 201, 203-205 [prosecutor challenged two prospective African-American jurors with prior jury experience as having "burned out" but kept Caucasians with prior jury experience]; Davidson v. Harris (8th Cir. 1994) 30 F.3d 963, 965-966 [finding Batson error in a lawsuit by an inmate for violation of civil rights after the attorney for prison officials challenged an African-American prospective juror because she had young children and would be sympathetic to a young man like the plaintiff, but did not challenge two white jurors who also had young

59.

children]; <u>Jones v. Ryan</u> (3d Cir. 1993) 987 F.2d 960, 973 [finding <u>Batson</u>
error when the prosecutor challenged African-American jurors who were the
same age as the defendant or who had children his age, but failed to challenge
white jurors who were similarly situated]; <u>Rankins v. Carey</u>, <u>supra</u>, 141
F.Supp.2d at pp. 1240-1243.)

The Ninth Circuit also has found <u>Batson</u> error when the prosecutor
states reasons that are not supported by the record. In one such case, the
prosecutor stated that the juror worked for a defense attorney, when in fact she
worked for a divorce attorney; stated the juror was uneducated, when the
record showed she was well-spoken and intelligent and held responsible jobs;
stated the juror was evasive when she was not; and stated that the juror's age
was a problem without explaining whether the juror was too old or too young.
(<u>Johnson v. Vasquez</u> (9th Cir. 1993) 3 F.3d 1327, 1329-1331; accord <u>Ford v.
Norris</u> (8th Cir. 1995) 67 F.3d 162, 167-169 [prosecutor's stated reasons that
one African-American juror was illiterate and another was not strong on the
death penalty were not supported by the record].)

**2. Analysis of Appellant's Case**

As appellant explained in subsection A, above, the trial court found
there was a prima facie case that the prosecutor was using peremptory
challenges in a discriminatory manner against African-American women and
asked the prosecutor to explain the reasons for the challenges. (ART 306.)



The prosecutor stated various reasons for the challenges. One reason applicable to all four of the challenged jurors was that friends or family members had been arrested for, charged with or convicted of a crime. (ART 307-311.) After the prosecutor stated his reasons for the challenges, appellant disputed them, noting particularly that some of the jurors who had been selected had friends or relatives who had been arrested for, charged with or convicted of a crime. (ART 313.) The court denied the Wheeler/Batson motion on the ground of the contacts of the challenged jurors with the criminal justice system. The court specifically based its ruling on a finding that the contacts with the criminal justice system by the relatives of the challenged jurors were different than those of the selected jurors, stating: "The crimes that the four excluded jurors had familiarity with in terms of their family members were crimes of violence, as of (sic) this crime, versus nonviolent crimes with some of the other jurors who were left on the jury." (ART 314.) The court's conclusion is not borne out by the record with respect to Ms. Scatliffe and Ms. Johnson.

In response to the question about a friend or family member being arrested for, charged with or convicted of a crime, Ms. Scatliffe wrote that her son had been stopped after a traffic accident. (CT 1246.) When asked about this incident during voir dire, Ms. Scatliffe said that after an accident, her son was arrested for driving under the influence, but a test showed that he was not

61.

intoxicated. (ART 105.) There is thus nothing in the record showing that Ms. Scatliffe's son was arrested for, charged with or convicted of a crime of violence. Drunk driving is not a crime of violence.

In response to the same question on the questionnaire, Ms. Johnson wrote that she had too many friends and relatives to list. (CT 530.) During voir dire, the prosecutor asked Ms. Johnson about the nature of the crimes to which she referred in the questionnaire. She answered: "Grand theft, drugs. That's about it." (ART 110.) When asked if the offenses were felonies or misdemeanors, Ms. Johnson said she did not know. (ART 110.) She did not say that any of her friends and relatives were convicted of violent crimes. Moreover, grand theft and drug offenses are not, in themselves, violent offenses.

The trial court thus was incorrect in believing that all four of the challenged African-American women had family members who had been arrested for, charged with or convicted of crimes of violence. Ms. Scatliffe's son and Ms. Johnson's relatives were not involved in crimes of violence.[17]

---

[17]Ms. Watts Holman wrote on her questionnaire that her nephew was in jail for two years. (CT 1621.) She said during voir dire that he was tried for murder. (ART 144.) The trial occurred recently, he was released the year before appellant's trial, and he was not convicted. (ART 161-162.) This indicates that the time he spent in jail was for pretrial custody. Even though he was not convicted and was released, the court was correct in concluding that the crime involved violence.

(continued...)



