1

2

3          UNITED STATES DISTRICT COURT

4          NORTHERN DISTRICT OF CALIFORNIA

5                  OAKLAND DIVISION

6

7   MELROLANDO WARREN,

8                   Petitioner,              No. C 08-0754 PJH (PR)

9       vs.                                  **ORDER DENYING PETITION
                                             FOR WRIT OF HABEAS**
10  TONY HEDGPETH, Warden,                   **CORPUS AND GRANTING
                                             CERTIFICATE OF**
11                  Respondent.              **APPEALABILITY**
    _____/

12

13         This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. §

14  2254.  The court ordered respondent to show cause why the writ should not be granted.

15  Respondent has filed an answer and a memorandum of points and authorities in support of

16  it, and has lodged exhibits with the court.  Petitioner has responded with a traverse.  For

17  the reasons set out below, the petition is denied.

18         In the answer to the petition, respondent first argues that the case should be

19  dismissed as untimely, for being filed beyond the one-year statute of limitations set forth in

20  28 U.S.C. 2244(d)(1).  The California Supreme Court denied petitioner's petition for review

21  on October 25, 2006.  Judgment became final ninety days later on January 23, 2007.

22  *Bowen v. Roe*, 188 F.3d 1157, 1159 (9th Cir. 1999) ("Direct review" includes the period

23  within which a petitioner can file a petition for a writ of certiorari from the United States

24  Supreme Court, whether or not the petitioner actually files such a petition).  Petitioner thus

25  had until January 23, 2008, to file his federal petition, absent tolling.  *Patterson v. Stewart*,

26  251 F.3d 1243, 1246 (9th Cir. 2001) (adopting what is referred to as the "anniversary

27  method" because, absent any tolling, the expiration date of the limitation period will be the

28  same date as the triggering event but in the following year).

**United States District Court**
For the Northern District of California

**United States District Court**

For the Northern District of California

The original petition in this case was docketed by the court on January 31, 2008, and then later stayed to exhaust further claims.  Respondent notes that the petition is undated, nor is there any indication when petitioner provided the petition to prison officials to benefit from the mailbox rule.  *See Saffold v. Newland*, 250 F.3d 1262, 1268 (9th Cir. 2001) (pro se prisoner's federal habeas petition is deemed filed when prisoner delivers petition to prison authorities for mailing), vacated and remanded on other grounds, *Carey v. Saffold*, 536 U.S. 214 (2002).  However, the petition is stamped as received by this court on January 28, 2008.  As the petition was received by the court five days following the expiration of the statute of limitations, it is reasonable to assume that petitioner provided the petition to prison officials prior to the expiration date.  The court also notes that the petition was sent from Centinela State Prison which is located near San Diego.  While the court could request petitioner to file an affidavit attesting to when he provided the petition to prison officials for mailing, that would be unnecessary as the court is denying the petition on the merits.  *See Van Buskirk v. Baldwin*, 265 F.3d 1080, 1083 (9th Cir. 2001) (approving district court resolution of petition on merits without reaching "the complex questions lurking in the time bar of the AEDPA").  Therefore, the case will not be dismissed as untimely.

**BACKGROUND**

Petitioner was convicted by a jury of six counts of sexual penetration with a foreign object and one count of rape with a special kidnaping allegation.  It was also found true that petitioner used a gun during the course of the crime and had a prior rape conviction.  He was sentenced to prison for 65 years to life.   The California Court of Appeal affirmed his conviction and the California Supreme court denied his petition for review.

The opinion of the California Court of Appeal does not describe the facts of the case, therefore the court presents the facts as set forth in the trial transcript and in the briefing of the parties:

On September 11, 1996, 19 year-old Renia Webb missed her bus to work.  Reporter's Transcript (RT) at 180.  As she waited for the next bus, petitioner approached her from behind.  RT at 180, 182.  Petitioner initially engaged in casual conservation, but

United States District Court
For the Northern District of California

then told Webb that police were looking for him.  RT at 182-83.  Petitioner showed Webb a gun and stated he had shot another women that day and warned her not to scream.  RT at 184.  Petitioner stood behind Webb, pushed the gun in her back and her forced her to walk down the street.  RT at 185.  Petitioner was directly behind Webb when he ordered her to stop crying.  RT at 186.  Webb was shaking from fear and was unable to comply with petitioner's order for her to "swish" her hips.  Petitioner ordered Webb to go down an alley next to a house where he fondled Webb's breasts, buttocks and vagina.  RT at 193-96.

Petitioner then ordered Webb to bend over as he stood behind her and pushed his finger into her vagina.  RT at 196-97.  Petitioner forced Webb to remove her underwear and told her to grab her ankles.  RT at 198.  Webb was unable to grab her ankles because she was shaking and crying, so petitioner ordered her to lie down instead.  RT at 198-99.  Petitioner pushed her down on the ground and she lay down on her stomach.  Petitioner turned Webb over so she was lying on her back and repeatedly inserted his finger into her vagina while he masturbated.  RT at 200.  Petitioner did not remove his clothing during the attack, only unzipping his pants.  Petitioner then raped Webb.  RT at 201.  Petitioner then inserted his finger in Webb's rectum and stated he wanted to "fuck" her like that.  RT at 203-04.  As petitioner positioned himself behind Webb, she reached for the gun and grabbed it.  RT at 204.  Webb pulled the trigger of the gun several times, but it did not fire.  Petitioner then began hitting Webb about the face and grabbing the gun.  RT at 205.  Petitioner continued to hit Webb and bit her on the back of the head.  RT at 206.  Petitioner then placed his hand around her nose and mouth and Webb started to get dizzy.  Petitioner stated that he would snap her neck and strangle her if she did not let go of the gun.  RT at 208.  As she was losing her breath, she let go of the gun.  RT at 207.  Petitioner then put his finger back inside her vagina while he masturbated.  RT at 208.  Petitioner then zipped his pants, told Webb to count to fifty and left.  RT at 209-10.

Webb dressed herself and then banged on the house next door and asked for help and to call the police.  RT at 210-11.  Webb heard people inside, but no one opened the door.  RT at 211.  Caroline Coelho who stayed in a garage next to the crime scene heard a

woman scream "he's going to kill me" and a man say "give it to me" and a woman counting to fifty, but did not call police or help because she was scared and did not have a phone. RT at 611-12.

Webb called her boyfriend who took her to the police station where she provided a description and then was taken to a hospital for a sexual assault examination.  RT at 214-17.  All of Webb's clothes were taken and swabs and slides were taken from her mouth and vagina.  RT at 219.  A few days later, Webb was shown three different photo lineups but did not identify anyone as the person who assaulted and raped her.  RT at 236-39. Approximately five years later, Webb was shown another photo lineup and immediately identified petitioner as the person who assaulted and raped her.  RT at 240-43.  At the time of the photo lineup Webb was 95 percent certain of the identification and at trial she was 100 percent sure.  RT at 288-89

Because petitioner was convicted of a separate rape in 1991 and a sexual battery in 1997, his DNA was eventually entered into the state DNA bank and was found to be a genetic match with the sperm recovered from Webb.[1]  RT at 645-46; Ex. B-2 at 2.[2]  The DNA analysis concluded that the chances of somebody sharing the same genetic profile as petitioner were estimated at one in 380 billion among Blacks, one in 7.4 trillion among Caucasians and one in 1.1 trillion among Hispanics.  RT at 647.  Testimony from a prior similar incident was also heard by the jury when petitioner raped a 17 year-old girl in 1991 in a similar location and manner.  RT at 131-37.