In addition, the court was incorrect in concluding that none of the selected jurors had family members who were involved in violent crimes. Juror No. 3 wrote on his questionnaire that a family member had been arrested and convicted. (CT 245.) During voir dire, Juror No. 3 explained that this person was his nephew (ART 274) and that the conviction was for armed robbery. (ART 261.) Armed robbery is, of course, a crime of violence. Juror No. 3 was one of the jurors who sat on appellant's case and was a man (CT 235), not an African-American woman.

The court was incorrect in yet another respect. Alternate Juror No. 1 had a brother who was arrested for, charged with or convicted of driving while intoxicated. (CT 395.) As appellant has noted, the court stated that all four of the African-American women whom the prosecutor challenged had relatives

---

[17](...continued)

Melba Biddings wrote on her questionnaire that she had a cousin serving time for assault. (CT 1576.) He was convicted of the offense. (ART 178-179.) Assault is defined as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (Penal Code §240.) Appellant notes, however that the term "violent injury" used in section 240 is not synonymous with bodily harm, but includes any wrongful act committed by means of physical force against the person of another. (People v. McCoy (1944) 25 Cal.2d 177, 191; People v. Herrera (1970) 6 Cal.App.3d 846, 851.) The "injury" can consist of the least unwanted touching. (People v. Wright (1996) 52 Cal.App.4th 203, 210.) Naturally, an assault can involve actual violence, such as the stabbing or shooting of another person. In this case it is not clear from the record whether the assault committed by Ms. Biddings's cousin involved actual violence as opposed to involving the least unwanted touching. Nevertheless, assault is technically a crime of violence.

who were involved in crimes of violence, while the selected jurors had relatives who were involved in nonviolent crimes. Yet Ms. Scatliffe's son had been arrested for driving while intoxicated, as had Alternate Juror No. 1's cousin. The fact that both had relatives involved in the identical offense undermines the court's ruling finding there was a distinction between the crimes involving the relatives of the selected and challenged jurors.

The Wheeler/Batson error in appellant's case is an unusual one. The trial court denied the Wheeler/Batson motion on a ground that the record contradicts in four separate ways. Another factor that makes appellant's case unusual is that the trial court did not simply accept a reason for the challenges the prosecutor offered, but rather made a finding that modified a general reason which the prosecutor had stated (criminal contacts by relatives and friends), after defense counsel pointed out that this general reason applied to several of the selected jurors. Appellant has not been able to find a case that squarely addresses the effect of the trial court basing its denial of a Wheeler/Batson motion on a reason which modifies or narrows a stated reason but is based on factual findings which are not supported by the record.

One way to analyze this situation is to analogize it to cases in which the court bases its denial of the motion on a reason stated by the prosecutor which is not supported by the record. Such a ruling is error as it involves a failure by the trial court to meet its obligation to make a sincere and reasoned attempt to

64.

evaluate the prosecutor's explanation. (People v. Silva, supra, 25 Cal.4th at pp. 385- 386; see also, Collins v. Rice, supra, 365 F.3d at pp. 686-687; Ford v. Norris, supra, 67 F.3d at pp.167-169; Johnson v. Vasquez, supra, 3 F.3d at pp. 1330-1331.)

It can be said that in this case the court did in fact make some effort to evaluate the genuineness of the prosecutor's explanations. For example, the court rejected the prosecutor's reason for challenging Mrs. Watts Holman for failure to make eye contact because it did not itself observe this. (ART 310, 314.) In addition, although the prosecutor stated he challenged the four African-American women because they said they had relatives or friends who had been arrested for, charged with or convicted of a crime, the court made inquiry of appellant and learned that this was true of several of the selected jurors as well.

Although the court made some effort to evaluate the prosecution's explanations for the challenges, the law requires more than effort. It also requires that the effort include a correct evaluation of the record and that the court's factual findings be supported by the record. (See, e.g., People v. Fuentes, supra, 54 Cal.3d at p. 718.) In Fuentes, although the trial court "did make some effort to evaluate the prosecutor's explanations," it evaluated them improperly because it did so in the abstract and did not determine whether bona fide or sham reasons actually applied to particular challenged jurors.

65.



(Ibid.)  In appellant's case, the trial court made an effort to evaluate the prosecutor's explanations but came to factual conclusions that were not supported by the record.  This was error.