Petitioner's mother testified for the defense, stating that petitioner had been shot in 1996 and was wearing a cast on his leg at the time Webb was raped.  RT at 706-08. Petitioner's cousin also testified that petitioner was wearing a cast during the relevant time period.  RT at 719.

///

[1]The California Court of Appeal opinion erroneously stated this incident occurred in 1986.  The testimony at trial indicates 1996 was the year of the attack and rape.

[2]Citations to "Ex." are to the record lodged with the court by the Attorney General.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

**STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407–09, (2000), while the second prong applies to decisions based on factual determinations, *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]valuating whether a rule application [i]s unreasonable requires considering the rule's specificity. The more general the rule, the

United States District Court
For the Northern District of California

more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* "As a condition for obtaining habeas corpus [relief] from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El*, 537 U.S. at 340.

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

## DISCUSSION

As grounds for federal relief, petitioner argues that:

(1) counsel was ineffective in not putting on expert testimony as to petitioner's physical condition and leg cast on the day of the rape;

(2) new evidence shows that he is innocent; and

(3) some of the prosecution's peremptory strikes were discriminatory under *Batson v. Kentucky*, 476 U.S. 79 (1986).

## I.     Ineffective Assistance of Counsel

Petitioner argues that trial counsel was ineffective for failing to put on an expert witness to testify that on the day of the rape, petitioner was wearing a cast on his leg.

### A.     Standard

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.*

United States District Court
For the Northern District of California

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687–88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *Cullen*, 131 S. Ct. at 1403. A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *See id.* at 1410–11; *Harrington*, 131 S. Ct. 770, 788 (same); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011) (same). The general rule of *Strickland*, i.e., to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland' s deferential standard." *Harrington*, 131 S. Ct. at 788.

To demonstrate deficient performance, a petitioner is required to show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *See Strickland*, 466 U.S. at 687.

**B.    Discussion**

Petitioner's counsel obtained evidence that petitioner was shot in the knee on July 30, 1996, and a cylinder cast was placed on his leg. RT at 673. Counsel obtained a discharge summary record that indicated petitioner was seen by doctors regarding his leg

on July 31, August 2, August 15 and September 17, 1996, at Highland Hospital.  RT at 674.

The rape occurred on September 11.  Counsel stated to the trial court that he originally

subpoenaed petitioner's medical records a year earlier but had been told there were no

records.  Counsel personally went to Highland Hospital and found that some records did

exist.  RT at 676.  At the time of trial, Highland Hospital was searching for more records.

Counsel wished to have Dr. Akizuki, the doctor who treated petitioner, testify regarding

petitioner's knee and the meaning of the medical records, but was unable to locate him.

RT at 679-80.  The hospital records indicated that a cast was put on petitioner on July 31,

1996.  RT at 679.  There was disagreement between petitioner's counsel, the prosecution

and the trial court regarding how to interpret the medical records and if the leg cast was on

or off on the dates petitioner was seen by doctors.  RT at 678-80.

Petitioner's mother testified that the cast covered petitioner's whole leg and was on

for three or four months at the relevant time.  RT at 707.  On cross-examination the

prosecution discussed petitioner's medical records that appeared to indicate that petitioner

was to be out of the cast on the August 15, 1996 medical visit for an X-ray.  RT at 711.

Petitioner's cousin also testified that petitioner was wearing a cast on his leg for two to

three months during the relevant time.  RT at 719.  In closing arguments the prosecution

argued that the medical records indicated that petitioner was supposed to have his cast off

as of August 15.  RT at 870.

Following petitioner's conviction, counsel moved for a new trial after he received

additional medical records from Highland Hospital which demonstrated that petitioner was

indeed wearing his cast on August 15, contrary to the statements in the prosecution's

closing arguments.  Clerk's Transcript (CT) at 190-92, RT at 930.  The prosecution

opposed a new trial noting the victim's identification of petitioner and the DNA evidence.

RT at 933.  The trial court denied the motion for a new trial.  RT at 934.  In the instant

habeas proceeding, petitioner obtained medical records indicating that the cylinder cast

was removed on September 17, 1996.  Petition, Exhibit A.

This claim was denied without a reasoned decision by the state court.  When the

United States District Court

For the Northern District of California

state court decision does not articulate the rationale for its determination or does not

analyze the claim under federal constitutional law, a review of that court's application of

clearly established federal law is not possible. *Delgado v. Lewis*, 223 F.3d 976, 981–82

(9th Cir. 2000).  When confronted with such a decision, a federal court must conduct an

independent review of the record and the relevant federal law to determine whether the

state court's decision was contrary to, or involved an unreasonable application of, clearly

established federal law. *Id.* at 982.

> When a state court does not furnish a basis for its reasoning, we have no basis other than the record for knowing whether the state court correctly identified the governing legal principle or was extending the principle into a new context....[A]lthough we cannot undertake our review by analyzing the basis for the state court's decision, we can view it through the 'objectively reasonable' lens ground by *Williams* [, 529 U.S. 362].... Federal habeas review is not *de novo* when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law.... Only by that examination may we determine whether the state court's decision was objectively reasonable.

*Id.* at 981-82.

After reviewing the record it is evident that petitioner has failed to demonstrate that

counsel's performance was deficient or that petitioner was prejudiced as a result.  The

record is clear that counsel attempted to locate the doctor who treated petitioner in order to

testify and that counsel diligently pursued the medical records starting a year prior to trial.

Despite the hospital stating no medical records existed counsel was still able to obtain

certain records prior to trial that aided in petitioner's defense.  While no expert was able to

testify at trial, counsel called two witnesses who testified that petitioner was wearing a cast

around the time of the incident.  This is not a situation where counsel completely failed to

present evidence regarding the petitioner's medical treatment and existence of a cast.

It is well settled that whether and how to present evidence is a matter of trial tactics.

*Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984).  Tactical decisions are not

ineffective assistance of counsel simply because in retrospect better tactics are known to

have been available. *Id.*  Further, a mere difference of opinion as to trial tactics does not

constitute denial of effective assistance. *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir.

United States District Court

For the Northern District of California

1981).  That counsel failed to obtain an expert witness to interpret medical records, records that at the time were incomplete through no fault of counsel, that could have suggested petitioner was in a cast around the time of the incident, fails to demonstrate ineffective assistance of counsel.  Especially as counsel proffered some medical records and provided witness testimony that petitioner was wearing a cast during the relevant time.  Nor could any expert testimony establish that petitioner was indeed wearing a cast on the day of the rape and assault.  Although such testimony may have established that plaintiff was wearing a cast on certain days during medical appointments.

Even assuming for sake of argument that petitioner could show counsel was deficient, petitioner has still failed to demonstrate prejudice to set forth a successful Sixth Amendment claim.  Petitioner maintains that an expert witness would have shown that petitioner was wearing a cast on the date of the incident and petitioner concludes the jury would therefore have found him not guilty.  Petitioner offers no arguments in support of this conclusory statement.  Petitioner has not presented any arguments that wearing a cast would have made it impossible for him to rape and assault the victim or even that expert testimony would have established definitely that he was wearing a cast on the day of the incident.  Petitioner offers no evidence that he was unable to walk as a result of the cast.  It appears that it would have been more difficult for petitioner to move around, but petitioner has failed to show how the facts of the case could be called into question because petitioner was wearing a cast.  To the extent that the victim did not state the assailant was wearing a cast, the facts indicate that the assailant never removed his pants and was either walking behind the victim or on top of her during a large portion of the incident.  Of course, in addition to the victim positively identifying petitioner, the DNA recovered from the victim identified petitioner as the assailant.  Petitioner does not address the DNA evidence.