Another way to analyze the error in this case is to conclude, simply, that no substantial evidence supports the trial courts findings that the relatives of the four African-American women were connected with crimes of violence while the relatives of the selected jurors were not.  A trial court's ruling accepting a justification for peremptory challenges is a factual one and is entitled to deference on appeal, but only if it is supported by substantial evidence.  (People v. Catlin, supra, 26 Cal.4th at p. 117.)  In this case, as appellant has shown, the record does not contain any substantial evidence supporting the trial court's crucial "violent crimes" finding with respect to jurors Scatliffe and Johnson and with respect to two of the selected jurors.  It follows that the trial court's finding and its ruling on the Wheeler/Batson motion are simply erroneous.

## C. The Error Requires Reversal

Under Wheeler and Batson, the improper peremptory challenge of a juror is structural error that requires reversal per se.  (People v. Wheeler, supra, 22 Cal.3d at p. 283; People v. Snow (1987) 44 Cal.3d 216, 226; People v. Turner, supra, 42 Cal.3d at p. 728; United States v. McFerron (6th Cir. 1998) 163 F.3d 952, 955-956; Tankleff v. Senkowski (2nd Cir. 1998) 135 F.3d


66.

235, 248; <u>Ford v. Norris</u>, <u>supra</u>, 67 F.3d at pp. 170-171.) Accordingly, the

judgment must be reversed.

67.

## A. Factual and Procedural Background

Uedico Scatliffe and Rischa Johnson were two of the original group of prospective jurors. (1ART[1] 21.) The prosecutor exercised his second peremptory challenge against Ms. Scatliffe and his fourth peremptory challenge against Ms. Johnson. (1ART 139.)[2] Immediately after the prosecutor challenged Ms. Johnson, appellant made a motion under *People v. Wheeler* (1978) 22 Cal.3d 258 and *Batson v. Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69] on the ground that the prosecutor was systematically challenging female African-American jurors. (1ART 140-141.) The court said that it wished to continue with jury selection and would hear the motion later. (ART 141.)

When the prosecutor exercised his sixth peremptory challenge against a juror identified in the transcript as Juror No. 48, appellant stated he had

---

[1]ART refers to the two-volume, 315-page, augmented reporter's transcript of the jury selection proceedings.

[2]The prosecutor exercised his first peremptory challenge against Roy Kaneshiro (1ART 21, 113), and his third peremptory challenge against Jennifer Cherry. (1ART 113, 140.)

another "motion" (by which he meant *Wheeler/Batson* motion) to make.[3] The court took note that appellant was making the motion and said it would "follow the same procedure that we did before" (by which the court meant it would hear the motion later). (2ART 180-181.)[4]

When the prosecutor exercised his eleventh peremptory challenge against Rose Watts Holman (5SCT[5] 1611),[6] appellant told the court he had a motion that he wanted to have "heard now." (2ART 235.)[7] The court told appellant it would handle the motion in due course. (2ART 235.)

After jury selection proceedings concluded, but before the jurors were sworn, the court heard appellant's *Wheeler/Batson* motion. (2ART 302-303.) The court noted that appellant had made the motion after the prosecutor exercised his fourth challenge to Ms. Johnson and his sixth challenge to Ms. Biddings, and asked appellant to proceed with his motion. (2ART 303.)

---

[3]Later, the juror was identified as Melba Biddings. (2ART 303.)

[4]The prosecutor exercised his fifth peremptory challenges to a prospective juror identified in the transcript as Juror No. 38. (2ART 180.)

[5]The jury questionnaires appear in five volumes which are marked supplemental clerk's transcript. The first numbered page of the supplemental clerk's transcript is 205, and the original clerk's transcript ends with numbered page 204. Appellant will cite to the pages containing the questionnaires using the abbreviation SCT preceded by the volume number of the relevant document.

[6]In the reporter's transcript Ms. Watts Holman appears as one word – Wattsholman. (See 1ART 141.) On her jury questionnaire, however, Ms. Watts Holman wrote this as two words. (5SCT 1611.)

[7]The prosecutor exercised his seventh through tenth peremptory challenges to prospective jurors identified in the transcript as Jurors Nos. 11, 12, and 57 and Gamez. (2ART 205-206, 234.) After challenging Ms. Watts Holman using his eleventh peremptory challenge, the prosecutor challenged three more prospective jurors. (2ART 259, 289.)

(2ART 305.)[10] Appellant said he did not see any reason why the prosecutor challenged Ms. Biddings since she said she would be fair and impartial and had a daughter who was a victim of molestation. (2ART 305.) Appellant also said that he did not see any reason why the prosecutor challenged Ms. Watts Holman since she, too, said she would be fair and impartial, felt that appellant should testify, and said both sides should be heard. (2ART 305-306.)

The court ruled that appellant had made a prima facie case and asked the prosecutor if he wished to respond. (2ART 306.)