Petitioner has failed to demonstrate either deficient performance or prejudice with respect to counsel's representation.  "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment." *Cullen*, 131 S. Ct. at 1407 (quoting *Strickland*, 466

10

United States District Court

For the Northern District of California

1    U.S. at 689–90).  Petitioner has failed to overcome that strong presumption and this claim

2    is denied.

3    **II.      Actual Innocence**

4          Petitioner next argues that the newly discovered evidence that his leg cast was not

5    removed until September 17, 1996, proves his actual innocence.

6          This claim was also denied without a reasoned decision by the state court, therefore

7    the court will conduct an independent review.  *Delgado*, 223 F.3d at 981–82.  Petitioner

8    presents a free-standing actual innocence claim.  He does not assert actual innocence as a

9    procedural gateway to move past a procedural bar, instead alleging that the newly

10   discovered evidence demonstrates he is actually innocent.  "Claims of actual innocence

11   based on newly discovered evidence have never been held to state a ground for federal

12   habeas relief absent an independent constitutional violation occurring in the underlying

13   state criminal proceeding."  *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also House v.*

14   *Bell*, 547 U.S. 518, 555 (2006); *District Attorney's Office for Third Judicial Dist. v. Osborne*,

15   557 U.S. 52, 71 (2009) ("Whether such a federal right [to be released upon proof of actual

16   innocence] exists is an open question.  We have struggled with it over the years, in some

17   cases assuming, arguendo, that it exists while also noting the difficult questions such a

18   right would pose and the high standard any claimant would have to meet."); cf. *In re Davis*,

19   130 S. Ct. 1, (2009).  Thus, the state court's denial of this claim could not be AEDPA

20   unreasonable as there is no Supreme Court authority establishing a free-standing actual

21   innocence right.

22         Even if a claim of actual innocence based upon new evidence could present a

23   cognizable claim for habeas review, petitioner's additional evidence does not prove his

24   innocence.  A habeas petitioner asserting a freestanding claim of actual innocence must

25   make a "stronger showing than [the] insufficiency of the evidence to convict" showing

26   adopted by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  *Carriger*

27   *v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997).  The required showing must go "beyond

28   demonstrating doubt about [the petitioner's] guilt, and must affirmatively prove that he is

11

United States District Court

For the Northern District of California

1  probably innocent." *Id.* (citation omitted).  Post conviction evidence serving only to

2  "undercut the evidence presented at trial" does not suffice to meet this standard.  *Id.* at 477;

3  *see also Spivey v. Rocha*, 194 F.3d 971, 979 (9th Cir. 1999) (habeas relief unavailable

4  where "the totality of the new evidence does not undermine the structure of the

5  prosecution's case").

6       While the evidence regarding petitioner's cast could perhaps cast some doubt

7  regarding the identification, as discussed above it does not demonstrate his innocence

8  based on the facts of this case including the fact that it would have been impossible for the

9  assailant to have committed the offense while wearing a cast.  Nor would the evidence

10  have definitively established that petitioner was in fact wearing a cast on the day of the

11  rape.  Most importantly, petitioner fails to address how his wearing a cast contradicts the

12  DNA evidence recovered from the victim that placed petitioner at the scene as the

13  assailant.  Petitioner's newly discovered evidence is insufficient to meet the high standard

14  for such a claim.  For all of these reasons, this claim must be denied.

15  **III.    Prosecution's Use of Peremptory Challenges**

16       Petitioner next contends that the prosecution impermissibly used peremptory

17  challenges by excusing four African American female jurors.  Petitioner specifically argues

18  that the prosecution's reasons were pretextual and the trial court in agreeing with the

19  prosecution, mistakenly stated that excused jurors' relatives had been arrested for crimes

20  of violence, when in fact some of the crimes were non-violent.

21       **A.    Legal Standard**

22       The use of peremptory challenges by either the prosecution or defendant to exclude

23  cognizable groups from a jury may violate the Equal Protection Clause.  *Georgia v.

24  McCollum*, 505 U.S. 42, 55–56 (1992).  The Supreme Court first held that the Equal

25  Protection Clause forbids the challenging of potential jurors solely on account of their race,

26  *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), and later extended this protection to

27  challenges solely based on gender.  *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140–43,

28  (1994).  A party may raise an equal protection claim on behalf of a juror excluded because

United States District Court

For the Northern District of California

1    of the juror's race, regardless of whether the party and the excluded juror share the same

2    gender or race.  *Powers v. Ohio*, 499 U.S. 400, 406 (1991).  The California counterpart to

3    *Batson* is *People v. Wheeler*, 22 Cal. 3d 258, 148 Cal. Rptr. 890, 583 P.2d 748 (1978).

4        *Batson* permits prompt rulings on objections to peremptory challenges under a

5    three-step process.  *Batson*, 476 U.S. at 96-98.  First, the defendant must make a prima

6    facie case that the prosecutor exercised peremptory challenges on the basis of gender or

7    race "by showing that the totality of the relevant facts gives rise to an inference of

8    discriminatory purpose."  *Id*. at 93–94.  As for the second Batson step, if a prima facie case

9    is made, the burden shifts to the prosecutor to articulate a gender or race-neutral

10   explanation for striking the jurors in question.  *Id*. at 97; *Wade v. Terhune*, 202 F.3d 1190,

11   1195 (9th Cir. 2000).  Third and finally under *Batson*, the trial court must determine whether

12   the defendant has carried his burden of proving purposeful discrimination.  *Id*. at 98; *Wade*,

13   202 F.3d at 1195.  Petitioner's claim turns on the third step of the *Batson* analysis

14       **B.    Trial Court Proceedings**

15       During voir dire, assistant district attorney Scheingart for the prosecution exercised

16   peremptory challenges against eight women and three men.  Challenges were also used

17   against four other jurors, but the record is not clear as to their gender, nor is the race

18   known of any of the jurors that were eliminated, other than what petitioner has raised in the

19   petition.  Petitioner's counsel, Hove, objected to the prosecution's second, fourth, sixth and

20   eleventh challenges as they were directed against the following African American women:

21   Uedico Scatliffe, Rischa Johnson, Melba Biddings and Rose Watts Holman.  Ultimately, the

22    jury consisted of eight men[3] and four women with one male alternate and one female

23   alternate.  CT at 205-414.  Three of the jurors were African American, though it is not clear

24   the gender of those jurors.  Augmented Reporter's Transcript (ART) at 315.

25       Outside the presence of any jurors, petitioner's counsel presented his arguments for

26   a *Wheeler-Batson* motion.  ART at 303-05.  The trial court found that petitioner had made a

27   _____

28       [3]Juror number seven did not answer the gender question on the questionnaire but did
     refer to his spouse as a housewife, indicating that juror was likely male.  CT at 295-96.

United States District Court

For the Northern District of California

1    prima facie case and requested Scheingart to articulate any race-neutral reasons for

2    striking the four jurors.  ART at 306.