The prosecutor began with Ms. Scatliffe. He said she wrote on her questionnaire that one witness was not enough. In response to a question on the questionnaire asking about her views about the criminal justice system, she wrote: "What is fair?" The prosecutor felt that her answers to his questions about this during void dire were inarticulate, rambling, illogical, confusing and indicative of potential bias. In response to a question on the questionnaire about the prosecution proving guilt beyond a reasonable doubt, she said there were two sides to every story. At another place on her questionnaire, she spoke about an attorney who represented her son. In response to a question about family members being arrested or charged with a crime, she said her son had been stopped randomly for a traffic accident and this was unfair. (2ART 307.) The prosecutor said he felt Ms. Scatliffe was not forthright because she said she hired an attorney to represent her son and it was a very serious matter. (2ART 307-308.) The prosecutor also said that particularly with regard to her son, Ms. Scatliffe had a very strong bias that she was concealing, and this was his basis for challenging her. (2ART 308.)

With respect to Ms. Johnson, the prosecutor said she wrote on her

---

[10]DNA evidence was introduced at trial. (See slip opn., p. 2.)

72.

Defense counsel said that he paid particular attention to Ms. Watts Holman because he believed the prosecutor would challenge her. Defense counsel said Ms. Watts Holman looked the prosecutor directly in the eye when talking about her cousin and said she was not close to him, did not attend his trial, and learned about the trial secondhand through her family. She said her cousin would not affect her because she was not aware of the circumstances of his case. (2ART 311.) With regard to Ms. Watts Holman's desire that both sides testify, defense counsel pointed out that this indicated she would view appellant's failure to testify as a sign of guilt, and it was disingenuous for the prosecutor to advance this as reason for challenging her. (2ART 312.)

Defense counsel stated he did not see any juror make a movement when appellant made his statement. (2ART 312.) Defense counsel also said that Juror No. 8 had stated in response to the question about whether one witness would be sufficient, "it depends." (2ART 312.) Juror No. 1 had said the testimony of all witnesses should be used to determine if the testimony is credible. (2ART 312-313.) Appellant noted that these responses were inconsistent with the statement that one witness would be sufficient. (2ART 313.)

Defense counsel also pointed out that three of the selected jurors said they had friends who had been charged with or convicted of crimes. Juror No. 5 was one. Juror No. 2, a white male, said a friend had spent time in jail for multiple drunk drivings and subsequent failures to appear. And Juror No. 4 said his brother and two friends had been convicted of crimes. (2ART 313.)[11] Defense counsel stated that other jurors also had given positive responses on

---

[11]The relevant portion of Juror No. 5's questionnaire is at 2SCT 275. The relevant portion of Juror No. 2's questionnaire is at 2SCT 230. The relevant portion of Juror No. 4's questionnaire is at 2SCT 260.

relatives who were arrested for, charged with, or convicted of criminal conduct. As noted about, defense counsel pointed out that this characteristic applied to several of the jurors who had been selected to serve, and argued that this showed the reason was not a genuine basis for the challenges of the four African-American women. (2ART 313-314.)

Immediately after defense counsel pointed this out, the court made its ruling. In its ruling, the court mentioned three of the reasons the prosecutor stated for the peremptory challenges. The first related to one of the reasons the prosecutor stated for challenging Rose Watts Holman – failure to make eye contact with the prosecutor, which the prosecutor interpreted as being evasive. (2ART 310.) The second related to a gesture the prosecutor said Rischa Johnson made. According to the prosecutor, the gesture occurred after appellant's attorney introduced him, appellant said hello, no juror responded, appellant said a"what, no hi's back?" and Johnson raised her right hand and looked at appellant. (2ART 309.) The third related to the ground common to all four challenged African-American women – having relatives involved in crime. The court's statement and findings when making its ruling reads, in its entirety, as follows:

> "THE COURT: As to the issue of eye contact, I must admit I was not paying attention to that. I have no idea if there was or was not eye contact. And as for the alleged gesture that was made, I did not see that. I was looking down writing copious notes and trying to get through jury selection and pay attention to the ethnicity and gender of each juror so I could take note of it in case there was a *Wheeler* motion. So I have no idea if that was done.
>
> However, it's clear that contact with the criminal justice system is enough to defeat *Wheeler*. The crimes that the four excluded jurors had familiarity with in terms of their family

76.

which the prosecutor's stated reasons were not inherently implausible or unsupported by the record, and the trial court therefore did not need to make detailed findings and did not do so. Instead, despite the single ground the trial court stated when making its ruling, in the view of the Court of Appeal the trial court accepted all of the reasons the prosecutor stated for all of the challenges since it did not expressly reject any of those reasons. (Slip opn., pp 12-18.)