3    **Uedico Scatliffe**

4         During voir dire, Scatliffe made the following statements and Scheingart set forth his

5    reasons for striking her, as described by the California Court of Appeal, that is confirmed

6    after a review of the transcripts:

7        **U.S.**  Each questionnaire asked, "In general, what are your views concerning
the effectiveness of the criminal justice system[?]" and U.S. wrote in hers,

8    "'What is Fair.'"  Asked whether she agreed with the principle of law that the
testimony of one witness, if believed, is sufficient to prove a fact, she wrote,

9    "No, how would be sure [sic] if not an assumption."  The questionnaire
explained the presumption of innocence and that failure by the People to

10   meet the reasonable-doubt burden entitled the defendant to a verdict of not
guilty; asked if she agreed, and to "please explain" if not, she wrote, "Not

11   Guilty."  Asked if she agreed with the principle that the prosecution has the
burden to prove guilt beyond a reasonable doubt and that a defendant is not

12   obligated to present any evidence, she wrote, "No, their [sic] two sides to
every story."  Asked if friends or family members had been arrested, charged

13   or convicted criminally and whether the experience would impair her ability to
be fair and impartial, she wrote, "Yes, son-traffic accident, stop randomly &

14   secure-'unfair .'"  Asked for any experience with police that would impair her
ability should a police witness testify, she wrote: "Yes, being question[ed] on

15   issue that had no bearing on issue at that time." Asked for anything about "the
nature of the charges alone" here that would impair her ability to be fair and

16   impartial, she wrote, "Yes, mainly I feel rape is such a violent crime."

17   In initial questioning by the court about her "two sides to every story" answer
and the court's explanation why "there would not be two sides necessarily" in

18   the courtroom, U.S. said she understood and agreed with the explanation.
She said she was comfortable following the law about the testimony of one

19   witness being enough, said she did not think her strong feelings about the
crimes would affect her ability to be fair, said, "Yes, I think so," when asked if

20   she could put aside those feelings and be fair, adding that she was "willing to
do it."

21

22   Asked later by Scheingart what she meant by her "'What is Fair'" answer,
U.S. offered: "Talking personally, to me I'm just saying fair in what way?

23   Meaning-how should I put this-not looking at one issue or the other, just
saying that I'm not sure if I have evidence of something, I can live with that,

24   and if I don't, it's kind of like weighing whether or not I feel it's fair or not fair.  I
don't know how to explain it. It's not  like I'm saying something isn't or is.  It's

25   just that I'm saying that off the top of my head I would say some things seem
fair.  Some things don't."  Asked what she meant by some things seeming fair

26   and some not, she cited "an example stopping individuals.  Sometimes it
seems like a more particular individual gets stopped more than others.  I just

27   draw that concept of what is fair in there."  She added: "A certain race or
against another race.  Whereas people do the same thing in all races, but it

28   seems like more would get stopped more than the other."  Asked if she was
suggesting "prejudice inherent in the criminal justice system against members

of a certain race," she said "No" and added: "I'm just saying that I see or I hear or I see the media.  I'm not saying I'm particularly saying that it's one race or the other.  I'm just saying that you see it mostly sometimes on one and not-it's kind of confusing.  I'm trying to say that-it's not that I'm saying that-I see it may be one race more than the other and maybe it's not.  I just say, 'What is fair?'"  On her questionnaire answer about the impact of police experience on her ability to be fair regarding a police witness, she explained: "I was being questioned about my son, and it went off into a different direction that had nothing to do with why they were asking me a particular question, yes."  The questionnaire asked about any attorneys she knew and her relationship with them, and U.S. named one for which she wrote, "Represent my son."  She elaborated: "He was arrested for driving under the influence [DUI], but it was proven that he wasn't drunk and tested.  He wasn't stopped.  There was an accident, and they say they found a bottle cap in his car."  "[T]hey tested him for alcohol."

. . . .

For U.S., Scheingart cited U.S.'s written qualms about the one-witness rule, her "unusual" what-is-fair response to the effectiveness question, and her oral replies on the same subject, which Scheingart felt "made no sense," were "rambling," were "not even close to being articulated with any sort of logic," and struck him as being "very confusing and [showing] potential bias."  He also cited her reasonable-doubt need to hear both sides of every story, her feeling that the son's stop was random and "unfair."  While she said the stop was for a traffic accident, it was evidently serious since she hired an attorney for him.  "So," Scheingart said, "I don't think that she was being as forthright as she should have been in filling out her questionnaire.  And particularly with regard to the events involving her son, I think that she had a very strong bias that was being concealed that I, in questioning, believed to exist, and that was the basis of my excusing [her]."  Hove offered no rebuttal specific to U.S.

Ex. B-2 at 2-4, 7; ART at 37-38, 103-05, 307-08.

**Rischa Johnson**

With respect to Johnson:

**R.J.** answered, in her questionnaire, that "a few friends & family members" had been victims of sexual offenses but that this would not impair her ability to be fair.  Confusingly, as to whether she agreed with the law that the testimony of one witness, if believed, is sufficient to prove a fact, she wrote: "[N]o.  That person could be lying."  On friends or family having been arrested or charged or convicted, she wrote: "Yes.  Too many to list!  No, this would not impair my ability."  She also felt no impairment from knowing attorneys from work (as a secretary for a utilities agency) and family law, or knowing people in law enforcement-a brother in the California Highway Patrol (CHP) and the police officer husband of a friend.  On the general effectiveness of the criminal justice system, she wrote: "Sometimes there are too many technical issues.  If the person committed a crime, that person should not be found innocent because of a technicality."

In examination by the court on her "technicality" answer, the court explained to R.J. that the court would decide any questions about admitting evidence; jurors would not and would hear only things they were permitted to hear.  R.J.

15

1    said she was okay with that.  She was also comfortable, having heard the
     court explain to another juror, with the idea of one witness being enough and
2    would follow that law.

3    Prosecutor Scheingart probed R.J.'s too-many-to-list reply about arrested,
     charged or convicted friends and family.  These were for grand theft and
4    drugs, as recent as a year or two past, she said, were brought against
     "[c]ousins, stepbrother, friends," and involved jail.  None were still ongoing as
5    far as she knew.  Asked how she felt about a case being thrown out on a
     technicality, she said: "It depends on what it is.  It just depends on what it is
6    and what it involves and who it involves."  Asked if it would make a difference
     "if it was a theft versus a violent crime," she replied: "It depends on the
7    circumstances, what was involved, the crime."  On knowing people in law
     enforcement, R.J. said that her brother had been with the CHP for two years
8    or less, in Northern California, but that she did not talk to him much about his
     work and was not close to him.

9
     . . . .
10
     For R.J., Scheingart cited her too-many-to-list answer yet claim that this
11   would not impair her ability, saying he found the statements to be "oxymorons
     in nature."  Also, the casual, too-many-to-list answer, given "family members
12   in this county being involved with the law," seemed "quite unusual" and a sign
     that she would not be fair.  Scheingart was also put off at start of voir dire
13   after Hove introduced himself and his client. [Petitioner] said hi and then,
     "'What? No hi's back?'" FN2.  R.J. then raised her right hand and looked right
14   at [petitioner], which Scheingart "perceived to be a 'hello' or a gesture back"
     to him.  Scheingart thought this "extraordinary" since no one else responded
15   at all.  Hove countered, evidently referring in error to M.B.: "As to ... the other
     jurors, especially Ms. B[.], I didn't notice Ms. B[.] make any movement
16   whatsover.  Had she made some indication, the prosecutor would have
     brought that up at the recess, just as he did when he heard [petitioner]
17   [petitioner] make a statement [see fn. 2, ante ].  I think he would have
     indicated that Ms. B [.] made a movement with her arm in direction of, I
18   guess, some sort of affiliation or affection with the defendant.  I didn't see that
     occurring whatsover."
19
     FN2. Scheingart had stated back then, out of the panel's presence: "When we
20   were introduced, Mr. Hove introduced his client.  The defendant looked at the
     jury and said, 'No hi's back.' I heard it.  I wrote it down.  I asked the court
21   reporter if she recorded it.  [She] indicated that she couldn't hear because of
     someone else talking, and I would ask that that be placed on the record.  And
22   I would ask Mr. Hove [to] respond whether he heard that as well."  Hove said
     only, "He said something."  The court indicated that it knew [petitioner] had
23   said something but had not heard what.