The Court of Appeal's findings and rationale are troubling. The trial court expressly denied the *Wheeler/Batson* motion solely on the ground that the four African-American women the prosecutor challenged had relatives with contacts with the criminal justice system involving crimes of violence. In the trial court's words: "contact with the criminal justice system is enough to defeat *Wheeler*. In this case I believe it does. And the *Wheeler-Batsen* (sic) motion is denied." (2ART 314.) The trial court did not say that such contact was one of the reasons why it believed the *Wheeler* motion was without merit. Nor did the trial court say that it found other reasons the prosecutor stated to be valid. Instead, the court said that in this case "it," by which the court meant contact with the criminal justice system, was enough to defeat the *Wheeler* motion and in fact defeated it. The Court of Appeal's conclusion that the trial court denied the *Wheeler/Batson* motion based on all grounds stated by the prosecutor simply cannot be reconciled with the trial court's express ruling.

When explaining its ruling the Court of Appeal stated that because it reviews a trial court's *Wheeler/Batson* ruling with deference, it draws appropriate inferences to support the ruling, and the appropriate inference is that the trial court viewed the prosecutor as having exercised the challenges in good faith. (Slip opn., pp. 13-14.) The trial court, however, did not state it was making some sort of generic, global "good faith" finding. Instead, it

76,

*Miller-El* involved review of a trial court's determination that the prosecutor's race-neutral explanations of its peremptory challenges to African-American jurors were true. (*Miller-El v. Dretke*, *supra*, 125 S.Ct. at p. 2325.) The Supreme Court held that the trial court's determination was wrong to a clear and convincing degree and was unreasonable as well as erroneous. (*Id.* at p. 2340.) In the course of analyzing the validity of the trial court's ruling, the Supreme Court compared at length the characteristics of African-American jurors the prosecutor challenged with those of white jurors that the prosecutor did not challenge. (*Id.* at pp. 2325-2332.) This comparison included jurors who had relatives who had been convicted of crimes. (*Id.* at pp. 2327, 2328, 2330, fn. 8.) As the Supreme Court stated: "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination...." (*Id.* at p. 2325.) The Supreme Court held that based on comparative analysis between the reasons the prosecutor gave for challenging two African-American jurors (Fields and Warren) and the comparable characteristics of nonblack jurors the prosecutor did not challenge, the prosecutor's explanations for the challenges could not reasonably be accepted. (*Id.* at pp. 2329, 2332.)

The central issue presented by appellant's case is whether, and under what circumstances, the express statement of a single reason for denying a *Wheeler/Batson* motion is determinative for purposes of appellate review. The closest this court has come to addressing the issue is in *People v. Silva*, *supra*, 25 Cal.4th 345. The court's analysis in *Silva*, however, does not provide sufficient guidance for sound appellate review because *Silva* draws a distinction that is difficult to apply and the court has not provided additional guidance to clarify the point. Also, *Silva* does not expressly discuss the

*80.*

the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." (*People v. Silva, supra,* 25 Cal.4th at pp. 385-386, citations and internal quotation marks omitted.) This court reversed the conviction, finding that, with respect to M., the trial court had denied the *Wheeler/Batson* motion on a ground that was not supported by the record. (*Id.* at p. 386.)

More recently, this court reaffirmed that "the trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." (*People v. Reynoso* (2003) 31 Cal.4th 903, 919.) The court, however, restated in *Reynoso* the above-quoted portion of *Silva* requiring detailed findings when some of the prosecutor's stated reasons for a challenge are inherently implausible or unsupported by the record. (*Id.* at p. 923.)

The Court of Appeal concluded that appellant's case was one in which the prosecutor's stated reasons were not inherently implausible or unsupported by the record, so the trial court was not under an obligation to make detailed findings. (Slip opn., p. 13.) The Court of Appeal thus found that the detailed finding the trial court did make about the relatives of the challenged jurors being involved in crimes of violence was not the true basis for the trial court's ruling. Instead, in the Court of Appeal's view, the trial court accepted every stated reason as valid because the trial court did not say it rejected any of those reasons. (Slip opn., pp. 13, 17.)

The Court of Appeal's analysis is troubling for several reasons.