24   Ex. B-2 at 4-5, 7-8; ART at 52-53, 109-11, 308-09.

25   ///

26   ///

27   ///

28   **Melba Biddings**

With respect to Biddings:

**M.B.**  To the questionnaire item on arrests, charges or convictions, M.B. wrote: "Yes I have a cousin serving time for assault.  This I don't feel would impair my ability to be a fair juror."  On knowing victims of sexual offenses, she wrote: "[M]y daughter was a victim although no charges were filed due to lack of evidence in 1986[.]"  In-chambers questioning of M.B. (Juror No. 48 in the transcript) revealed that this was in Oakland.  The child, at age three, had revealed oral copulation by an uncle, the husband of M.B.'s sister, and child protective services told M.B. that lack of physical trauma to the child meant that charges could not be brought.  Around the same time, the sister moved with the uncle to Los Angeles, disappeared and was never heard from again. M.B. felt the uncle was involved and should be held responsible but did not go to the police, fearing further trauma to her child and that the child might disappear, too.  M.B. thought that she could set this aside.

Scheingart asked if the cousin's matter was handled in that county (Alameda). M.B. said it was in San Leandro in 1997 and confirmed that someone in Scheingart's office had prosecuted him.  The case went to trial and resulted in conviction.  Asked if she was "close with" the cousin, M.B. said, "No, not really."

. . . .

Regarding M.B., Scheingart cited her cousin serving prison time for an assault, apparently in Alameda County.  While M.B. said she did not think this would impair her ability to be fair, Scheingart reasoned: "She knows her cousin.  She's somewhat close to her cousin.  Besides that, I don't think that she could be fair because of that relationship...."

Ex. B-2 at 5-6, 8; ART at 166-72, 309.[4]

**Rose Watts Holman**

With respect to Holman:

**R.W.H.**  To the written query about views concerning the effectiveness of the criminal justice system, R.W.H. wrote: "I never dealt with it, so I really would not have anything to say about it."  On agreement with the law presuming innocence, she wrote: "Once again, I have never been put in that position before so I really don't know how to answer that."  On whether she agreed with the principle that penalty or punishment was not a proper consideration for the jury in determining whether a case had been proved, she answered, "I really don't know how to answer that."  On whether she agreed with the idea of the prosecution having the burden of proving guilt beyond a reasonable doubt and the defendant having no obligation to present any evidence, she wrote: "No[,] I do not agree.  I believe both sides should be heard in order to

---

[4]While Scheingart stated Biddings was close to her cousin, the factual support for that statement is not in the record.  Respondent cites to a discussion in chambers with Biddings that could perhaps serve as the basis for Scheingart's statement.  ART at 150.  However, that discussion is in the record with Biddings being referred to as juror number forty-eight, who says she was not close with her cousin.  ART at 178-79.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

get a full understanding of what I have to make a decision on." On whether she agreed with the principle of one witness's testimony being sufficient if believed, she wrote, "It depends on how close the person is to the testimony." On the principle that a defendant had a right to remain silent, even at trial, and that jurors could not consider this in any way in determining guilt, she wrote: "No, a person should tell their side[.]" On whether she had been the victim of a crime, she wrote, "Not anything that has to do with the court system." On the arrests of friends or family for crime, she wrote: "Yes-my nephew was in jail for 2 years. I never been to any of his trail [sic] so I can not answer that!"

Asked by the court about the nephew's case, R.W.H. said it was a California prosecution for "murder as far as I know," but that she had not been involved in the trial and did not think it would affect her service here. On a defendant's right not to testify, she was now "[c]rystal clear," having heard explanations during the preceding voir dire, could follow the law in this case, and was willing to serve.

When later questioned by Scheingart about her need to hear both sides to make a decision, she said this was "something that I try to teach my children, that there's two sides to every story...." She had heard the court's explanations, however, and said if she had to listen to only one side "and that's the law, I'll do my best with that," adding: "I think just to be fair, you should hear the other person if they want to be heard. If they chose not to be heard, then you have to make the best decision with the information that you have." Questioned further about the nephew's case, she said it was a jury trial in Alameda County, that the nephew had been "just released this year" and not convicted. She had been very close with the nephew "[w]hen he was growing up" but did not know whether he was treated fairly in the case. All of her information about it had been "third- and fourth-hand," she said: "I didn't go to the trial or have anything [ sic ]. I distanced myself from it because I couldn't deal with it."

. . . .

Finally, Scheingart explained that he had misplaced his questionnaire for R.W.H. (apparently notated), but worked from the court's copy to jog his memory. He cited her never-been-put-in-that-position answer to the presumption of innocence query, seeing it as unusual for "such a significant issue of law." Regarding her answer that both sides must be heard, the response struck him as indicating that she would have a problem understanding some legal concepts. As to her both-sides answer, Scheingart acknowledged that she had later changed her answer, but he feared that if one side did not testify, "that renders her in a situation of confusion and inability to make a decision." He also cited her written reply that persons should have to tell their side of the story. He felt that her nephew having been "in jail as a result of an action in this county," apparently for homicide, "would have a significant impact." Finally, he had noticed: "[W]henever I tried to make eye contact with her when I was questioning her, she would look away from me. I took that posture, those mannerisms, to be evasive.... I look at everyone to see if they make eye contact with me when I talk with them. I look at their body language to see what I may interpret to be the type of person that is amenable or keeps an open mind to evidence, to questioning, and I did not get that same sense from her as I did from other jurors."

18

Ex. B-2 at 6-8; ART at 144-45, 160-62, 310-11.

After Scheingart presented his arguments, Hove responded and the trial court ruled regarding the third step of the *Batson* analysis.  The California Court of Appeal described the arguments and ruling:

> Most of Hove's comments centered on R.W.H.  Hove said he had paid particular attention to her, believing Scheingart would "bounce her" immediately, and felt that she "comported herself properly" and had "looked him directly in the eye."  The nephew's trial, Hove noted, had not been attended by R.W.H., who got secondhand information from the family and said it would not affect her.  Hove urged that the both-sides answer meant that if [petitioner] did not testify, R.W.H. would not show "confusion" but, rather, be inclined to find guilt, making Scheingart's reliance on that factor "totally disingenuous."

> Hove then invited comparisons with questionnaire answers from some retained jurors.  On agreement with the one-witness rule, Juror No. 8 wrote, "It depends," and Juror No. 1 wrote, "No, the testimony of all witnesses should be used to determine if the testimony is credible."  On friends or family having been charged or convicted, Juror No. 4 listed a brother and two friends, and Juror No. 2 wrote that a friend spent time in jail for multiple DUI's and subsequent failures to appear.

> The court ruled: "As to ... eye contact, I must admit I was not paying attention to that.  I have no idea if there was or was not eye contact.  And as for the alleged gesture that was made, I did not see that.  I was looking down writing copious notes and trying to get through jury selection and pay attention to the ethnicity and gender of each juror so I could take note of it in case there was a *Wheeler* motion.  So I have no idea if that was done.  [¶]  However, it's clear that contact with the criminal justice system is enough to defeat *Wheeler*.  The crimes that the four excluded jurors had familiarity with in terms of their family members were crimes of violence, as [with] this crime, versus nonviolent crimes with some of the other jurors who were left on the jury."  The court cited cases on family exposure to the system (e.g ., *People v. Douglas* (1995) 36 Cal.App.4th 1681) and reiterated: "[C]ontact with the criminal justice [system] is enough to defeat *Wheeler*.  In this case I believe it does.  And the *Wheeler-Batson* motion is denied."