First, as explained at page 13, above, the language of the trial court's ruling indicates the court was denying the *Wheeler/Batson* motion based solely and entirely on the fact the four challenged African-American women had

82.

appellant's attorney introduced him to the jury, appellant said hello, no one responded, appellant said "what? No hi's back?", and Ms. Johnson made a gesture with her right hand and looked at appellant. (2ART 309.) Defense counsel mistakenly believed the prosecutor was referring the Ms. Biddings rather than Ms. Johnson, and said he did not notice her making such a movement or gesture. (2ART 312.) The court said it did not notice any eye contact or gesture, but had been taking notes. (2ART 314.) Reasons based on conduct by a juror are deemed pretextual unless that reason is either an uncontested matter of fact or is supported by observations made by the trial judge in the record. *(People v. Allen* (2004) 115 Cal.App.4th 542, 549; *Williams v. State* (Fla.App. 1989) 547 So.2d 179.) The gesture by Ms. Johnson was contested and was not observed by the trial court. It is a factor that is not supported by the record within the meaning of *Silva*.

There was another reason similar to this one that the prosecutor stated related to his challenge of Ms. Watts Holman, namely that she did not maintain eye contact with the prosecutor and looked away from him when he questioned her. (2ART 310-311.) Defense counsel told the court he paid particular attention to Ms. Watts Holman because he believed the prosecutor would challenge her, and he saw that she made direct eye contact with the prosecutor. (2ART 311.) This fact thus was contested and the court did not state it observed the lack of eye contact. (2ART 314.) The factor is not supported by the record under *Silva*.

Another reason the prosecutor gave for challenging Ms. Watts Holman was that she said both sides should be heard, although she later changed her response after the court explained that the law did not require both sides being heard. (2ART 310; see 5SCT 1618.) The prosecutor felt this showed Mr. Watts Holman would have problems understanding certain legal concepts such

*84*

court made – that the four African-American jurors had relatives involved in violent crimes – was erroneous. Ms. Scatliffe's son was arrested for drunk driving, but a test showed he was not intoxicated. (1ART 105.) Ms. Johnson's relatives were involved in grand theft and drug offenses. (1ART 110.) These are not crimes of violence. On the other hand, Juror No. 3's nephew had been convicted of armed robbery, which is a crime of violence. (2ART 261, 274.)[14]

The issues appellant presents for review thus are not abstract propositions of law, but rather are of crucial constitutional importance in this case. No only were the prosecutor's stated reasons for the challenges flawed in several respects, including the stated reason applicable to all four African-American women he challenged, but the trial court upheld the challenges on a basis that was factually inapplicable to two of the women but applied to one of the jurors who tried the case. The question appellant presents for review thus is not only an important one, its flawed resolution by the Court of Appeal denied appellant his rights under the United States and California Constitutions as interpreted in *Wheeler* and *Batson*.

---

[14]The Court of Appeal stated in its opinion that the seated jurors had "largely unspecified friends or family members who had been arrested or convicted of unspecified crimes." (Slip opn., p. 17.) The use of the word "largely" is inaccurate with respect to Juror No. 3. With respect to him, the crime (armed robbery) and the relative (nephew) were specified.

The Court of Appeal also stated that Ms. Bidding's cousin was still serving time. (Slip opn., p. 17.) It appears that Juror No. 3's nephew most likely also was serving time when appellant's trial began, as he was convicted only six months earlier. (2ART 273.)

reasons for the striking of jurors belonging to that cognizable group. (*Deputy v. Taylor* (3d Cir. 1994) 19 F.3d 1485, 1492; *United States v. Battle* (8th Cir. 1987) 836 F.2d 1084, 1086; *United States v. Gordon* (11th Cir. 1987) 817 F.2d 1538, 1541.) Accordingly, "[t]he exclusion by peremptory challenge of a single juror on the basis of race or ethnicity is an error of constitutional magnitude requiring reversal." (*People v. Silva, supra,* 25 Cal. 4th at p. 386.)

In this case, the prosecutor stated a *single* reason for his peremptory challenge of Ms. Biddings. That single reason was the fact she had a cousin who was serving time in prison for assault. (2ART 309.) The prosecutor's stated reason for his peremptory challenge of Ms. Biddings, in its *entirety*, reads as follows: "With regard to Ms. Biddings, she stated that her cousin is presently serving time in prison for assault. She did say she didn't think this would impair her ability. I asked her about that. She knows her cousin. She's somewhat close to her cousin. Beside [sic, most likely the prosecutor said "Based on"] that, I don't think that she could be fair because of that relationship, and I believe if my recollection is correct, that that was another incident that occurred in this county."[15] (2ART 309.)