> Scheingart then stated for the record, "in an abundance of caution," that there were three Black jurors left on the jury.  The court, however, said: "It doesn't matter what's left under *Wheeler* "; "Irrelevant."  Hove urged that the remaining jurors were "irrelevant" because the court "kept deferring the hearing on this motion," and the court said, "Which is why I said we didn't have to discuss this."

Ex. B-2 at 9-10; ART at 311-15.

///

///

C.     **Appellate Court Decision**

19

1    Petitioner appealed the trial court's ruling on the *Batson* motion to the California

2  Court of Appeal.  Petitioner argued that the trial court rested its decision solely on the

3  notion that the four excluded jurors had relatives involved with violent crimes, while some of

4  the jurors left on the jury had relatives involved with non-violent crimes.  Petitioner asserted

5  that the trial court was incorrect as some excluded jurors' relatives were involved in non-

6  violent crimes and a retained juror's relative was involved with a violent crime.  The

7  California Court of Appeal upheld the trial court's ruling stating:

8      [Petitioner] does not claim lack of substantial evidence for most of the
   race-neutral factors cited by the prosecutor; nor does he dispute the court's
9      stated reliance on each of the challenged prospective jurors having had family
   members or friends prosecuted for crime.  Rather, [petitioner] parses out the
10     court's statement that family members' crimes were "crimes of violence, as
   [with] this crime, versus nonviolent crimes with some of the other jurors who
11     were left on the jury."  Pointing out that U.S. said her son was arrested in a
   DUI stop and that R.J. said her friends' and family's offenses involved grand
12     theft and drugs, [petitioner] contends that the record does not show that all
   four jurors revealed crimes that were violent and, thus, that the ruling cannot
13     stand.  The court, he proposes, "based its ruling entirely on the characteristic
   that they all had family members associated with crimes that were violent
14     rather than nonviolent," and this "necessarily means that the court found that
   none of the other reasons stated by the prosecutor justified the challenges...."

15     We disagree, first, with the notion that the court relied solely on family's or
16     friends' law enforcement experiences, to the exclusion of all else in the
   record.  We are cited no authority that the court had to state every factor
17     influencing its finding of no purposeful discrimination.  Case law is to the
   contrary.  A court must make a sincere and reasoned effort to evaluate
18     prosecutors' explanations in light of the circumstances then known (*People v.
   Reynoso*, supra, 31 Cal.4th at p. 919), "[b]ut in fulfilling that obligation, the trial
19     court is not required to make specific or detailed comments for the record to
   justify every instance in which a prosecutor's race-neutral reason for
20     exercising a peremptory challenge is being accepted by the court as
   genuine." (*Ibid.*)  Thus, unlike [petitioner], we cannot deem the court's
21     articulation of one factor an implied rejection of every other.  "When the
   prosecutor's stated reasons are both inherently plausible and supported by
22     the record, the trial court need not ... make detailed findings" (*People v. Silva*,
   supra, 25 Cal.4th at p. 386), and that describes our case.  This is not a case
23     where more specificity was needed because "the prosecutor's stated reasons
   are either unsupported by the record, inherently implausible, or both...."
24     (*Ibid.*)

25     Looking to the court's words, we also see no statement that the court rejected
   all other reasons.  It said it had not seen R.J. gesture to [petitioner], but this
26     does not necessarily imply that it disbelieved the prosecutor's account.  The
   court only said, in effect, that it had not been paying attention and therefore
27     could not independently resolve the factual conflict arising between the
   prosecutor and defense counsel, who said he had not noticed anything.  The
28     court went on to state: "So I have no idea if that was done.  [¶]  However, it's

20

clear that contact with the criminal justice system is enough to defeat *Wheeler*." As part of our great deference to a *Batson/Wheeler* ruling we draw appropriate inferences to support a ruling. (E.g., *People v. Reynoso*, supra, 31 Cal.4th at p. 918, fn. 4.) [Petitioiner's] view that the court relied on only one factor, to the exclusion of all others, contravenes that principle by asking us to draw an inference against the ruling. FN4 So does his view that, because the court did not itself see R.J. gesture toward [petitioner], the court "rejected the prosecutor's reason" for that challenge. Rather, and more appropriately, we infer in support of the ruling that the court was otherwise satisfied with the prosecutor's good faith and, having no personal basis for resolving the attorneys' conflicting impressions, accepted the prosecutor's account as made in good faith.

FN4. Deferential review of a *Batson/Wheeler* ruling entails a test for substantial evidence (*People v. Williams*, supra, 16 Cal.4th 635, 666; cf. *People v. Boyette* (2002) 29 Cal.4th 381, 423 [no prima facie case] ), and substantial evidence review entails deference to credibility matters, viewing the record most favorably to the ruling, and presuming in its support all supported implied findings (*In re Manuel G.* (1997) 16 Cal.4th 805, 822; *People v.. Rodriguez* (1999) 20 Cal.4th 1, 11). We cannot ignore supported favorable inferences and rely, instead, on contrary inferences we might find supported. (*People v. Rodriguez*, supra, 20 Cal.4th at p. 11; *In re Manuel G.*, supra, 16 Cal.4th at p. 823.)

We reject also the inflated worth [petitioner] attaches to the court's reliance on the term "crimes of violence." The court initially said only that "contact with the criminal justice system is enough to defeat *Wheeler*," and closed by saying: "[C]ontact with the criminal justice [system] is enough to defeat *Wheeler*. In this case I believe it does." Precedent solidly holds that family's or friends' negative contact with the criminal justice system is a reason which, if not sham or pretextual, justifies a peremptory challenge in the face of a *Batson/Wheeler* claim (*People v. Garceau* (1993) 6 Cal.4th 140, 172 [family members had "run afoul of the law" and been incarcerated]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1282 [brother convicted of a crime possibly prosecuted by another deputy in the same office]; *People v. Walker* (1988) 47 Cal.3d 605, 626 [juror believed police had followed her husband home and harassed him by stopping him without cause]; *People v. Douglas*, supra, 36 Cal.App.4th 1681, 1690 [son convicted for grand theft auto] ), and no case of which we are aware requires that such negative contact must be for crimes of violence. Indeed, a case cited by the trial court involved grand theft auto that apparently entailed no violence. (*Ibid.*)

[Petitioner] stresses, however, this single sentence between the court's opening and closing lines: "The crimes that the four excluded jurors had familiarity with in terms of their family members were crimes of violence, as [with] this crime, versus nonviolent crimes with some of the other jurors who were left on the jury." [Petitioner] would have us infer, against the ruling, that "crimes of violence" were crucial to the court finding good faith by the prosecutor. A supported inference in favor of the ruling, however, is that the court was satisfied, for all four of the challenged women, that family members' negative crime contacts were genuine and enough under the law it cited, and went on to mention crimes of violence only to address defense counsel's invitation to do a comparative juror analysis, counsel having argued that other jurors with similar negative contacts were not challenged. Viewing the record in that favorable light, error in characterizing two of the challenged jurors'