Although this was the *only* reason the prosecutor stated for challenging Ms. Biddings, he failed to challenge six prospective jurors, all of whom were selected to serve in this case, who also had relatives or friends who were convicted of crimes but who were not African-American women. Juror No. 3 had a nephew who had been convicted of armed robbery six months before appellant's trial. (2ART 261, 273-274; 1SCT 245.) Juror No. 4 had a brother

---

[15]The prosecutor's statement that Ms. Biddings had a "close" relationship with her cousin in prison for assault is inaccurate. As the Court of Appeal noted in its opinion, Ms. Biddings was juror number 48 in the transcript. (Slip opn., p. 5.) When the prosecutor asked her if she was close to her cousin, she answered: "No, not really." (2ART 179.)

if that reason is invoked only to eliminate African-American prospective jurors and not others who also have that characteristic." (*Coulter v. Gilmore, supra,* 155 F.3d at p. 921.) "It is well-established that peremptory challenges cannot be lawfully exercised against potential jurors of one race unless potential jurors of another race with comparable characteristics are also challenged." (*Doss v. Frontenac* (8th Cir. 1994) 14 F.3d 1313, 1316-1317.)[16]

---

[16]It its opinion, the Court of Appeal, quoting and relying on *People v. Johnson* (2003) 30 Cal.4th 1302, 1323, states that "case law deems comparative juror analysis to be, while not irrelevant, largely beside the point because of the legitimate subjective concerns that go into selecting the jury." (Slip opn., p. 15, internal quotation marks omitted.) The Court of Appeal's reliance on *Johnson* is misplaced in light of *Miller-El v. Dretke, supra,* 125 S.Ct. 2317. Also, this court may wish to grant review to bring its case law into conformity with *Miller-El.*

The issue in *Miller-El* involved review of a trial court's determination that the prosecutor's race-neutral explanations of its peremptory challenges to African-American jurors were true. (*Miller-El v. Dretke, supra,* 125 S.Ct. at p. 2325.) The Supreme Court held that the trial court's determination was wrong to a clear and convincing degree and was unreasonable as well as erroneous. (*Id.* at p. 2340.) In the course of analyzing the validity of the trial court's ruling, the Supreme Court compared at length the characteristics of African-American jurors the prosecutor challenged with those of white jurors that the prosecutor did not challenge. (*Id.* at pp. 2325-2332.) This comparison included jurors who had relatives who had been convicted of crimes. (*Id.* at pp. 2327, 2328, 2330, fn. 8.) As the Supreme Court stated: "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination...." (*Id.* at p. 2325.) The Supreme Court held that based on comparative analysis between the reasons the prosecutor gave for challenging two African-American jurors (Fields and Warren) and the comparable characteristics of nonblack jurors the prosecutor did not challenge, the prosecutor's explanations for the challenges could not reasonably be accepted. (*Id.* at pp. 2329, 2332.)

(continued...)

*90*

*v. Harris* (8th Cir. 1994) 30 F.3d 963, 965-966.) Another appellate court found *Batson* error and reversed a conviction when the prosecutor challenged African-American jurors who were the same age as the defendant or who had children his age, but failed to challenge white jurors who were similarly situated. (*Jones v. Ryan* (3d Cir. 1993) 987 F.2d 960, 973-975.) Yet another appellate court found peremptory challenges to be improper because the stated reasons for challenging three African-American jurors also applied to one unchallenged white juror. (*United States v. Sowa* (7th Cir. 1994) 34 F.3d 447, 452.)

In appellant's case, the one and only reason the prosecutor stated for challenging Ms. Biddings – having a cousin who had been convicted of assault – was improper under the above cases. A total of six jurors and alternates whom the prosecutor did not challenge had friends or relatives who had been charged with, arrested for or convicted of crimes. And one of them, Juror No. 3, had a nephew who had been convicted of armed robbery within the past six months. "Peremptory challenges cannot be lawfully exercised against potential jurors of one race unless potential jurors of another race with comparable characteristics are also challenged." (*McLain v. Prunty, supra,* 217 F.3d at p. 1221.) The challenge to Ms. Biddings was improper under this standard, and this invalid challenge alone required reversal of appellant's conviction.

Review should be granted to correct the constitutional error in appellant's case. Such review can be plenary. Alternatively, the court can grant review summarily and remand the case to the Court of Appeal with directions to issue a decision reversing appellant's conviction because the challenge to Ms. Biddings was invalid since several selected jurors had the sole characteristic upon which the prosecutor based his challenge of Ms.

*92.*

FOR THE REASONS STATED, THIS COURT SHOULD RULE AS FOLLOWS;

1. PETITIONER, WARREN, WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS ON A NUMBER OF GROUNDS, BEFORE TRIAL AND ON DIRECT APPEAL.