United States District Court

For the Northern District of California

family experiences as "crimes of violence" has little apparent impact on the ruling as a whole.  First, as the trial court was presumably aware, case law deems comparative juror analysis to be, while "not irrelevant," " 'largely beside the point' because of the legitimate subjective concerns that go into selecting a jury.  [Citation.]"  (*People v. Johnson*, supra, 30 Cal.4th at p. 1323.)  Moreover, as [petitioner] concedes, two of the women did have family members who were tried for crimes of violence.  M.B.'s cousin had been convicted of "assault," which was M.B.'s term and, since she declared "no" legal training, most likely not used in any legal sense of mere attempted battery or a "'least touching'"  (*People v. Colantuono* (1994) 7 Cal.4th 206, 214).  The case was prosecuted by someone in this same Alameda County prosecutor's office, and the cousin was still serving time (reinforcing the inference that violence was involved).  R.W.H.'s nephew had been tried for murder, also in Alameda County, and while he had been released just that year without being convicted, had spent two years in jail.  R.W.H. said she had been close to this nephew as he was "growing up" and said she had "distanced" herself from the trial, "because I couldn't deal with it."  Neither the prosecutor nor the trial court was bound to accept at face value a prospective juror's answer (*People v. Boyette*, supra, 29 Cal.4th at p. 422), and the record here raises legitimate doubt about either of these women's claimed ability to serve impartially and without bias despite the relatives' negative experiences.

Any error, then, was the court perceiving crimes of "violence" for the other two women.  U.S. wrote of her son being stopped "randomly & secure" (apparently meaning arrested), called it "'unfair,'" and said police had questioned her "on [an] issue that had no bearing on issue at that time."  From her oral answers, we learn that the incidents were related, for she was questioned about the son.  She explained that the son was "arrested" for DUI after "an accident"; yet inconsistently, "He wasn't stopped"; and "it was proven that he wasn't drunk and was tested" (sic).  We do accept that DUI is not what lawyers think of as intrinsically a "crime of violence," but the court may well have linked the DUI to the "traffic accident" that precipitated the arrest, in which case there clearly was some unspecified physical impact.  Obviously, this arrest of a son, which U.S. deemed unfair and resulted in her being questioned by police in a way that she found offensive, legitimately supports the court's conclusion that her challenge was not purposeful racial discrimination.  Bearing in mind that any error in characterizing the DUI as a "crime of violence" related specifically to a comparative juror analysis, we see no conceivable prejudice.  True, as [petitioner] points out, Alternate Juror No. 1 wrote of his brother having been involved in a DUI as well, but nothing from that juror fueled the strong implication of lingering bias that M.B.'s answers did.  The juror said that a friend of his wife's who had quit the San Francisco Police Department left him with some qualms about certain long-term officers, but that his brother's case had nothing to do with this and that he felt fine about it.  With or without characterizing the crime of U.S.'s son as violent, the record still amply supports race-neutral reasons for challenging U.S. but not the alternate.

R.J. wrote, "Too many to list," to the query about friends or relatives who had been arrested, charged or prosecuted.  She revealed little detail in follow up except to say they were cousins, friends and a stepbrother, and, when asked the crimes' type or range, said: "Grand theft, drugs.  That's about it."  [Petitioner] is correct to say that the record does not show, with certainty, that any of these offenses was a crime of violence, but again we see no conceivable prejudice in that distinction.  The point, for R.J., was not so much the seriousness of the offenses, but that there were so many she could not

United States District Court
For the Northern District of California

list them and, yet, asserted that this would not "impair" her ability to serve fairly.  The prosecutor felt that the two statements were "oxymorons in nature," and that the too-many-to-list reply was unusual and casual, given so many "family members in this county being involved with the law."  It was taken as a sign that she would not be fair.  None of this was significantly altered by any mistaken notion by the court that one or more of the family or friends had committed a "crime of violence ."  The prosecutor, whose good faith and reasons were the paramount concerns, articulated no such distinction or misapprehension.

Also on the subject of violent crimes, [petitioner] correctly observes that Juror No. 3 had a nephew who was convicted of armed robbery, a violent crime, but he mistakenly concludes from this that the court erroneously thought that "none of the selected jurors had family members who were involved in violent crimes."  The court did not, in fact, find that "none" had that involvement; it spoke of "nonviolent crimes with *some* of the other jurors who were left on the jury" (italics added).

[Petitioner] invites comparison of the challenged women with passed jurors, pointing out the alternate's brother's DUI conviction (discussed above), that Juror No. 2 had a friend who spent time in jail for multiple DUI's and related failures to appear, that Juror No. 1 had a friend with a DUI, and that Jurors No. 3, 4, 5 and 6 had largely unspecified friends or family members who had been arrested or convicted of unspecified crimes.  However, none of those mostly vague responses compares with the sheer number of experiences for J.R., the stop and jailing of a son that U.S. deemed random and unfair, the once-close nephew's conviction that R.W.H. had to distance herself from because she "couldn't deal with it," and the assault conviction of M.B.'s cousin, something for which the cousin was still serving time.

Also, the prosecutor articulated multiple race-neutral reasons for three of the women.  [Petitioner] would have us isolate the arrest/conviction factor as the sole basis for ruling, but as already explained, we cannot do that and imply that the court rejected all others.  For U.S., the record supports Scheingart's additional concern that her oral replies were rambling and made little sense, suggesting confusion with legal concepts, a good reason for challenge (*People v. Turner* (1994) 8 Cal.4th at p. 169), and/or concealed bias.  For R.J., there was Scheingart's concern over a gesture made to [petitioner], which the court's could not personally verify due to inattention and defense counsel said he had not noticed; but the court could have believed the account and found this to be an added good reason (*People v. Reynoso*, supra, 31 Cal.4th at p. 917 [smiling or glaring at defendant] ).  If the court entirely disregarded that observation, as [petitioner] urges, the challenge was still solidly justified given the too-many-to-list arrests and convictions.  For R.W.H., there was Scheingart's concern that her never-been-in-that-situation answers regarding various legal concepts legitimately raised suspicion of her inability to understand them, and this remained so even if, for sake of argument, the court was troubled by defense counsel's insistence that M.B. had not, as Scheingart claimed, also avoided eye contact.  The court presumably rejected defense counsel's cynical argument-shamelessly urged again on appeal-that, if M.B. evinced any confusion about the single-witness rule, this would favor the prosecution and was therefore a "disingenuous" ground for challenge.  A prosecutor is entitled to seek jurors capable of understanding the law, regardless of whom any confusion might benefit.

23

United States District Court
For the Northern District of California

1   In short, this was not a close case, for any of the challenges, so that error in
2   the comparative analysis on the issue of whether relatives or friends had
    experienced crimes of "violence" would have been prejudicial.

3   Finally, the court's remarks discounting as "[i]rrelevant" the prosecutor having
    left three Black jurors on the jury are perplexing. "Although not a conclusive
4   factor, 'the passing of certain jurors may be an indication of the prosecutor's
    good faith in exercising his peremptories, and may be an appropriate factor
5   for the trial judge to consider in ruling on a *Wheeler* objection'" (*People v.
    Reynoso*, supra, 31 Cal.4th at p. 926; accord *People v. Turner*, supra, 8
6   Cal.4th 137, 168 [passed jurors considered]; *People v. Gray* (2001) 87
    Cal.App.4th 781, 787 [passed group members a factor] ). [Petitioner] defends
7   the remarks by positing that the passing of jurors is relevant only in finding no
    prima facie case, but this is incorrect. Our Supreme Court has also declared
8   it relevant in reviewing a finding of no purposeful discrimination. (*People v.
    Reynoso*, supra, 31 Cal.4th at p. 926.) The trial court's further remarks
9   deeming the factor inappropriate, because the court had reserved ruling on all
    objections until the end of jury selection, are also perplexing. The court never
10  intimated that it deemed the prosecutor's passing of Black jurors an effort to
    mask purposeful discrimination, and such a finding would be hard to reconcile
11  with its overall finding of no purposeful discrimination. Still, [petitioner]
    correctly observes that the record does not show the gender of the passed
12  Black jurors, and that if they were not women, this arguably did diminish their
    relevance in assessing a claim of improper challenges against Black women.
13  Whatever the court's reasoning, it clearly did not rely on passed jurors, and its
    implied finding of no purposeful discrimination is supported without that
14  additional factor.