2. PETITIONER, WARREN, WAS DEPRIVED OF NEW EVIDANCE, THAT WOULD HAVE PROVED HIS INNOCENSE, THUS AN ORDER TO SHOW CAUSE SHOULD BE ISSUED.

3. PETITIONER, WARREN, WAS DEPRIVED OF EXECTIVE ASSISTANCE OF TRIAL AND APPELLATE COUNSEL, WITH REGARD TO NEW EVIDENCE THAT SHOULD HAVE BEEN SECURED FOR UNABLE REASONS, FOR THE COURT, TO HONOR, A NEW TRIAL, AND BE REVIEWED ON DIRECT APPEAL.

4. THAT THIS COURT SHOULD TAKE JUDICIAL NOTICE OF THE RECORD AND THE AFFIDAVITS AND DECLARATION, ATTACHED IN THIS PETITION, FOR THE CASE OF PEOPLE V. WARREN (2003) CASE NO. #31401 ALAMEDA COUNTY SUPERIOR COURT OF CALIFORNIA

94

1   WHICH IS REFERRED TO HEREIN, TO CLARIFY AND
2   AMPLIFY VARIOUS ALLEGATIONS IN ACCORDANCE
3   WITH CAL. EVIDENCE CODE 452(b)(1) AND
4   459.)

5

6   5.  ISSUE A WRIT OF HABEAS CORPUS OR
7       ORDER TO SHOW CAUSE TO THE ATTORNEY
8   GENERAL OF CALIFORNIA TO INQUIRE INTO THE
9   LAWFULNESS OF PETITIONER WARREN'S, CONVICTION

10

11  6.  IF NEEDED, ORDER THAT AN EVIDENTIARY
12      HEARING BE CONVENED;

13

14  7.  AFTER, FULL CONSIDERATION, OF THIS MATTER,
15      SET ASIDE THE CONVICTION OF PETITIONER
16  WARREN, AND ORDER A NEW TRIAL OR OTHER
17  APPROPRIATE RELIEF NECESSARY.

18  8.  REVERSE THE JUDGEMENT WITH DIRECTIONS
19      TO ALLOW PETITIONER A NEW TRIAL, TO
20  HEAR THE NEW EVIDENCE, THAT PROVES
21  PETITIONER'S INNOCENSE.

22

23  9.  GRANT PETITIONER WARREN, WHATEVER
24      FURTHER RELIEF IS APPROPRIATE IN THE
25  INTEREST OF JUSTICE.

26

27

28

1   Accordingly, this court should issue the Great
2   writ of Habeas Corpus ordering petitioner
3   Wanken, freed from the effect of his
4   Unconstitutional Confinement

6
7                            Respectfully, Submitted
8
9                            Meholando Wanken
                                            pro Se
10  Dated: 8/19/08
11

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34769

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare the following:

I am over 18 years of age, and a party to the within action.

My address is: *Melholanda Warren V-09970*
*CSP-Corcoran po Box 3461*
*Corcoran Ca 93212*

On __8/19/08__ , I served a copy of the attached

*Memorandums of points and Authorities*
*in Support of First Amended Federal Petition,*

On the below-named persons by placing a true copy thereof
in envelope addressed as follows, with first class postage
thereon fully prepaid, and delivering the sealed envelopes,
according to the procedures prescribed for sending legal
mail, to the proper institutional official for deposit
in the United States mail at Corcoran, in the County of
Kings, California.

*United State District Court          Tony Hedgpeth Warden*
*For northern District               Region by Attorney General*
*US Court house                       Edmund G Brown real party interest*
*432 Golden Gate Ave                  Office 1300 I St. 16-1-8*
*San Francisco Ca. 94102 5Y5         Sacramento Ca. 95294-2550*

Executed under penalty of perjury this __19__ day of
*August* , 200_8_, at Corcoran, California.

*Melholanda Warren*
DECLARANT

Affidavit of Dwight Staten

I Dwight A. Staten, declare, the foregoing. That on 8/1/08 I submitted Melredando Warrens legal documents to prison officials of CSP-Corcoran State prison, P.O. Box 3461 Corcoran CA. 93212 who there by, retrieved the legal documents from me.

and mailed them before their mail box of outgoing legal mail

I declare the foregoing is true and correct executed on this day August 19, 2008

Declarant



Dwight of States #-18498
Est Corcoran 3(4) 04-249
P.O. Box 3461
Corcoran CA. 93212

CORCORAN STATE PRISON

Confidential
"Legal mail"
Copies

RECEIVED
AUG 2 2 2008

United States District Court
for Northern District
the Courthouse
430 Golden Gate
San Francisco CA. 94