15  Substantial evidence supports the ruling.

16  Ex. B-2 at 12-18.

17  In this case, both the trial court and the California Court of Appeal reached the third

18  *Batson* step and discussed the prosecution's reasons for striking these jurors and engaged

19  in a comparative juror analysis. Petitioner does not argue that the state courts used an

20  improper legal standard. Therefore, the California Court of Appeal opinion is entitled to

21  AEDPA deference. *See Johnson v. Finn*, 665 F.3d 1063, 1068-69 (9th Cir. 2011).

22  Petitioner's arguments focus on the discrepancy between what jurors' relatives were the

23  victims of violent or non-violent crimes. The court will discuss that issue along with the

24  prosecution's other race neutral reasons all of which were analyzed on appeal.

25  As noted by the state court and conceded by petitioner, both Melba Biddings and

26  Rose Watts Holman had family members who were arrested for violent crimes. Biddings'

27  cousin was prosecuted for assault and Holman's nephew was prosecuted for murder. Both

28  of these crimes were prosecuted by Alameda County, the same county prosecuting

1    petitioner that employed Scheingart.

2          When asked about friends or family having been arrested, charged or convicted,

3    Rischa Johnson answered too many too list.  ART at 109.  When queried further she stated

4    they were cousins, stepbrother, friends, who had been involved in grand theft or drugs.

5    ART at 110.  Uedico Scatliffe spoke of her son who was in a traffic accident and was

6    arrested for driving under the influence and she had to hire a lawyer.  ART at 105.  She

7    also expressed a negative experience with the police in her son's case who asked her

8    questions not concerning the case.

9          That a potential juror has a relative who has been convicted of a crime and is

10   dissatisfied with how that relative has been treated or another prior negative experience

11   with law enforcement are race-neutral reason for striking a juror. See, e.g. *Cook v.*

12   *LaMarque*, 593 F.3d 810, 820–21 (9th Cir. 2010) (prior negative experiences with law

13   enforcement sufficient race-neutral explanation to withstand *Batson* challenge); *Mitleider v.*

14   *Hall*, 391 F.3d 1039, 1048 (9th Cir. 2004) (brother's conviction for cocaine possession was

15   a facially neutral reason for challenging juror); *United States v. Vaccaro*, 816 F.2d 443, 457

16   (9th Cir. 1987) ("reasonable" to challenge black juror whose brother was in prison for armed

17   robbery), overruled on other grounds by *Huddleston v. United States*, 485 U.S. 681 (1988);

18   *Messiah v. Duncan*, 435 F.3d 186, 201 (2d Cir. 2006) (prosecutor could reasonably have

19   believed that juror who had been prosecuted by his office and who had relatives in prison

20   would be unduly sympathetic to defendant and hostile to the prosecutor); *United States v.*

21   *Crawford*, 413 F.3d 873, 875 (8th Cir. 2005) ("There is no *Batson* violation when a juror is

22   dismissed because the juror's relatives have been prosecuted or convicted of a crime.").

23   Regardless if the crimes were violent or non-violent, the prosecution was well within its right

24   to excuse these jurors.  To the extent that the trial court erred in describing what jurors had

25   family members who committed violent crimes, any such error alone is insufficient to

26   provide habeas relief.

27          Nor is there merit to petitioner's argument that the prosecution was motivated by

28   race or gender as other retained jurors had family or friends who had been arrested or

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

convicted of a crime.  Alternate juror number one, a male, wrote of his brother who was involved with a driving under the influence charge, but stated it would not affect his impartiality, yet none of his other answers raised the possibility of bias as with the excused jurors.  CT at 395.  Similarly, juror number two, also a male, wrote of a friend who spent time in jail for driving under the influence, but this juror also stated it would not hinder his ability to serve on a jury nor were his other answers problematic.  CT at 230.  Juror number three, also a male, had a nephew who was convicted for armed robbery.  ART at 274.  Yet, his answers on the questionnaire and during an extensive voir dire did not reflect any bias as with the other jurors .  ART at 273-81; CT at 235-49.  Most importantly, juror number three's nephew was prosecuted in Sacramento, not by the office that was prosecuting petitioner and had prosecuted the relatives of the other excused jurors.  ART at 274.

Moreover, the prosecution provided other race-neutral reasons for striking Scatliffe, Johnson and Holman, independent of their relatives involved in the criminal justice system. With respect to Scatliffe, the prosecution noted that her answer regarding the fairness of the criminal justice system was rambling, made no sense and lacked any logic.  ART at 103-104, 307.  The prosecution felt she was not forthcoming and was concealing a strong bias.  ART at 307-08.  In addition, she expressed qualms about the notion that the testimony of just one witness is sufficient to prove a fact.  ART at 307.

The prosecution felt that Johnson's statement that too many of her friends and relatives had been arrested to list, but she could be impartial was highly unusual, demonstrated the inability to be a fair and impartial juror and the statements were "oxymorons in nature."  ART at 308.  As discussed above, there was also the allegation from the prosecution that Johnson waved or made a gesture to petitioner.

With respect to Holman, the prosecution was concerned with other answers she provided.  In the questionnaire she stated she did not know how to answer questions concerning the effectiveness of the criminal justice system, the presumption of innocence, that the jury should not consider punishment or penalty in determining whether a case had been proved.  CT at 1617-18.  She also stated that the defendant must present evidence

United States District Court
For the Northern District of California

and testify so both sides could be heard.  CT at 1618-19.  Based on all of these answers the prosecution felt that she would have difficulty with legal concepts.

Petitioner's primary argument that the trial court misstated which jurors had family members who committed violent crimes fails to set forth a claim for habeas relief.  After reviewing the record and the extensive analysis of the state courts it is evident that the prosecution's reasons for striking these four jurors was not pretextual.  In addition to the reasons due to relatives involved with the criminal justice system the prosecution proffered many additional race-neutral reasons for excusing these jurors nor is there any evidence of discrimination after looking to the other jurors who remained.  Petitioner has failed to demonstrate any unreasonable application of established Supreme Court authority and this claim is denied.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.  The clerk shall close the file.

## Certificate of Appealability

To obtain a COA, petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a COA to indicate which issues satisfy the COA standard.  Here, the court finds that only one issue presented by petitioner in his petition meets the above standard and accordingly GRANTS the COA as to that issue.  *See generally Miller-El v. Cockrell*, 537 U.S. at 322.

That issue is:

(1) were the prosecution's peremptory strikes against four African American female jurors discriminatory under *Batson v. Kentucky*, 476 U.S. 79 (1986).

Accordingly, the clerk shall forward the file, including a copy of this order, to the

1   Court of Appeals.  *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270

2   (9th Cir. 1997).

3   **IT IS SO ORDERED.**

4   Dated: November 19, 2012   _____

5                                        PHYLLIS J. HAMILTON
                                         United States District Judge

9   G:\PRO-SE\PJH\HC.08\Warren0754.rul.wpd